| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA | PRIORITY SEND<br>JS-6 |

CIVIL MINUTES -- GENERAL

| | |
|---|---|
| Case No.   **CV 07-2866-JFW (JTLx)** | Date:  March 22, 2012 |

Title:      Marei von Saher *-v-* Norton Simon Museum of Art at Pasadena, et al.

**PRESENT:**

   HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Shannon Reilly<br>Courtroom Deputy | None Present<br>Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFFS:<br>None | ATTORNEYS PRESENT FOR DEFENDANTS:<br>None |
|---|---|

PROCEEDINGS (IN CHAMBERS):    ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED [filed 12/27/2011; Docket No. 76]

On December 27, 2011, Defendants Norton Simon Museum of Art at Pasadena and The Norton Simon Art Foundation (collectively "Defendants" or "Norton Simon") filed a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim Upon Which Relief Can Be Granted.  On February 10, 2012, Plaintiff Marei von Saher ("Plaintiff") filed her Opposition.  On March 7, 2012, Defendants filed a Reply.[1]  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that this matter is appropriate for decision without oral argument.  The hearing calendared for March 26, 2012 is hereby vacated and the matter taken off calendar.  After considering the moving, opposing, and reply papers and the arguments therein, the Court rules as follows:

---

[1]On March 19, 2012, Plaintiff filed Objections to Certain Portions of Defendants' Reply Brief.  On March 20, 2012, Defendants filed their Response to and Motion to Strike Plaintiff's Improper Sur-Reply.  On March 20, 2012, Plaintiff filed an Opposition to Defendants' Motion to Strike Plaintiff's Objections to Certain Portions of Defendants' Reply Brief.  The Court agrees with Defendants that Plaintiff's "Objections to Certain Portions of Defendants' Reply Brief" is plainly a sur-reply, which is flatly prohibited by the Local Rules.  *See* Local Rule 7-10 ("Absent prior written order of the Court, the opposing party shall not file a response to the reply.").  Accordingly, Defendants' Motion to Strike Plaintiff's Improper Sur-Reply is **GRANTED.**

I.   **FACTUAL AND PROCEDURAL BACKGROUND**[2]

Plaintiff seeks to recover the diptych entitled "Adam and Eve," a pair of sixteenth century oil paintings on wood panels by Lucas Cranach the Elder (the "Cranachs"), which were taken by the Nazis during World War II from Plaintiff's father-in-law, Jacques Goudstikker, in a forced sale. The Cranachs were acquired by Norton Simon from George Stroganoff-Scherbatoff in 1970-71 and have been continuously on display at the Norton Simon Museum of Art at Pasadena since 1979.

   A.   **The Paintings and Their History**

In 1931, the Soviet government held an art auction in Berlin titled the "Stroganoff Collection," which featured artworks formerly in the collection of the Stroganoff family as well as other artworks. The Cranachs were among the auctioned works. According to Plaintiff, the Cranachs were not part of the Stroganoff family's collection, but instead came from the Church of the Holy Trinity in Kiev, Ukraine. Jacques Goudstikker ("Goudstikker"), a prominent Dutch art dealer and Plaintiff's predecessor-in-interest, purchased the Cranachs at the 1931 art auction.

Nazi Germany invaded The Netherlands in May 1940, and Goudstikker fled with his wife and son, Desi and Edo, to South America by ship. Although Goudstikker was forced to leave his art gallery and collection behind, Goudstikker brought with him a black notebook (the "Blackbook") which listed over 1,000 artworks he had left in The Netherlands, including the Cranachs. Goudstikker unfortunately died in a ship-board accident.

After the Goudstikkers escaped, the Nazis looted Goudstikker's gallery. Herman Göring, Reischsmarschall of the Third Reich, and his cohort, Aloïs Miedl, forcibly purchased the Goudstikker assets in two transactions at a fraction of their value. Miedl took Goudstikker's real property, the art dealership itself, and personal property, whereas Göring took most of the dealership's inventory of art, including the Cranachs.

In May 1945, the Allied Forces discovered and took possession of Göring's collection of artworks, and sent them to the Munich Central Collection Point, where the works from the Goudstikker collection were identified, including the Cranachs. On July 29, 1945, at the Potsdam Conference, President Truman formally adopted a policy of "external restitution," which governed looted artwork found within the United States' zone of occupation. Under this policy, the United States determined that looted art should be returned to the countries of origin, not to individual owners, allowing the newly liberated governments to restitute the art to individual owners. Pursuant to this policy of external restitution, in or about 1946, the Allied Forces formally returned

---

[2] The Court accepts the factual allegations in Plaintiff's First Amended Complaint as true, and construes them in the light most favorable to Plaintiff. Although the factual and procedural history of this action is very interesting, the Court has elected to provide a succinct statement of the relevant facts necessary to its ruling on this motion. The factual and procedural history has been exhaustively set forth in Plaintiff's First Amended Complaint, in the Ninth Circuit's opinion in *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (2010), the parties' briefs filed in the Ninth Circuit and the Supreme Court, and the Solicitor General's brief filed at the invitation of the Supreme Court.

the Goudstikker artworks, including the Cranachs, to The Netherlands.

### B.     The Dutch Restitution Proceedings

In 1946, Desi Goudstikker returned to The Netherlands and commenced restitution proceedings in order to recover her family's property.  Dutch restitution law required claimants who had received money from the Nazis in forced sales to return that money as a condition of recovering their property.  Claimants were given until July 1951 to file restitution petitions.

Ms. Goudstikker filed a timely restitution petition seeking return of the real estate and other property taken by Miedl.  Ms. Goudstikker ultimately settled her claims and entered into a written settlement agreement with the Dutch authorities in 1952.  The settlement did not include any of her claims related to the works taken as a result of the Göring transaction, such as the Cranachs.  For a variety of reasons but primarily because she believed the restitution proceedings were unfair, Ms. Goudstikker decided not to file a claim for the works taken in the Göring transaction, and allowed the Dutch restitution filing deadline to lapse.

In May 1961, one of the Stroganoff heirs, former Prince and U.S. Naval Commander George Stroganoff-Scherbatoff, filed a claim with the Dutch government for the return of the Cranachs and other paintings, claiming that they belonged to his family.  In 1966, the Dutch government settled his claim by exchanging the Cranachs and a third painting for a monetary payment.  Norton Simon purchased the Cranachs from Stroganoff in 1970-1971.

In 1996, Ms. Goudstikker and her son Edo both died, leaving Plaintiff as the sole Goudstikker heir.  On January 9, 1998, Plaintiff filed a new restitution claim with the Dutch State Secretary of Education, Culture, and Science ("Dutch State Secretary") demanding return of "the Goudstikker Collection" and all proceeds received by the Dutch government from the sale of any of the works taken by Göring.[3]  According to Plaintiff, at that time, she was not aware that the Dutch government no longer had possession of the Cranachs.  The Dutch State Secretary rejected Plaintiff's claim, concluding it was time-barred.  Plaintiff appealed the Dutch State Secretary's decision to the Court of Appeals of The Hague and asserted original claims seeking restitution and challenging the Goudstikker restitution proceedings under international law.  The Hague Court rejected her claims, emphasizing that "nearly 50 years have now elapsed since the last moment that an application for the restoration of rights could be submitted, and that Ms. Goudstikker had made a "conscious and well considered decision to refrain from asking for restoration of rights with respect to the Göring transaction".

In 2001-2002, the Dutch government made a policy decision to "depart from a purely legal approach of the restitution of 'war art'" in favor of a "more moral" approach, and established a new Restitution Committee to hear certain Holocaust art claims.  In April 2004, Plaintiff filed a renewed claim seeking "the goods that the State of the Netherlands has in its custodianship and that were part of the Goudstikker Collection."  "[B]ased more on policy than strict legality," the Restitution Committee decided that Plaintiff's claim for the works taken by Göring was "still admissible" and

---

[3] Sometime in the 1950s, the Dutch government auctioned at least 63 of the Goudstikker paintings taken by Göring.

recommended the return of those works that were still in the Dutch government's possession. On February 6, 2006, the Dutch State Secretary adopted the Restitution Committee's recommendations regarding the return of the art works, but rejected the majority of the Restitution Committee's reasons for its recommendations. In particular, the Dutch State Secretary found that "this case is not included in the current restitution policy" and that it has already been "settled." Nevertheless, based on "the facts and circumstances surrounding the involuntary loss of property and the manner in which the matter was dealt with in the early Fifties," the Dutch State Secretary agreed to return the works still in The Netherlands' possession that had been taken by Göring, without requiring Plaintiff to relinquish any of the money paid by Göring in the forced sale. However, the Dutch State Secretary decided not to compensate Plaintiff for works that had been previously auctioned by the Dutch government.

    **C.**    **History of this Litigation**

On May 1, 2007, Plaintiff filed a Complaint against Defendants to recover the Cranachs, relying on the provisions of California Code of Civil Procedure § 354.3, which extended the statute of limitations for the recovery of Holocaust-era art until 2010. In a written decision, this Court held that California Code of Civil Procedure § 354.3 was "facially unconstitutional" under the foreign affairs doctrine, and that Plaintiff's claims were otherwise time-barred. In a published opinion, *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010), the Ninth Circuit affirmed the Court's decision that § 354.3 was preempted by the foreign affairs doctrine. However, the Ninth Circuit remanded the action to allow Plaintiff an opportunity to amend her Complaint "to allege the lack of reasonable notice to establish diligence" under California Code of Civil Procedure § 338, California's general three-year statute of limitations for the recovery of stolen property.

The California legislature responded to the *Von Saher* opinion, and on February 25, 2010, six weeks after the Ninth Circuit issued its opinion, the Committee on Judiciary introduced Assembly Bill 2765 ("AB 2765"),[4] which amended California Code of Civil Procedure § 338 with respect to art claims against museums. As enacted, the bill retroactively amended § 338 and (1) extended the statute of limitations for specific recovery of a work of fine art from three to six years if the action is brought against a museum, gallery, auctioneer or dealer; and (2) clarified that such claims do not accrue until "actual discovery" rather than "constructive discovery" of both the identity and whereabouts of the work and information supporting a claim of ownership.

On November 8, 2011, Plaintiff filed a First Amended Complaint seeking to recover the Cranachs from Defendants and alleging the following state-law claims for relief: (1) Replevin; (2) Conversion; (3) Damages under California Penal Code § 496; (4) Quiet title; and (5) Declaratory relief. Plaintiff relies on the amended statute of limitations provisions in California Code of Civil Procedure § 338 and alleges that she did not actually discover that the Cranachs were on display at the Norton Simon Museum of Art at Pasadena until October 25, 2000.

---

    [4]Although the bill was sponsored by the Committee on Judiciary, the "idea" for the bill came from Randol Schoenberg, whose law firm represents Plaintiff in this action. *See* Appendix at Exhibit 38 at 549.

## II. LEGAL STANDARD

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Summit Technology, Inc. v. High-Line Medical Instruments Co., Inc.*, 922 F. Supp. 299, 304 (C.D. Cal. 1996) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *See, e.g., Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). "However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations." *Summit Technology*, 922 F. Supp. at 304 (citing *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981) *cert. denied*, 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990) (citations omitted). However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment. *See, e.g., id.; Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994). Where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *See Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996).

## III. DISCUSSION

Defendants argue in relevant part that Plaintiff's claims are preempted under the foreign affairs doctrine. "The Supreme Court has characterized the power to deal with foreign affairs as a primarily, if not exclusively, federal power." *Von Saher v. Norton Somon Museum of Art at Pasadean*, 592 F.3d 954, 960 (9th Cir. 2010). Indeed, "the Constitution allocates the power over foreign affairs to the federal government exclusively, and the power to make and resolve war, including the authority to resolve war claims, is central to the foreign affairs power in the constitutional design. In the absence of some specific action that constitutes authorization on the part of the federal government, states are prohibited from exercising foreign affairs powers, including modifying the federal government's resolution of war-related disputes." *Deutsch v. Turner Corp.*, 324 F.3d 692, 714-15 (9th Cir. 2003).

There are two different theories which courts rely upon to declare state laws unconstitutional or preempted under this "foreign affairs doctrine":  (1) conflict preemption; or (2) field preemption.

As the Supreme Court has explained:

> If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine, whether the National Government had acted and, if it had, without reference to the degree of any conflict, the principle having been established that the Constitution entrusts foreign policy exclusively to the National Government. Where, however, a State has acted within . . . its "traditional competence," but in a way that affects foreign relations, it might make good sense to require a conflict, of a clarity or substantiality that would vary with the strength or the traditional importance of the state concern asserted.

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 n.11 (2003) (internal citations omitted).

Here, Defendants argue that Plaintiff's state-law claims are preempted under the foreign affairs doctrine because the remedies sought by Plaintiff conflict directly with express federal policy.[5] Conflict preemption occurs where state law conflicts with a federal foreign policy, and the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of that federal policy. *Von Saher*, 592 F.3d at 961 (quotations and citations omitted). In this case, as the Ninth Circuit acknowledged, after World War II, the United States adopted a policy of external restitution. Under that policy, "the U.S. restituted looted art to countries, not individuals. The newly liberated governments were responsible for restituting the art to the individual owners. Once the art was returned to the country of origin, the U.S. played no further role." *Von Saher*, 592 F.3d at 962. The Ninth Circuit also recognized the State Department's reasons for choosing this policy of external restitution:

> First, in view of the complexities of the sham transactions through which the Nazis seized many of the artworks, the State Department felt it best to allow the individual countries to handle restitution in whatever way they see fit. Second, the State Department observed, in some cases, it might "be impossible to locate the original owners or their heirs and the governments involved will have to decide what should be done with the property or proceeds therefrom." Finally, the State Department recognized that the liberated countries themselves had a stake in the restitution of art owned by their citizens. . . .

*Id.* (internal citations omitted).

The Ninth Circuit concluded however that the United States' external restitution policy ended in 1948 because "[a]fter September 15, 1948, the U.S. authorities refused to accept any more claims for external restitution." *Id.* at 963. The Ninth Circuit noted: "[H]ad [California Code of Civil Procedure § 354.3] been enacted immediately following WWII, it undoubtedly would have conflicted with the Executive Branch's policy of external restitution. The statute does not, however,

---

[5]Defendants apparently concede that California has acted within its traditional competence in amending California Code of Civil Procedure 338.

conflict with any current foreign policy espoused by the Executive Branch." *Id.* Accordingly, the Ninth Circuit concluded that conflict preemption was inapplicable and instead concluded that § 354.3 was preempted under a theory of field preemption.

Although the Ninth Circuit rejected the application of conflict preemption to § 354.3, Defendants argue that this Court is not bound by the Ninth Circuit's determination and that this Court can and should conclude that conflict preemption bars Plaintiff's state-law claims. The Court agrees. Under the law of the case doctrine, this Court may only depart from a decision of the Ninth Circuit in very limited circumstances, which include: "(1) the first decision was clearly erroneous; (2) an intervening change in law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).

The Court, recognizing its obligation to follow the law of the case except in very limited circumstances, concludes that the evidence on remand is significantly different than on appeal and that it is permissible and appropriate to depart from the Ninth Circuit's determination that conflict preemption is inapplicable. The Ninth Circuit and this Court did not have the benefit of the United States' view of its foreign policy, as expressed in the Solicitor General's brief filed in the Supreme Court in connection with Plaintiff's petition for writ of certiorari. Importantly, the Solicitor General's brief was signed by Harold Koh, the Legal Advisor to the Department of State, on the agency's behalf. In his brief, the Solicitor General succinctly stated and clarified the United States' foreign policy as it specifically relates to Plaintiff's claims in this litigation:

> The court of appeals erred in dismissing the external restitution policy as irrelevant to this case because it "ended" on September 15, 1948 – the deadline set by the United States for filing restitution claims. The United States established a deadline to ensure prompt submission of claims and achieve finality in the wartime restitution process. The United States has a continuing interest in that finality when appropriate actions have taken by a foreign government concerning the internal restitution of art that was externally restituted to it by the United States following World War II.

*See* Appendix at Exhibit 37 at 500 (internal citations omitted). Moreover, the Solicitor General focused on and emphasized the importance of the United States' policy of respecting the finality and outcome of The Netherlands' restitution proceedings:

> When a foreign nation, like the Netherlands here, has conducted bona fide post-war internal restitution proceedings following the return of Nazi-confiscated art to that nation under the external restitution policy, the United States has a substantial interest in respecting the outcome of that nation's proceedings.

 *Id.* at 502.

Plaintiff disputes that the Solicitor General has accurately expressed United States foreign policy, and asks the Court to supplant the Solicitor General's statement of current United States foreign policy with her own. Specifically, she argues that the Solicitor General has grossly misstated and misinterpreted The Washington Conference Principles on Nazi-Confiscated Art ("Washington Principles") and the Terezin Declaration on Holocaust Era Assets and Related

Issues ("Terezin Declaration"), and contends that the Solicitor General is wrong to imply that litigation to retrieve Nazi-looted art is precluded.

The Washington Principles are an important, non-binding set of norms signed by participating nations including the United States and The Netherlands, which resulted from the Washington Conference on Holocaust Era Art Assets hosted by the United States in 1998. Appendix at Exhibit 34. The Washington Principles were based on the moral principle that art and cultural property confiscated by the Nazis and not subsequently restituted should be returned to Holocaust victims or their heirs, while also recognizing that "among participating nations there are differing legal systems and that countries act within the context of their own laws." *Id.* at Exhibit 34, 35. The principles encouraged participating nations to take steps "expeditiously to achieve a just and fair resolution, recognizing this may vary according to the facts and circumstances surrounding a specific case," *Id.* at Exhibit 34.

In June 2009, many signatories to the Washington Principles participated in the Prague Holocaust Era Assets Conference which produced the Terezin Declaration. *See* Appendix at Exhibit 35. The Terezin Declaration promulgated a substantially similar set of non-binding principles, and "urge[d] all stakeholders to ensure that their legal systems or alternative processes, while taking into account the different legal traditions, facilitate just and fair solutions with regard to Nazi-confiscated and looted art, and to make certain that claims to recover such art are resolved expeditiously and based on the facts and merits of the claims and all the relevant documents submitted by the parties." *Id.*

After carefully considering the norms and principles established by the Washington Principles and Tezerin Declaration, the Solicitor General concluded that contemporary United States policy "does not support relitigation of all art claims in U.S. courts," but rather "supports the fair and just resolution of claims involving Nazi-confiscated art, while also respecting the bona fide internal restitution proceedings of foreign governments."[6] Appendix at Exhibit 37 at 489, 501. After a thorough review of the Washington Principles, Terezin Declaration, and other relevant statements of United States foreign policy, the Court concludes that the Solicitor General's statement of United States policy is entirely complementary and does not in any manner whatsoever contradict the Washington Principles or the Terezin Declaration. Even if it were appropriate to do so, the Court finds no compelling reason to second-guess the Executive Branch's statement and interpretation of its own foreign policy. *See e.g., Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1188 n.18 ("The Court notes that it must take these statements [of the State Department] at face value."); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 ("[T]here is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy.").

---

[6]Plaintiff claims that "[a]fter arguing that the post-War external restitution policy rendered § 354.3, a statute that specifically targeted Holocaust claims, unconstitutional," the Solicitor General "made clear that [Plaintiff's] common law claims may now proceed to be determined on the merits" under the generally applicable statute of limitations for stolen property claims. Opposition at p. 1. The Solicitor General took no such position. He merely stated that Supreme Court review would be premature because the Ninth Circuit's preemption holding may not be dispositive.

The Court concludes that the United States' policy of external restitution and respect for the outcome and finality of The Netherlands' bona fide restitution proceedings, as clearly expressed and explained by the Solicitor General in his amicus curiae brief, directly conflicts with the relief sought in Plaintiff's action. "Conflict is imminent when two separate remedies are brought to bear on the same activity." *Crosby v. Nat'l Foreign Trade Counsil*, 530 U.S. 363, 380 (2000) (quotations and citations omitted). In this case, the United States made a decision and chose its favored remedy for the restitution of Nazi-looted art, i.e. a country of origin's bona fide restitution proceedings. This external restitution policy has not changed since it was first adopted by the United States after World War II. However, Plaintiff's action seeks to trump and interfere with United States foreign policy, by relying on an entirely different remedy for the restitution of Nazi-looted art, i.e. the laws of the State of California. Although the United States and California both share a goal of returning Nazi-looted art to its rightful owners, "[t]he fact of a common end hardly neutralizes conflicting means." *Crosby*, 530 U.S. at 379. Moreover, if the Court were to allow Plaintiff's claims to proceed, the Court undoubtedly would be forced to review the restitution decisions made by the Dutch government and courts, including for example whether Plaintiff's claims had in fact been "settled." *See Von Saher*, 592 F.3d at 967 ("In order to determine whether the Museum has good title to the Cranachs, a California court would necessarily have to review the restitution decisions made by the Dutch government and courts."). Such a determination by the Court would seriously undermine the federal government's policy of respecting the finality and outcome of the Dutch government's restitution proceedings and would potentially implicate the act of state doctrine. Allowing Plaintiff's action to proceed would have "more than incidental effect in conflict with express foreign policy of the National Government." *See Garamendi*, 59 U.S. at 420. Accordingly, the Court concludes that Plaintiff's state-law claims are preempted.

To the extent Plaintiff argues that the foreign affairs doctrine cannot preempt claims which arise under a state's generally applicable law, the Court disagrees. *See, e.g., In re Assicurazioni Generali S.P.A. Holocaust Ins. Litig.*, 340 F. Supp. 2d 494, 501 (S.D.N.Y. 2004) (concluding that the Supreme Court's decision in *Garamendi* "requires dismissal . . . of the benefits claims arising under generally applicable state statutes and common law" because "[l]itigation of Holocaust-era insurance claims, no matter the particular source of law under which the claims arise, necessarily conflicts with the executive policy favoring voluntary resolution of such claims . . . ."). "It is a black-letter principle of preemption law that generally applicable state laws may conflict with and frustrate the purposes of a federal scheme just as much as a targeted state law." *Saleh v. Titan Corp.*, 580 F.3d 1, 13 n.8 (D.C. Cir. 2009). In this case, California's generally applicable laws must yield to the United States' conflicting foreign policy.

It is again with great reluctance that the Court concludes that Plaintiff's claims are preempted by the foreign affairs doctrine, realizing the effect that this decision may have on victims of the holocaust and their descendants. As the Court stated in its previous order, there are no words which can adequately describe the atrocities suffered by the victims of the Holocaust, which continue to have an effect on those victims and their descendants today.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim Upon Which Relief Can Be Granted is **GRANTED.** Plaintiff's First Amended Complaint is **DISMISSED with prejudice**.

IT IS SO ORDERED.