RONALD L. OLSON (State Bar No. 44597)
ron.olson@mto.com
LUIS LI (State Bar No. 156081)
luis.li@mto.com
FRED A. ROWLEY, JR. (State Bar No. 192298)
fred.rowley@mto.com
E. MARTÍN ESTRADA (SBN 223802)
martin.estrada@mto.com
ERIC P. TUTTLE (State Bar No. 248440)
eric.tuttle@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Ángeles, California 90071-1560
Telephone:   (213) 683--9100
Facsimile:    (213) 687-3702

Attorneys for Defendants
NORTON SIMON MUSEUM OF ART
AT PASADENA and NORTON SIMON
ART FOUNDATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| MAREI VON SAHER,<br><br>                 Plaintiff,<br><br>          vs.<br><br>NORTON SIMON MUSEUM OF ART<br>AT PASADENA, et al.,<br><br>                 Defendants. | Case No. 07-2866 JFW (SSx)<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:            August 1, 2016<br>Time:            1:30 p.m.<br>Courtroom:    16<br><br>Pre-Trial Conf.:  September 2, 2016<br>Trial:            September 20, 2016<br><br>Judge:         Hon. John F. Walter |

1  **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2      TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3      PLEASE TAKE NOTICE that Defendants Norton Simon Museum of Art at

4  Pasadena and Norton Simon Art Foundation (the "Norton Simon"), pursuant to

5  Federal Rule of Civil Procedure 56(a), hereby move for Summary Judgment on all

6  claims identified in Plaintiff's First Amended Complaint.  Pursuant to this Court's

7  orders, oral argument on this motion is scheduled for August 1, 2016, at 1:30 p.m.

8  This motion is based on this Notice of Motion and Motion, the Memorandum of

9  Points and Authorities that follows, the Separate Statement of Undisputed Facts and

10 Conclusions of Law, the declarations and exhibits that have been submitted in

11 support of this motion, the Notice of Intent to Rely on Foreign Law, the pleadings

12 and papers on file herein, any reply memorandum that may be filed, and any further

13 evidence and argument as may be presented to the Court prior to or at the hearing on

14 this motion, or subsequent thereto as permitted by the Court.

15     This motion is made following the conference of counsel pursuant to L.R. 7-3

16 which took place on May 27, 2016.

17

18 DATED:  June 13, 2016          MUNGER, TOLLES & OLSON LLP
19                                  RONALD L. OLSON
                                    LUIS LI
20                                  FRED A. ROWLEY, JR.
                                    E. MARTIN ESTRADA
21                                  ERIC P. TUTTLE

22

23

24                             By: */s/ Luis Li*
25                                 LUIS LI
                                   Attorneys for Defendants
26

27

28

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................... 1

II.    FACTUAL BACKGROUND .................................................................. 4

    A.    Jacques Goudstikker Purchases the Cranachs at a Controversial Soviet Auction................................................................... 4

    B.    The Cranachs Are Sold to Hermann Göring During World War II in a Voidable Transaction and Are Restituted to the Netherlands.......... 6

    C.    The Dutch Government Enacts a Comprehensive Legal Framework for Restitution and Reparations .......................................... 8

    D.    The Goudstikker Firm Makes a Deliberate and Strategic Decision Not To Seek Restitution of the Artwork Sold to Göring ....... 11

        1.    The Goudstikker Firm Assembles an Elite Team of Restitution Experts and Advisers ................................................ 11

        2.    The Goudstikker Firm Forms a Strategy to Seek Restitution for the Miedl Transaction, While Keeping the Purchase Price from the Göring Transaction............................. 12

        3.    The Goudstikker Firm Successfully Pursues Its Strategy, Waiving and Abandoning Its Rights in the Göring Artwork ........................................................................... 14

    E.    The Dutch State Assumes Ownership of the Paintings ....................... 19

    F.    George Stroganoff Acquires the Cranachs ......................................... 20

    G.    The Norton Simon Acquires the Cranachs ........................................ 22

    H.    Plaintiff Seeks Restitution of the Cranachs and Other Artwork from the Dutch Government ............................................................ 22

III.    LEGAL STANDARD ........................................................................... 26

    A.    Summary Judgment.............................................................................. 26

    B.    Questions of Foreign Law.................................................................... 26

    C.    Questions of Contract Interpretation.................................................. 26

    D.    Conflict of Law .................................................................................. 27

# TABLE OF CONTENTS
## (continued)

**Page**

IV.   ARGUMENT ................................................................................................28

    A.   The Dutch State Acquired Ownership or a Power to Transfer the Cranachs after World War II...................................................................29

        1.   The Dutch State Acquired Ownership Under E133 and E100.............................................................................................29

        2.   E100 Gave The Dutch State the Power to Dispose ...................34

        3.   The Dutch State Had Title or the Power to Dispose of the Cranachs Under International Law..............................................36

        4.   The Dutch State Acquired Title Because the Goudstikker Firm Waived, Abandoned, and Settled Its Claims ....................38

            (a)   The Goudstikker Firm Abandoned Its Rights in the Göring Works by Its Conduct in 1949 – 1951 .................38

            (b)   The Goudstikker Firm Waived Its Rights in the 1952 Settlement Agreement ..............................................40

    B.   Plaintiff's Claims are Barred by the Act of State Doctrine .................43

    C.   Plaintiff's Claims Are Preempted by Federal Restitution Policy.........50

    D.   Plaintiff Cannot Prove Ownership Based on Soviet Theft ..................53

    E.   The Passage of Time Bars Plaintiff's Claims ...................................54

        1.   The Statute of Limitations Bars Plaintiff's Damages Claims .........................................................................................54

        2.   Laches Bars Plaintiff's Claims For Specific Return .................56

    F.   The Norton Simon Acquired Ownership of the Cranachs by Adverse Possession .......................................................................58

        1.   California's Adverse Possession Statute Applies......................58

         2.   The Norton Simon's Title By Adverse Possession Vested Before the Legislature Amended the Statute of Limitations......59

         3.   Retroactive Extension of the Statute of Limitations to Defeat the Norton Simon's Title Would be Unconstitutional...........................................................................60

V.   CONCLUSION ..........................................................................................60

07-2866 JFW(SSx)

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*389 Orange St. Partners v. Arnold*,
   179 F.3d 656 (9th Cir. 1999) ...................................................................27

*Adler v. Taylor*, No. CV-04-8472-RGK(FMOX), 2005 WL 4658511
   (C.D. Cal. Feb. 2, 2005) .......................................................................28

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
   425 U.S. 682 (1976) .............................................................................49

*Am. Int'l Grp., Inc. v. Am. Int'l Bank*,
   926 F.2d 829 (9th Cir. 1991) ...............................................................56

*Bakalar v. Vavra*,
   819 F. Supp. 2d 293 (S.D.N.Y. 2011) ..........................................59, 60

*Campbell v. Holt*,
   115 U.S. 620 (1885) .......................................................................59, 60

*Cassirer v. Thyssen-Bornemisza Collection Found.*,
   737 F.3d 613 (9th Cir. 2013) ...............................................................60

*Cassirer v. Thyssen-Bornemisza Collection Found.*, No. CV 05-3459-
   JFW (Ex), 2015 WL 9464458
   (C.D. Cal. June 4, 2015) .......................................................26, 27, 28

*Clayco Petrol. Corp. v. Occidental Petrol. Corp.*,
   712 F.2d 404 (9th Cir. 1983) ..........................................45, 46, 47, 48

*CRS Recovery, Inc. v. Laxton*,
   600 F.3d 1138 (9th Cir. 2010) ......................................................28, 38

*DM Residential Fund II v. First Tenn. Bank Nat'l Ass'n*,
   813 F.3d 876 (9th Cir. 2015) ...............................................................38

*F.B.T. Prods., LLC v. Aftermath Records*,
   827 F. Supp. 2d 1092 (C.D. Cal. 2011) ..............................................26

*In re Grand Jury Proceedings*,
   40 F.3d 959 (9th Cir. 1994) .................................................................26

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3
4
*Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*,
  1999 WL 673347 (S.D.N.Y. Aug. 30, 1999) ....................................56

5
6
*Int'l Ass'n of Machinists and Aerospace Workers v. OPEC*,
  649 F.2d 1354 (9th Cir. 1981) ........................................45, 50

7
8
*McKesson HBOC, Inc. v. Islamic Republic of Iran*,
  271 F.3d 1101 (D.C. Cir. 2001)........................................26

9
*Mendler v. Winterland Prod., Ltd.*,
  207 F.3d 1119 (9th Cir. 2000) ...........................................26

10
11
*Orkin v. Taylor*,
  487 F.3d 734 (9th Cir. 2007) ............................................55

12
13
*In re Philippine Nat'l Bank*,
  397 F.3d 768 (9th Cir. 2005) ............................................48

14
15
*Ricaud v. Am. Metal Co.*,
  246 U.S. 304 (1918) .................................................passim

16
17
*Shiotani v. Walters*,
  2012 WL 6621279 (S.D.N.Y. Dec. 3, 2012)........................56

18
19
*Summers v. Teichert & Son, Inc.*,
  127 F.3d 1150 (9th Cir. 1997)..........................................26

20
*Tchacosh Co. v. Rockwell Int'l Corp.*,
  766 F.2d 1333 (9th Cir. 1985)......................................45, 47

21
22
*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
  2011 WL 1753738 (N.D. Cal. May 9, 2011) .......................49

23
24
*Trishan Air, Inc. v. Fed. Ins. Co.*,
  635 F.3d 422 (9th Cir. 2011) ............................................58

25
26
*Underhill v. Hernandez*,
  168 U.S. 250 (1897) ...............................................43, 45

27
28
*United States v. BCCI Holdings (Luxembourg), S.A.*,
  977 F. Supp. 1 (D.D.C. 1997).........................................26

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003) .................................................................. 52

4

5

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  592 F.3d 954 (9th Cir. 2010) ................................................. 50, 54, 55

6

7

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  754 F.3d 712 (9th Cir. 2014) ......................................................... passim

8

9

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
  No. 12-55733 (9th Cir.), Docket No. 25 ........................................ 1, 28

10

11

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*,
  493 U.S. 400 (1990) ........................................................................... 44

12

13

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
  433 F.3d 1199 (9th Cir. 2006) ........................................................... 48

14

**STATE CASES**

15

16

*Aguayo v. Amaro*,
  213 Cal. App. 4th 1102 (2013) .......................................................... 60

17

18

*Auto Auction, Inc. v. Riding Motors*,
  187 Cal. App. 2d 693 (1960) ............................................................. 27

19

20

*Ben-Zvi v. Edmar Co.*,
  40 Cal. App. 4th 468 (1995) .............................................................. 26

21

22

*Buic v. Buic*,
  5 Cal. App. 4th 1600 (1992) .............................................................. 60

23

*California Standard Fin. Corp. v. Cornelius Cole, Ltd.*,
  9 Cal. App. 2d 573 (1935) ............................................................ 27, 31

24

25

*Chapin v. Freeland*,
  142 Mass. 383 (1886) ........................................................................ 59

26

27

*In re Estate of Kampen*,
  201 Cal. App. 4th 971 (2011) ............................................................ 56

28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Finton Constr., Inc. v. Bidna & Keys, APLC,*

4

238 Cal. App. 4th 200 (2015) ................................................................. 29

5

*Flores v. California Dep't of Corr. & Rehab.,*

6

224 Cal. App. 4th 199 (2014) ................................................................. 54

7

*Frontier Oil Corp. v. RLI Ins. Co.,*

153 Cal. App. 4th 1436 (2007) ............................................................... 28

8

*Fugl v. Edwards,*

9

96 Cal. App. 2d 460 (1950) ..................................................................... 60

10

*Getty v. Getty,*

11

187 Cal. App. 3d 1159 (1986) ................................................................. 57

12

*Gilardi v. Hallman,*

13

30 Cal. 3d 317 (1981) ............................................................................. 59

14

*Golem v. Fahey,*

15

191 Cal. App. 2d 474 (1961) ................................................................... 27

16

*Hopson v. Nat'l Un. of Marine Cooks and Stewards,*

116 Cal. App. 2d 320 (1953) ................................................................... 38

17

*Hudson v. West,*

18

47 Cal. 2d 823 (1957) ............................................................................. 29

19

*Kearney v. Salomon Smith Barney, Inc.,*

20

39 Cal. 4th 95 (2006) ............................................................................. 27

21

*Keeler v. Superior Court.,*

22

2 Cal. 3d 619 (1970) ............................................................................... 59

23

*Lawrence v. Fulton,*

24

19 Cal. 683 (1862) ................................................................................... 59

25

*Lee On v. Long,*

26

37 Cal. 2d 499 (1951) ............................................................................. 53

27

*Lowe v. Ozmun,*

137 Cal. 257 (1902) ................................................................................. 54

28

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*McKenzie v. Brandon,*

4

   71 Cal. 209 (1886) ................................................................. 59

5

*Myrick v. O'Neill,*

6

   33 Cal. App. 2d 644 (1939) ................................................. 31

7

*Riverside Cty. Sheriff's Dep't v. Stiglitz,*

   60 Cal. 4th 624 (2014) ......................................................... 55

8

*Rutherford Holdings, LLC v. Plaza Del Rey,*

9

   223 Cal. App. 4th 221 (2014) ............................................. 53

10

*San Francisco Credit Clearing House v. Wells,*

11

   196 Cal. 701 (1925) ............................................................. 58

12

*Soc'y of Cal. Pioneers v. Baker,*

13

   43 Cal. App. 4th 774 (1996) ............................................... 58

14

*Stanley W. Smith, Inc., v. Pilgrim,*

15

   93 Cal. App. 539 (1928) ..................................................... 28

16

*State Farm Mut. Auto. Ins. Co. v. Dep't of Motor Vehicles,*

17

   53 Cal. App. 4th 1076 (1997) ............................................. 54

18

*Suttori v. Peckham,*

   48 Cal. App. 88 (1920) ....................................................... 53

19

*Welco Elecs., Inc. v. Mora,*

20

   223 Cal. App. 4th 202 (2014) ............................................. 28

21

*Williams v. Goodwin,*

22

   41 Cal. App. 3d 496 (1974) ............................................... 59

23

*Wolf v. Walt Disney Pictures & Television,*

24

   162 Cal. App. 4th 1107 (2008) ........................................... 27

25

*Wong v. Tenneco, Inc.,*

26

   39 Cal. 3d 126 (1985) ......................................................... 53

27

*Yuba River Sand Co. v. City of Marysville,*

   78 Cal. App. 2d 421 (1947) ............................................... 60

28

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3

*Yvanova v. New Century Mortg. Corp.*,
   62 Cal. 4th 919 (2016)..................................................................31, 38

4

5

**FEDERAL STATUTES**

6

21 U.S.C. § 853(n) .........................................................................37

7

**STATE STATUTES**

8

Cal. Civ. Code § 657........................................................................58

9

10

Cal. Civ. Code § 1006......................................................................58

11

Cal. Civ. Code § 1007................................................................58, 59

12

Cal. Civ. Code § 1008......................................................................58

13

Cal. Civ. Code § 1566................................................................27, 31

14

Cal. Civ. Code § 1646......................................................................28

15

Cal. Civ. Code § 1691................................................................27, 31

16

17

Cal. Civ. Proc. Code § 338(c)(1).......................................................55

18

Cal. Civ. Proc. Code § 338(c)(2).......................................................54

19

Cal. Civ. Proc. Code § 338(c)(3)(A) ..................................................60

20

Cal. Civ. Proc. Code § 338(c)(5).......................................................56

21

Cal. Civ. Proc. Code § 761.020 ........................................................29

22

23

Cal. Com. Code § 2403....................................................................35

24

Cal. Penal Code § 496 .....................................................................29

25

Cal. Penal Code § 1411(a)..........................................................27, 37

26

**FEDERAL RULES**

27

Fed. R. Civ. P. 12(b)(6) ..................................................................50

28

Fed. R. Civ. P. 44.1.....................................................................4, 26

**TABLE OF AUTHORITIES**
(continued)

**Page**

Fed. R. Civ. P. 56(a) ............................................................... 26

TREATISES

2 C.J.S. Adverse Possession § 315 .......................................... 59

3 AM. JUR. 2D ADVERSE POSSESSION § 12 (2007) ...................... 59

3 William Blackstone & St. George Tucker, BLACKSTONE'S
    COMMENTARIES WITH NOTES OF REFERENCE, TO THE CONSTITUTION
    AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES
    AND OF THE COMMONWEALTH OF VIRGINIA 401 (2d ed. 1803) ........... 59

13 Witkin, Summary 10th (2005) Pers. Prop., § 123 ................. 58

Restatement (Third) of Foreign Relations Law § 443 (1987) ................... 47

OTHER AUTHORITIES

2010 Cal. Legis. Serv. Ch. 691 (A.B. 2765) ........................... 55

*Advisory Opinion No. 1*, 1 Court of Restitution Appeals Reports 489,
    492 (Aug. 4, 1950).................................................. 37

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    No. 09-1254 (U.S.), Br. of U.S. as Amicus Curiae, 2011 WL
    2134984 ............................................................. 50

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

From the outset of this case, Plaintiff has advanced the same, inflammatory narrative about her claim to the Cranachs.  Faced with a chain of title that the Norton Simon traces directly to the Dutch government, Plaintiff insists that the Dutch government wrongly refused to return the works to her in-laws' art dealership in restitution proceedings following World War II.  Plaintiff's complaint avers that when that dealership, Kunsthandel J. Goudstikker N.V. (the "Firm" or "Goudstikker Firm"), sought to recover artworks forcibly purchased by Nazi general Herman Göring and Alois Miedl, it "was met with hostility by the post-War Dutch Government and confronted a 'restitution' regime that made it difficult for Jews … to recover their property."  (FAC ¶ 24.)  The Dutch government allegedly defended these transactions as "voluntary sales undertaken without coercion," giving the government "no obligation whatsoever to restore the property looted by Göring and Miedl to its pre-war Owner."  (FAC ¶ 26.)  According to Plaintiff, it was because the Dutch government required the Firm to "pay for" the "looted property [it wanted] returned" that it decided a restitution claim for the artworks purchased by Göring "could not be successful," and was "futile." (FAC ¶¶ 26, 28, 32).  Plaintiff's core theory throughout has been that the Firm reluctantly "sought only to obtain whatever settlement it could with respect to the Miedl 'transaction.'" (FAC ¶ 29.)

The discovery Plaintiff has long sought, and the "thorough hearing of the fact issue[s]" she has long demanded, (*Von Saher v. Norton Simon Museum of Art at Pasadena*, No. 12-55733 (9th Cir.), Docket No. 25 ("*Von Saher II* Reply Br."), at 1), show that these contentions are flatly wrong.  The facts show, instead, that Plaintiff's claim of title to the Cranachs fails as a matter of law and raises no triable issue of fact.  The evidence establishes four salient and undisputed facts:

*First*, the Firm successfully implemented a strategy for selective restitution of the property Göring and Miedl forced the Firm to sell.  The Firm determined that the

best course, in its own director and advisor's words, "was to *prevent* inclusion of the Göring transaction in the restoration of rights," and to seek recovery only of the property sold to Miedl, because it was to the Firm's advantage to keep the money paid by Göring that remained.  SUF ¶¶ 121-122.

*Second*, far from undermining or frustrating the Firm's efforts to seek restitution of the Göring works, the Dutch restitution process gave the Firm a fair opportunity to press a claim to the Göring works, and accorded fully with public international law.  The Firm obtained a determination from the Dutch Council for the Restoration of Rights that both the Miedl and Göring transactions were involuntary.  The Firm's concern was not that the Council would deem the transaction involuntary.  Rather, the Firm worried that the Dutch government would deny its selective restitution effort because it cherry-picked the aspects of the transactions benefitting the Firm.  On that critical point, the Firm ultimately prevailed, securing precisely the selective restitution that the Firm wanted.

*Third*, the expert testimony shows that under Dutch and international law, the Dutch State became the owner of the Cranachs after the time to file a restitution claim lapsed.  Plaintiff's own experts agree that the Dutch restitution framework furnished the exclusive remedy for a party claiming recuperated property.  That framework gave the Dutch State title over property that went unclaimed.  Plaintiff's experts also confirm that public international law firmly supports the Netherlands' exercise of the power to take title to and dispose of unclaimed, recuperated property.  Indeed, both U.S. and California law recognize the same authority.

*Fourth and finally*, the undisputed facts confirm that Plaintiff, acting for the Firm, filed a restitution claim in the Netherlands that was rejected.  While Plaintiff insists the Cranachs were never subject to restitution, (*Von Saher II* Reply Br. at 8-9), the Firm's 1999 claim for damages for works sold by the Dutch government was specifically aimed at the Cranachs.  They were, in fact, *the only works identified in a list of paintings that the Dutch government identified as "exchanged or sold."*

These key, undisputed facts establish that the Norton Simon is entitled to summary judgment on multiple independent grounds, including the following:

• Under both Dutch and international law, the Dutch government owned the Cranachs and/or had the power to dispose of them at the time the government transferred the works to George Stroganoff.  It is ironic, in this respect, that Plaintiff asserts the Cranachs were "state owned artworks" when they were seized by the Soviets before Jacques Goudstikker purchased them.  (FAC ¶ 11.)  If that is right, the Cranachs must surely have been "state owned" by operation of the Netherlands' bona fide restitution process.  This means the Dutch government passed lawful title to Stroganoff and, by extension, to the Norton Simon.

• The Dutch government's disposition of the Cranachs constitutes an official sovereign act, carrying the force of law under the act of state doctrine.  The undisputed facts, including admissions by Plaintiff's own experts, establish that the Dutch State's adoption and execution of an exclusive restitution process, its assertion of ownership after the Firm decided against claiming the Cranachs through that process, and its decision to sell the Cranachs to Stroganoff to settle his claims reflect "considered policy decision[s] by a government to give effect to its political and public interests."  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 754 F.3d 712, 726 (9th Cir. 2014) ("*Von Saher II*").  These sovereign acts establish the Norton Simon's chain of title and furnish the rules of decision controlling this case.

• Because the Netherlands convened bona fide restitution proceedings that included the Cranachs, Plaintiff's claims challenging them are preempted under the foreign affairs doctrine.  The United States "has a continuing interest in respecting the finality of 'appropriate actions' taken in a foreign nation to restitute Nazi-confiscated art."  *Id.*  The facts adduced in discovery confirm that the United States was correct in finding that the Dutch restitution process met that standard.

This case has been pending for nearly a decade.  Plaintiff has now had a full and fair opportunity in this Court—a jurisdiction the Executive Branch never

1  contemplated as a post-war restitution forum—to develop the facts bearing on her

2  claims.  Those facts show that, on the merits, Plaintiff cannot establish title as a

3  matter of law, and that the Norton Simon is the sole lawful owner of the Cranachs.

## II.   FACTUAL BACKGROUND

### A.   Jacques Goudstikker Purchases the Cranachs at a Controversial Soviet Auction

7  Plaintiff traces her claim of ownership to the Cranachs through her father-in-

8  law, Jacques Goudstikker, who purchased the Cranachs for the Firm from the Soviet

9  Union in 1931.  SUF ¶ 1, 49.[1]  As Plaintiff herself contends, the Soviet Union had

10  acquired the Cranachs as part of "a campaign of closing and liquidating churches

11  and monasteries, during which representatives of museums confiscated artistic

12  valuables from the churches and monasteries, and transferred them to their

13  museums."  SUF ¶¶ 2-5.  Plaintiff has called this "horrible" and "wrong."  SUF ¶ 6.

14  Throughout the 1920s, armed Soviet agents forcibly seized religious and

15  cultural property from churches and institutions, in some cases using deadly

16  violence.  SUF ¶ 7-9.  They shut down thousands of these religious institutions, and

17  arrested thousands of clergy for, among other things, resisting the confiscation of

18  religious property.  SUF ¶¶ 10-15, 17-18.  These arrests led to show trials,

19  imprisonment and even execution.  *Id.*  In Ukraine, where the Cranachs were seized,

20  not a single Orthodox bishop remained by 1939.  SUF ¶ 16.  The Soviet looting and

21  persecution of churches was regularly reported in the Dutch press.  SUF ¶ 19.

22  Plaintiff avers that "[t]he Cranachs were transferred during this campaign"

23  from the Trinity Church in Kiev to an anti-religious state museum there.  SUF ¶¶ 3,

24  21.  The Soviets established the museum on the site of the 1,000 year-old Kievo-

25  Pecherskaya Monastery, expelling its priests and seizing its artifacts.  SUF ¶ 20.

---

[1] "SUF" refers to the Separate Statement of Undisputed Facts and Conclusions of Law.  Because foreign law may be proven through evidence, Fed. R. Civ. P. 44.1, the Norton Simon has included support for conclusions of foreign law in the SUF.

The Soviets displayed the Cranachs and other seized paintings in the Museum's "Cults" Department.  SUF ¶ 22.

The Soviet regime auctioned many of the artworks it seized, including those taken from churches.  SUF ¶ 32.[2]  The Cranachs were auctioned in 1931 in Berlin.  SUF ¶¶ 1, 39.  The auction house that offered the Cranachs, Lepke, already had a reputation for trading in stolen art.  Lepke's first auction of artwork on behalf of the Soviet regime in 1928 provoked numerous lawsuits and protests by Russians who had fled the Soviet regime, including front-page coverage in *The New York Times*.  SUF ¶¶ 33-38.  A Dutch newspaper asked whether this "auction of antique furniture, gold jewelry, tapestries and paintings, that the Soviets have brought to Berlin to be sold, also hid[] a string of tragedies"?  SUF ¶ 38.

Lepke's 1931 auction followed this pattern.  The auction was entitled the "Stroganoff Collection." SUF ¶ 39.  An advertisement in a Dutch newspaper openly stated that the "[t]he Soviet government seized the collection" from the Stroganoff family.  SUF ¶ 41.  The Stroganoff princess and heir, Olga Stroganoff, wrote a letter of protest that was published and read aloud at the auction.  SUF ¶¶ 42-47.  She declared the offered works "exclusively my property" and warned that she would hold Lepke and any and all buyers responsible.  SUF ¶ 44.  The editors of a German newspaper called it "thoroughly shameful" for Lepke to be selling "old Russian family treasures, which were taken from their true owners through outright robbery."  SUF ¶ 46.

In the face of these well-known confiscations, Jacques Goudstikker purchased the Cranachs for the Firm as well as two paintings by Van Dyck from Lepke's "Stroganoff Collection" auction on May 12, 1931.  SUF ¶ 48.  As the founder and controlling shareholder of the Firm, he was not only one of Europe's most

---

[2] The Soviets used the proceeds in part to repay loans from German banks for the purchase of imports, including arms, under the Treaty of Rapallo.  SUF ¶¶ 24-28, 31.  In exchange, the Soviets permitted Germany to test weapons in secret, some of which the Nazis used to invade the Netherlands in World War II.  SUF ¶¶ 29-30.

sophisticated art dealers, but also a leading society figure.  SUF ¶¶ 50-54.  Jacques understood that the conflict and political turmoil in the Soviet Union was driving artworks into the market.  SUF ¶ 55.  Describing the Soviet auction of confiscated works, Jacques remarked that "financial and political catastrophes sometimes give opportunity" to acquire "previously unattainable" artwork.  SUF ¶ 56.

### B.   The Cranachs Are Sold to Hermann Göring During World War II in a Voidable Transaction and Are Restituted to the Netherlands

In May 1940, Jacques, his wife Desi, and their son Edo fled the Netherlands as German forces invaded.  SUF ¶ 57.  Jacques died in a ship-board accident within days.  SUF ¶ 58.

The Nazi occupation of the Netherlands ravaged the Dutch people and destroyed its economy.  SUF ¶¶ 59-60.  The Nazis plundered the nation of its industrial resources and stole billions from the Dutch Central Bank by forcibly exchanging valuable Dutch guilders for worthless Reichsmarks.  SUF ¶¶ 61-62.  Hundreds of thousands of Dutch citizens lost their lives and many more were made homeless.  SUF ¶ 65.  Historians estimate that the Nazis caused more than $180 billion in damage to the Dutch economy, and that the Dutch people had to spend the same amount to reconstruct their country.  SUF ¶¶ 63-64.

In the Netherlands, as in other occupied countries, the Nazis also plundered cultural and artistic treasure.  In July 1940, Hermann Göring and his associate, Alois Miedl, forcibly purchased the Goudstikker Firm and its assets through a set of related agreements.  SUF ¶¶ 66, 72-75.  For a payment of 550,000 guilders, Miedl acquired the Firm as a going concern, the Firm's real estate, and certain personal property including some of the Firm's inventory of artwork.  SUF ¶ 67.  Miedl dissolved the Goudstikker Firm and transferred its assets to a new company (the "Miedl Firm").  SUF ¶ 104.  Göring purchased much of the Firm's remaining inventory of paintings, including the Cranachs, for 2 million guilders.  SUF ¶ 68.  In 2013 U.S. dollars, the combined payments for these transactions would total more

than $27 million.  SUF ¶¶ 84-86.  Göring and Miedl promised to prevent confiscation of the purchase price so that the proceeds of the sale would remain for the Firm's shareholders (the Goudstikker family).  SUF ¶¶ 87-88.  At the end of the war, the Firm still retained about 1.4 million guilders, even after taxes, repayment of loans (including about 350,000 guilders repaid to Jacques's mother), and professional fees.  SUF ¶ 89.

The Goudstikker Firm entered into these sales agreements through a long-time employee who had held an unlimited power of attorney to act for the Firm since 1931.  SUF ¶¶ 77-79.  Following Jacques' death, he was made a Firm director at a shareholder meeting where Jacques's shares, then held by his widow Desi, were not voted.  SUF ¶¶ 80-81.  After the war, the Firm's directors and advisors were well aware of the involuntary nature of these agreements and the irregularities surrounding them.  SUF ¶ 82.

When Allied forces defeated Germany, they recovered much of Göring's art collection, including the Cranachs.  SUF ¶ 90.  To administer and return these recovered artworks, the United States adopted a policy of "external restitution."  SUF ¶ 92.  Under that policy, the U.S. returned artworks found in occupied Germany to their country of origin and left it to those countries to determine whether and how to return the artworks to their individual owners.  SUF ¶¶ 93-94.  Under this policy, the U.S. returned to the Dutch government numerous artworks found in Germany that had previously been part of the Firm's inventory, including the Cranachs, in 1946.  SUF ¶ 90.  The Dutch government placed recuperated artworks in the custody of the *Stichting Nederlands Kunstbezit* (the Netherlands Art Property Foundation, or "SNK") under the supervision of the *Nederlandse Beheersinstituut* (Dutch Custody Institute, or NBI) pending any claims for restitution under the procedures that the government set up after the war.  SUF ¶ 98.

### C.   The Dutch Government Enacts a Comprehensive Legal Framework for Restitution and Reparations

The Dutch government created a comprehensive legal framework furnishing two distinct but related forms of relief:  (1) *restitution*, which invalidated wartime transactions and returned property or compensation to former owners; and (2) *reparations*, whereby Germany compensated the Dutch State for the massive damage it inflicted on the Netherlands.  The relevant cornerstones of this framework were three Royal Decrees:  E100, E133, and A6.

**Royal Decree E100.**  This law established a Council for the Restoration of Rights (the "Council") with broad and exclusive powers to review all wartime transactions and order restitution.  SUF ¶¶ 254, 262 .  Under E100, the Council had the power to declare totally or partially null and void, or to modify, "any legal relations that originated or were modified during enemy occupation of the [Netherlands]."  SUF ¶¶ 263-264.  The Council would presumptively intervene in cases where a transaction occurred under coercion, threat, or improper influence by the enemy, SUF ¶ 265, and had the power to order the return of property to its former owner, subject to appropriate conditions, or to order compensation.  SUF ¶¶ 266-268.

E100 was the exclusive mechanism for claimants seeking restitution of property lost as a result of wartime transactions.  SUF ¶ 274.  As the Dutch Supreme Court squarely held in 1947, claims to annul a wartime contract for duress under ordinary Dutch civil law could not be brought in ordinary Dutch courts.  SUF ¶ 275.  Nor could claims be brought to recover property in ordinary courts under ordinary civil law.  SUF ¶ 276.

Four other aspects of E100's remedial scheme are important here:  First, E100 created several divisions of the Council, including an Administration Division and an independent Judicial Division.  SUF ¶¶ 255-258.  The former included the NBI, which played a key role in restitution claims, including in this case.  SUF ¶ 257.

But a claimant always had the ability to bring a claim before the independent Judicial Division, and decisions by any of the other divisions (including the NBI) could be appealed to the Judicial Division.  SUF ¶¶ 259-260.  The decisions of the Judicial Division were final.  SUF ¶ 261.

Second, the Dutch government established a deadline of July 1, 1951 for the filing of claims for restoration of rights under E100.  SUF ¶ 279.  After that deadline, the Council retained the authority (in its discretion) to order restoration of rights on its own initiative, but no claimant would be entitled to demand restitution.  SUF ¶¶ 281-282.

Third, former owners generally had to return money or other consideration in order to obtain restitution.  SUF ¶ 269.  The purchase price would be returned to the State if the purchaser had been an enemy.  *Id*.  This was a way to balance the wartime harm suffered by individual claimants against the harm the Nazis inflicted on the Dutch people as a whole, including forced currency exchanges.  SUF ¶ 270.

Fourth, E100 gave the Council responsibility to administer the property of "unknown owners" that came into the State's possession and authorized the Dutch government to sell unclaimed property:  "If the owner has not come forward within a period to be further determined by Us, items that have not yet been sold shall be sold …."  SUF ¶ 289.  The Dutch government later set the deadline at September 30, 1950.  SUF ¶ 290.

Plaintiffs' experts have acknowledged the Dutch government's good faith and evenhandedness in carrying out the restitution scheme under E100.  One testified that he had "no doubt whatsoever" that Dutch government officials "acted in good faith."  SUF ¶ 100.  Another testified that E100 was "absolutely not" administered in an anti-Semitic way.  SUF ¶ 101.  To the contrary, Plaintiff's expert explained, the Dutch government "wanted to apply the laws in the same way to all the people no matter how much they suffered" because "everyone had suffered during the war."  SUF ¶ 102.

**Royal Decree E133.**  This law facilitated reparations, as opposed to restitution:  It expropriated enemy assets to compensate the Dutch people as a whole for losses the Netherlands suffered during the war.  SUF ¶¶ 317-318.  Article 3 of E133 decreed that all enemy property within the jurisdiction of the Netherlands automatically passed in ownership to the State on an ongoing basis (until the Netherlands' 1951 treaty with Germany).  SUF ¶¶ 319-320, 323-324.

In 1955, the Dutch Supreme Court ruled that Decree E133 made the State the full owner of covered assets, as opposed to a mere fiduciary for another owner.  SUF ¶ 328.  The State's ownership, however, was qualified by Decrees E100 and E133, which gave claimants the opportunity to assert rights in expropriated property.  SUF ¶ 329.  In cases where the enemy had acquired an asset from a former Dutch owner (including through duress), E100 allowed the transaction to be nullified and the property returned to its former Dutch owner.  SUF ¶ 330.  Thus, until the deadline of July 1, 1951, a former owner would come forward and successfully petition the Council for restitution of expropriated enemy assets.  SUF ¶ 333.  Decree E133 also permitted "enemy" property owners to petition for "de-enemization" so they might regain their property.  SUF ¶ 331.

**Royal Decree A6.**  This statute prohibited all transactions with Germans and other enemies that had effects outside the Nazi-occupied Netherlands, unless prior approval was obtained from a special committee (*Commissie Rechtsverkeer in oorlogstijd* or "CORVO").  SUF ¶¶ 353-354.  Such prohibited contracts were automatically void, but A6 gave CORVO the power to "revoke" the invalidity of these transactions after the fact by "declaring the agreement or act still effective."  SUF ¶ 356.

In February 1947, CORVO did just that for agreements relating to goods found in enemy territory and returned to the Netherlands after the war.  SUF ¶ 357.  The purpose of this decision was to classify recuperated objects like the Cranachs as enemy property that would be expropriated by the government.  SUF ¶¶ 359-360.

At the same time, CORVO contemplated that E100 would still give former owners the opportunity to nullify their transactions with the enemy, at their election, and recover their property where appropriate on a case-by-case basis.  SUF ¶ 361.

**Overall Framework.**  Following the February 1947 CORVO decision, recuperated enemy property such as the Cranachs passed in ownership to the Dutch State under Decree E133, subject to the right under E100 of a former Dutch owner, until July 1, 1951, to request nullification of the transaction with the enemy and restitution of the asset.  SUF ¶ 362.  In this way, Decree E100 and Decree E133 worked together to ensure the orderly disposition of restituted property, either to a successful restitution claimant or, failing that, to the State.  If the former owner successfully petitioned to annul the transaction under E100, then the item would be returned to her and would not be subject to E133 because it would not be "enemy property."  *Id*.  By contrast, if the former owner *did not* annul the transaction under E100, it would remain enemy property and would become property of the State.  *Id*.

This Dutch restitution scheme was similar in many important respects to the one adopted by the United States Military Authority in occupied Germany, known as Law 59.  Like E100, Law 59 required restitution claimants to return any consideration that they received.  SUF ¶ 302.  The U.S. also imposed a deadline for filing restitution claims, and a claimant who failed to file before the deadline "lost his right to restitution" and was "forever barred from making any claim for the restitution of such property."  SUF ¶¶ 299-301.  Upon the deadline, "all right, title and interest" to the property "became vested by operation of law" in an organization designated by the U.S. military administration.  SUF ¶ 308.

**D.**     **The Goudstikker Firm Makes a Deliberate and Strategic Decision Not To Seek Restitution of the Artwork Sold to Göring**

      **1.**      **The Goudstikker Firm Assembles an Elite Team of Restitution Experts and Advisers**

In 1946, Desi Goudstikker, Jacques Goudstikker's widow and Plaintiff's mother-in-law, returned to the Netherlands to pursue restitution.  SUF ¶ 107.  Desi

had Jacques's "Blackbook," a notebook detailing the Firm's inventory, including the dimensions and provenance notes for the Cranachs.  SUF ¶ 108.  After the war, the Dutch government had seized the Miedl Firm and appointed administrators (the "Miedl Administrators") to manage it and the Goudstikker Firm.  SUF ¶ 106.  After she returned, Desi became one of three directors of the Goudstikker Firm, replacing these administrators.  SUF ¶ 109.  The other two directors were Max Meyer, an eminent Dutch lawyer who served as the Firm's counsel, and Ernst Lemberger, Jr., a Dutch banker.  *Id.*  The Firm received advice about the value of its art holdings from Saemy Rosenberg, a prominent European art dealer and "a personal friend of Mr. Goudstikker" who fled to the United States during the war.  SUF ¶¶ 112-113.  In 1945, he valued the Goudstikker Firm's pre-war inventory using the Blackbook.  SUF ¶ 114.  The Firm had other eminent advisers:  Ynso Scholten, who later became the Dutch Minister of Justice, represented the Firm in its restitution proceedings in the early 1950s.  SUF ¶ 115.  The Firm also received legal advice from A.E.D. von Saher, a Dutch and American lawyer whom Desi married in 1950 and who advised the Dutch government on restitution legislation.  SUF ¶¶ 116-117.

### 2. The Goudstikker Firm Forms a Strategy to Seek Restitution for the Miedl Transaction, While Keeping the Purchase Price from the Göring Transaction

With advice from their lawyers and consultants, the Firm's directors decided to pursue restitution of the real estate and other assets that had been sold to Miedl, but not to pursue restitution of artworks sold to Göring, including the Cranachs.

In an October 3, 1950 memorandum, Meyer documented the history of the Firm's restitution decisions and efforts to that point.  SUF ¶ 119.  Meyer explained that unwinding the Göring transaction would be disadvantageous to the Firm because, among other things:  (1) the Firm would be "left with a large number of works of art that are difficult to sell"; (2) restitution of hundreds of artworks would "inevitably have led to the revival of an art dealership," which would be problematic because "it proved impossible to find a suitable person to run such a business and

because reliable staff was lacking"; and (3) restitution would have resulted in "a considerable reduction in the [Firm's] liquid assets," with the Firm potentially having to pay back more money each time a new artwork was repatriated. *Id.*

The Firm and its advisors "discussed in detail" the issue with "Saemy Rosenberg who, after having taken cognizance of the objects sold to Göring, also concluded that it would be more beneficial to the [Firm] to resign itself to the transaction with Göring." SUF ¶ 121. Meyer stated in no uncertain terms that this is exactly what the Firm decided to do, SUF ¶ 122:

> In accordance with the recommendations given, it was decided to direct the course of events in such a manner as to prevent inclusion of the Göring transaction in the restoration of rights, also given the unpredictable consequences this would entail. It could not be predicted with certainty whether we would succeed. The Netherlands Property Administration Institute could have made the restoration of rights conditional upon the nullification of the Göring transaction, which was certainly not inconceivable. We therefore had to maneuver very carefully.

The directors came to a very different conclusion about the Miedl transaction. Desi Goudstikker wanted restitution of the country estate "for sentimental reasons." SUF ¶ 123. And "because the economy in the Netherlands had improved," and the Miedl Administrators "had leased [the other real estate] for a good price, the decision was made to apply for restoration of rights with regard to these real estate properties also." SUF ¶ 124. Moreover, taking into account the goods that Miedl had acquired, the directors concluded that Miedl "had earned what we estimated to be a value of at least ƒ 1,000,000.00 on a payment of ƒ 550,000.00." SUF ¶ 125. In contrast, Meyer noted, the 2 million guilders that Göring paid matched the prices that Jacques had paid for the artwork according to the Firm's own accounting records. SUF ¶ 120. Thus, the Firm decided to pursue a selective restoration of rights in the Miedl transaction only.

In his own April 1952 report, Desi's husband, A.E.D. von Saher, confirmed this strategic decision. Explaining "why it has not appeared feasible to seek redress

with regard to the Goring contract," Von Saher stated that the Firm "was aware that the paintings which returned to the Netherlands were in a poor condition."  SUF ¶ 126.  He added that, "[d]espite these arguments, the shareholders still considered to also conduct legal redress with respect to the Göring contract.  Mr. Meyer and Mr. Lemberger strongly advised against this."  SUF ¶ 126.

Plaintiff herself has acknowledged in other proceedings the Firm's strategic decision to selectively restore rights.  SUF ¶¶ 127-129.

### 3. The Goudstikker Firm Successfully Pursues Its Strategy, Waiving and Abandoning Its Rights in the Göring Artwork

The Goudstikker Firm consistently, and successfully, pressed its selective restitution strategy.  Indeed, the undisputed evidence is that it *fought* to retain the moneys paid by Göring while seeking restitution of the Miedl property.

Throughout 1947 and 1948, the Goudstikker Firm negotiated with the Miedl Administrators and the SNK to annul the Miedl transaction.  SUF ¶¶ 130-134 .  It made no request to annul the Göring transaction or for the restitution of the Cranachs or other recuperated Göring paintings.  *Id*.  It did propose restitution of paintings the Goudstikker Firm had co-owned with others (so-called "meta-paintings") recovered from Germany, but on the theory that they were part of the Miedl transaction.  SUF ¶ 131.  By July 1948, with negotiations apparently at impasse, the Goudstikker Firm threatened to "bring a claim for restoration of rights" before the Council.  SUF ¶ 132.

The Firm and the Miedl Administrators then reached a provisional settlement agreement in September 1948, which was subject to the NBI's approval.  SUF ¶¶ 133, 135.  Under that agreement, the sale of real estate to Miedl would be declared void and returned to the Firm in exchange for the purchase price.  SUF ¶ 133.  The Firm would also repurchase from Miedl certain paintings and other goods and would waive all claims for compensation or damages.  *Id*.  The agreement did not provide for return of the Cranachs or other recuperated Göring paintings, but

rather left the Göring transaction intact. SUF ¶ 134. Meyer wrote to Desi Goudstikker that he was "enormously" pleased to report that he had achieved "a full agreement regarding the restoration of rights" with which the Firm could "be very satisfied." SUF ¶ 136. A formal settlement agreement for the real estate followed in April 1949, and the Miedl Administrators began returning the personal property to the Goudstikker Firm. SUF ¶ 137-138.

On November 10, 1949, Meyer, a Firm director, made clear to the State that the Firm was forgoing any claim for the Göring artworks. SUF ¶ 140. He wrote to the SNK, *id*.:

> I would also like to take this opportunity to confirm to you that [the Goudstikker Firm] waives requesting restoration of rights regarding goods acquired by Göring, with the exception of the ceiling pieces of de Lairesse, which in my opinion belong to the premises at Herengracht 458.

Meyer made this statement fully aware that the Firm would very likely succeed in annulling the Göring transaction and recovering the artworks if it chose to bring a claim under E100. SUF ¶ 141. His November 10 letter to the SNK attached a memo asserting that both the Miedl and Göring transactions would be void under E100. SUF ¶ 142. Indeed, in April 1949, the Goudstikker Firm had obtained a decision from the Judicial Division of the Council that the Göring and Miedl transactions were involuntary and thus presumptively voidable under E100. SUF ¶ 143. The Firm had filed a claim to recover a dollhouse from a woman who had purchased it from Miedl. SUF ¶ 144. The Judicial Division held that the sales to Miedl and Göring were involuntary, having been entered into under threat of anti-Jewish measures and fear of coercion from the German occupier. SUF ¶ 143. The Judicial Division ultimately declined to order restitution of the dollhouse, but only because it viewed the 1948 provisional settlement agreement as waiving the right to recover it. SUF ¶ 145. It reasoned that the Goudstikker Firm's release of claims for damages against the Miedl Firm also precluded recovery of artwork from any third party who had bought artwork from the Miedl Firm. Otherwise, the Miedl Firm

1  (now owned by the Dutch State) would be liable to indemnify the third party,

2  defeating the release's effect.  *Id.*

3        Consistent with Meyer's November 1949 letter to the SNK, the Firm allowed

4  E100's September 1950 deadline (for unknown owners to come forward) to lapse

5  without requesting return of the Göring artworks.  SUF ¶ 146.  Less than two

6  months later, the Dutch government began selling many of the recuperated Göring

7  works at public auctions.  SUF ¶ 147.  These auctions, which took place from

8  November 1950 to November 1952, were publicized in newspaper articles

9  specifically noting that the sales would include former Firm artworks, and the

10  auction catalogs likewise identified the artworks as having belonged to the Firm.  *Id.*

11  There is no evidence that the Firm ever objected to or tried to stop any of these

12  auctions.

13        In the meantime, further disputes arose over the handling of personal property

14  under the September 1948 settlement, particularly as to the meta-paintings.  SUF

15  ¶ 149.  The Miedl Administrators offered to substantially reduce the price the Firm

16  would pay if the Firm agreed that the meta-paintings would not be returned.  *Id.*

17  The Firm "immediately accepted this exceptionally favorable proposal."  *Id.*  A new

18  May 1950 draft settlement agreement was prepared.  SUF ¶ 150.  It specifically

19  addressed the risk that the Firm might bring Dollhouse-type claims against third

20  parties that could potentially generate indemnity obligations for the Dutch State.  It

21  not only called for the Firm to waive its claims for restoration of rights related to the

22  Miedl transaction, but also required the Firm to indemnify the State against any

23  third-party claims based on the Firm's attempts to recover property from third

24  parties.  SUF ¶ 150.

25        As the July 1, 1951 final deadline for requesting any restoration of rights

26  under E100 approached, both the NBI and the Miedl Administrators wrote to Meyer

27  reminding him of the deadline, warning that the settlement would not be finalized in

28  time, and recommending that the Firm submit a request for restitution with the

1   Council to preserve the Firm's rights while negotiations proceeded.  SUF ¶ 151.

2   Then, on June 26, 1951, the NBI announced it would *not* approve the settlement

3   because it viewed the Firm's selective request for restitution of the Miedl

4   transaction, but not the Göring transaction, as unfair cherry-picking, SUF ¶ 153:

> [I]t is considered incorrect to lift one transaction out of a complex of deeply intertwined war transactions which should, in fact, be considered a single transaction, and to conclude amicable restoration of rights on this one part only because this part was considered detrimental to the Goudstikker company, while the other transactions, which had been profitable for Goudstikker, are left out of the amicable restoration of rights.

10      The very risk identified by Max Meyer in his October 1950 memorandum—

11  that the NBI might not countenance the Firm's selective restitution approach—had

12  materialized.  SUF ¶ 122.  Even so, the Firm adhered to its strategy.  The next day, it

13  submitted a request to the Judicial Division of the Council seeking restoration of

14  rights in the Miedl transaction only.  SUF ¶ 154.  The July 1, 1951 deadline passed

15  and the Firm chose not to file a petition to annul the Göring transaction.  SUF ¶ 155.

16      In its *pro forma* response to the Firm's Miedl petition, the NBI denied that the

17  Miedl transaction was involuntary.  SUF ¶¶ 152, 159.  But correspondence shows

18  that the Firm's lawyers were well aware that the Dollhouse precedent made very

19  likely a finding that the Göring transaction was involuntary.  On May 14, 1952 the

20  Firm's lawyer wrote to the NBI's lawyer that the Firm was "still of the opinion, and

21  in my view completely justifiably so, that the present agreement is definitely eligible

22  for restoration of rights, as was, by the way, already decided by the same Chamber

23  of the Council for the Restoration of Rights, Judicial Department, which is handling

24  this case."  SUF ¶ 160.

25      In June 1952, the Goudstikker Firm and the Dutch State (represented by the

26  NBI and the administrators of the expropriated Miedl Firm) reached a new deal.

27  The Firm agreed to increase the amount it would repay to the State, and the NBI

28  consented to the restitution framework the Firm wanted: only the Miedl transaction,

and not the Göring transaction, would be unwound.  The deal was documented in a June 26, 1952 draft settlement agreement.  SUF ¶ 161.  The Firm agreed to pay 100,000 guilders and the parties agreed that the Miedl goods that had already been delivered to the Firm would belong to it.  *Id*.  The draft also includes important waiver and release language.  The preamble recounts the history of the wartime transactions and post-war proceedings, identifying three agreements with Miedl and the agreement with Göring.  SUF ¶ 165.  Article V of the June Draft provides that "the parties hereby mutually grant each other discharge and declare to no longer have any kind of claims or rights regarding the purchase agreements mentioned in the preamble, except for those claims and rights that the parties have expressly reserved for themselves in this agreement."  SUF ¶ 166.  Article I of the draft further reinforces that the Firm was waiving its rights relating to the Göring and Miedl purchase agreements:  It states that the Firm "will remain entitled to claim goods and rights that do *not* fall within" the same Göring and Miedl agreements mentioned in the preamble.  *Id.* (emphasis added).

Appended to the June Draft are several proposed edits and insertions.  One is directed toward the "Dollhouse" problem:  preventing claims by the Firm against third parties whom the Dutch State (as successor to the Miedl Firm) might have to indemnify.  It provides that the Firm, for the benefit of the Dutch State, "waives all rights which it may be able to enforce against anyone whomsoever," anywhere in the world, as to artworks delivered to Miedl or Goring during the war.  SUF ¶ 167.

In a draft dated July 17, 1952, the parties made a number of changes to the June Draft.  SUF ¶ 168.  In a telegram sent the next day to Desi Goudstikker, the notary handling the settlement characterized these as "editorial changes."  SUF ¶ 169.  One of these changes deletes the reference to paintings delivered to Göring in the new "Dollhouse" clause.  SUF ¶ 168.  Because the Dutch State was not the successor to Göring, claims by the Goudstikker Firm against third parties who bought from Göring raised no such indemnity issues.  SUF ¶ 370.

The final agreement of August 1, 1952 includes, in article 1.4, the Dollhouse clause waiving claims against *third parties* with respect to paintings delivered to Miedl.  SUF ¶ 172.  But it retains in article 5.1 the same mutual release *between the parties* of all rights relating to "the purchase agreements mentioned in the preamble," and continues to state in article 1.6 that Goudstikker reserves the right to claim goods that do *not* fall within the agreements concluded with Miedl *and* Göring.  SUF ¶¶ 170-171.  The entire transactional history was cut from the preamble.  SUF ¶ 173.  The preamble simply recites the parties' authority to enter into the contract, the pending restitution proceeding for the Miedl transaction, and Desi Goudstikker's disappointment that "it may take years of litigating to attain what she considers to be restoration of rights" and that she had not received any "compensation for the profits made by aforementioned Alois Miedl" or the Miedl Firm.  *Id*.  Desi's statement makes no complaint about her decision not to commence litigation regarding the Göring transaction or request restitution of the Göring artworks.  *Id.*

The day after the settlement, the Firm's lawyer Scholten (a future Minister of Justice, SUF ¶ 115) wrote to Desi expressing satisfaction with the final result: "[W]e finally succeeded in getting our draft accepted almost in its entirety by the [NBI]."  SUF ¶ 174.  There is no evidence that, during the 40 years between the 1952 agreement and her death in 1996, Desi ever believed the Firm still held rights in the artworks sold to Göring, let alone that she sought their return.  Instead, she had the Firm dissolved in 1960, and in the 1970s she told an art historian that the Göring works were "no longer hers."  SUF ¶¶ 175-176.

**E.   The Dutch State Assumes Ownership of the Paintings**

As Plaintiff's expert concedes, following the 1952 Settlement Agreement, the State considered itself the owner of, and exercised ownership over, the recuperated Göring artworks.  SUF ¶¶ 177-178 .  This followed clear Dutch government policy.  SUF ¶ 179.

After the war, some officials and legal experts opined that the State owned recuperated artworks under Decree E133.  SUF ¶ 181.  Other officials suggested it would be better to base the State's ownership on other grounds.  SUF ¶ 182.  In November 1948, the influential Dutch Minister of Finance expressed concern that basing Dutch ownership on E133 might adversely impact the State's ability to recover reparations from Germany under a postwar treaty.  SUF ¶ 183.  This could be avoided, the Minister of Finance concluded, if the State instead based its ownership of unclaimed recuperated artworks on public international law.  SUF ¶¶ 183, 185.  Under international law, the Minister asserted, the State would be considered initially a custodian for former Dutch owners.  SUF ¶ 184.  But if no original owner asserted a claim, or if the claim was rejected, the State would be the owner.  SUF ¶ 184.  In 1951, the Dutch Minister of Justice expressed a similar view to the Dutch Parliament, stating that as to recuperated paintings taken by the Germans under duress, "the State acts as a fiduciary custodian on behalf of the dispossessed, and makes sure that their original rights regarding these goods are restored, *to the extent that these parties desire such and do not wish to waive their rights to the goods in exchange for keeping the original payment*."  SUF ¶ 187 (emphasis added).  But the State would be free to sell "those goods for which the rights have been waived by the dispossessed."  SUF ¶ 187.

Acting on this announced policy, the State sold many unclaimed recuperated artworks, including former Goudstikker artwork, at public auctions in the 1950s without objection.  SUF ¶¶ 147, 180.  Other recuperated artworks, including the Cranachs, were transferred to the national art collection.  SUF ¶ 180.

## F.    George Stroganoff Acquires the Cranachs

In 1961, George Stroganoff notified the Dutch government that he claimed the Cranachs, as well as other paintings, including a very famous and valuable Rembrandt.  SUF ¶ 188.  Stroganoff asserted that these paintings had belonged to his family and had been illegally seized by the Soviet Union.  SUF ¶¶ 188, 189.

From 1964 to 1966, the State and Stroganoff engaged in negotiations over his claim.  SUF ¶ 190.  Several Dutch government officials examined the State's rights in the Cranachs and concluded that the State was the owner, with some basing this ownership on E133 and others basing it on public international law.  SUF ¶ 192. None concluded, however, that the State was not the owner or that the Goudstikker Firm was the owner.  SUF ¶ 193.

In 1965, Stroganoff proposed that he would abandon his claims to the valuable Rembrandt if the State would allow him to "buy back" the Cranachs "at a price to be determined."  SUF ¶¶ 194-195.  The Minister of Culture initially rejected this proposal on the grounds that the Cranachs were an "especially important" part of Dutch cultural patrimony and not for sale:  "The sale of paintings from the State's art collection only takes place in exceptional cases, actually only if the interest of the country requires such sale."  SUF ¶¶ 196-198.

After further negotiations, the State ultimately agreed to Stroganoff's settlement proposal.  SUF ¶ 199.  The head of legal affairs for the Ministry of Culture explained the decision to the new Minister in a 1968 memorandum:

> These paintings had come into the property of the Dutch state after the (Jewish) art dealer Goudstikker from Amsterdam had been forced to sell them to Göring and after the American occupational forces subsequently sent them back to the country of origin, where the paintings, pursuant to the Decree Enemy Assets [E133], fell to the state. The legitimacy of this title of ownership was contested by [Stroganoff], as well as the legitimacy of the title of ownership originally acquired by Goudstikker. Our office at that time advised your predecessor to contest this claim, but your predecessor preferred to come to a settlement with the claimant. On the one hand, he based this preference on the risk of possibly losing the Rembrandt, which was valued at more than one million guilders, and on the other hand on the doubts expressed by the state attorney, who estimated the costs of a possible court case to be approx. *f.* 80,000.  Accordingly, a settlement was reached in 1966, in which Stroganoff agreed to waive all his claims on the Rembrandt, while purchasing the other three paintings from the state of the Netherlands for a total sum of *f.* 60,000.

SUF ¶ 200.  This settlement was effectuated on or around July 22, 1966.  SUF

¶¶ 201-204.

### G.    The Norton Simon Acquires the Cranachs

In 1967, Stroganoff, through his art dealer, Spencer Samuels, offered the Cranachs to Norton Simon.  SUF ¶ 207.  Drawing from his self-made fortune, by the late 1960s, Simon's art collection had grown significantly and he had become a major lender of art to the then-fledgling Los Angeles County Museum of Art.  SUF ¶ 206.  Samuels emphasized the paintings' strong connection to the Stroganoff family, providing Simon with documents that discussed the paintings' confiscation by the Soviets and their subsequent history.  SUF ¶ 208.  On January 13, 1971, Simon purchased "Adam" and "Eve" for $800,000.[3]  SUF ¶¶ 209-210.  Since 1971, the Cranachs have been on public display, as noted in many publications.  SUF ¶ 212.  Since 1978, the entry for the Cranachs in the catalogue raisonnés of Cranach's work has listed their location as the Norton Simon.  SUF ¶ 213.  Jacques Goudstikker's entry for the Cranachs in his Blackbook references an earlier edition of this catalogue.  SUF ¶ 214.

### H.    Plaintiff Seeks Restitution of the Cranachs and Other Artwork from the Dutch Government

Desi Goudstikker died in 1996.  SUF ¶ 217.  Soon after, Plaintiff and her husband Edo, Desi's son, burned Desi's personal papers over several days.  SUF ¶ 218.  Plaintiff claims she does not know what was in those documents.  SUF ¶ 219.  Edo died just months later.  SUF ¶ 220.

Shortly thereafter, in early 1998, Plaintiff revived the Firm.  SUF ¶ 221.  With Plaintiff's involvement, the Firm filed a number of requests related to the artworks sold to Göring.  The Firm petitioned the Dutch Ministry of Education, Culture, and Science to return the Göring artworks still in the Dutch national collection.  SUF

---

[3] Under the agreements, the purchasers were two of Simon's foundations:  the NSF purchased "Eve," and the NSAF purchased "Adam."  SUF ¶ 210.  Later, in 1991, the NSAF acquired "Eve" from the NSF.  SUF ¶ 211.

¶ 222.  The petition acknowledged that the Dutch State obtained title in the 1950s, though the Firm contended that Desi had been "pressured by the State to such an extent that she 'voluntarily' agreed to have ownership of the art collection transfer to the State."  SUF ¶ 222.  The Ministry rejected the request in March 1998, concluding that the Firm had "deliberately and intentionally decided not to submit a request for restoration of rights for the Goring transaction."  SUF ¶¶ 223-224.  The State Secretary found that the Firm "had excellent advisors, experts in various fields," and that it "knowingly and consistently decided not to petition for redress for the Göring transaction because she preferred to keep the money for financial and practical reasons."  SUF ¶¶ 225-228.

Following this decision, the Firm, with Plaintiff's involvement, requested restoration of rights under E100 with respect to the Göring transaction.  The Firm submitted a claim to the Court of Appeal in The Hague, which was the successor to the Council for the Restoration of Rights.  SUF ¶¶ 230-231.  The Firm sought return of paintings in the State's possession, and also amended its claim to seek monetary compensation for any artworks that the State had sold.  SUF ¶ 232.  In support of its claim, the Firm submitted a list of Goudstikker artworks that had been in the Dutch national collection.  SUF ¶ 233.  The *only* entry under "Paintings exchanged or sold" was for the Cranachs; it included the Cranachs' Blackbook inventory numbers and described them as "sold to Mr. G. Stroganoff."  SUF ¶¶ 234-235.

On December 16, 1999, the Dutch Court of Appeal, acting as the final decision-maker for the Council for the Restoration of Rights, issued an opinion rejecting the Firm's claims.  SUF ¶ 375.  Construing the Firm's claim as a direct request for restoration of rights under E100, the Court rejected that request because it had not been filed prior to the July 1, 1951 deadline.  SUF ¶ 377.  "[N]early 50 years have now elapsed," the Court explained, "since the last moment that an application for the restoration of rights could be submitted."  SUF ¶ 379.  The Court went on to consider whether there was good cause to excuse this failure and order

restitution *ex officio* (*i.e.*, *sua sponte*).  SUF ¶ 378.  The Court rejected restitution on that basis as well, concluding that the Goudstikker Firm "made a conscious and well considered decision to refrain from asking for restoration of rights with respect to the Goring transaction."  SUF ¶¶ 380-381.  This did not violate international law, as the "Netherlands created an adequately guaranteed procedure for handling applications for the restoration of rights."  SUF ¶ 382.

In 2001, the Firm filed a separate claim against the State in The Hague District Court seeking *revindication* (similar to common law replevin) of the artworks that were sold to Göring.  SUF ¶¶ 274, 384.  The Court rejected that claim because the Firm's exclusive recourse was to the Council under E100.  SUF ¶ 384.

Also in 2001, the Dutch government announced a new policy for handling restitution claims for recovered artworks.  SUF ¶ 236.  The government created a Restitutions Committee to review these claims and advise whether restitution should be made.  The new scheme eschewed "a purely legal approach to the restitution issue" in favor of "a more policy-oriented approach … in which priority is given to moral rather than strictly legal arguments."  SUF ¶ 237.  But "settled" cases, in which a "claim for restitution resulted in a conscious and deliberate settlement or the claimant expressly renounced his claim for restitution," would not be re-opened.  SUF ¶ 238.

In 2004, the Firm made a request under this new policy for the return of all former Goudstikker paintings in the Dutch State's possession.  SUF ¶ 239.  The Restitutions Committee produced an extensive report which summarized how the Firm succeeded in its deliberate strategy of selective restitution, SUF ¶ 240:

> On 10 November 1949, after two years of negotiating the restoration of rights, Old Goudstikker *formally* announced that it would only apply for the restoration of rights in respect of the Miedl transaction. Old Goudstikker wanted to exclude the Göring transaction − i.e., the goods recovered from Germany and put in the custody of the SNK − from the restoration of rights. However, the NBI initially could not agree to this preference. … The NBI deemed it unfair to allow the preference for a partial

1
2
3

> restoration of rights that, according to the NBI, was advantageous for Old Goudstikker. However, the NBI eventually agreed to the application for the restoration of rights for the Miedl transaction alone.

4    The Restitutions Committee ultimately recommended that the Dutch

5 government return the paintings in its possession that had been sold to Göring.  SUF

6 ¶ 241.  The Committee rejected Plaintiff's argument that the 1952 Settlement

7 Agreement had come about under coercion and deception.  SUF ¶ 242.  But it

8 concluded that the settlement agreement waived rights only as to the Miedl

9 transaction and not the Göring transaction.  SUF ¶ 242.  It based that conclusion on

10 the phrase "or to Göring" having been stricken from the provision dealing with

11 Dollhouse claims, without addressing the other provisions.  SUF ¶ 242.  The

12 Committee also noted the government policy that "settled" cases should not be

13 reopened, and that the government's formulation of "settled" case tracked the

14 holding in the 1999 Hague Court of Appeals decision that the Goudstikker Firm had

15 deliberately decided not to request restoration of rights in the Göring transaction.

16 SUF ¶¶ 244-245.  But, observing that (in contrast to the court in 1999) the

17 Committee was obligated "to issue a recommendation based more on policy than

18 strict legality," the Committee concluded that the Göring claim should not be

19 considered "settled" and that restitution should be granted.  SUF ¶ 246.

20    The State Secretary issued her decision on Plaintiff's claim in February 2006.

21 SUF ¶ 247.  She expressly disagreed with the Committee's reasoning, SUF ¶ 247:

> Unlike the Restitution Committee I am of the opinion that in this case it is a matter of restoration of rights which has been settled.  In 1999, The Hague Court of Appeal in its capacity as Restoration of Rights Court gave a final decision in this case.  This is why this case is not included in the current restitution policy.

22
23
24
25

26    Nevertheless, the State Secretary adopted the Committee's recommendation

27 to return the Göring artworks.  SUF ¶ 248.  Neither the Committee nor the State

28 Secretary purported to alter property rights to paintings belonging to third parties.

### III.   LEGAL STANDARD

#### A.   Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A] mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

#### B.   Questions of Foreign Law

On summary judgment, the court may resolve disputed questions of foreign law.  *McKesson HBOC, Inc. v. Islamic Republic of Iran,* 271 F.3d 1101, 1108 (D.C. Cir. 2001) *vacated in part on other grounds*, 320 F.3d 280 (D.C. Cir. 2003); *see*, *e.g.*, *Cassirer v. Thyssen-Bornemisza Collection Found.*, No. CV 05-3459-JFW (Ex), 2015 WL 9464458, at *14 (C.D. Cal. June 4, 2015).  To ascertain foreign law, "the court may consider any relevant material or source, including testimony."  Fed. R. Civ. P. 44.1.  While the Court may rely on expert testimony, "a determination of foreign law is a ruling on a question of law."  *In re Grand Jury Proceedings*, 40 F.3d 959, 964 (9th Cir. 1994); Fed. R. Civ. P. 44.1.  Accordingly, "[a]ny difference of opinion that the parties or their experts may have regarding the interpretation of a provision of foreign law does not create a genuine issue of material fact."  *United States v. BCCI Holdings (Luxembourg), S.A.*, 977 F. Supp. 1, 6 (D.D.C. 1997).

#### C.   Questions of Contract Interpretation

Similarly, "[c]ontract interpretation is a question of law."  *Mendler v. Winterland Prod., Ltd.*, 207 F.3d 1119, 1121 (9th Cir. 2000); *Ben-Zvi v. Edmar Co.*, 40 Cal. App. 4th 468, 472 (1995).  When there is no dispute as to the underlying evidence, but merely "battles over competing inferences" to be drawn from that evidence, the "interpretation of . . . agreements is a matter of law to be decided by the Court."  *F.B.T. Prods., LLC v. Aftermath Records*, 827 F. Supp. 2d 1092, 1102

1  (C.D. Cal. 2011) (citing *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App.

2  4th 1107, 1126-27 (2008)).

3      **D.    Conflict of Law**

4      In a diversity action such as this one, the Court must apply the forum

5  state's—California's—conflict of law rules. *389 Orange St. Partners v. Arnold*, 179

6  F.3d 656, 661 (9th Cir. 1999).  Under California's traditional rule, "[t]itle to a

7  tangible movable or chattel passes according to the law of the place where the

8  chattel was at the time of the transaction." *Auto Auction, Inc. v. Riding Motors*, 187

9  Cal. App. 2d 693, 696 (1960).  *Auto Auction* has never been overruled.  Under its

10  rule, Dutch law governs whether the Dutch State acquired title to the Cranachs while

11  the Cranachs were in the Netherlands.

12      California's governmental interests test leads to the same result.  *See Kearney*

13  *v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 107 (2006) (explaining governmental

14  interest test); *Cassirer*, 2015 WL 9464458 (Spanish law governs ownership of

15  painting in Spain).  The Dutch government enacted special statutes, including E100

16  and E133, to determine ownership of recuperated property.  California law has no

17  such scheme, so the laws of the Netherlands and California are not identical.  But

18  California law principles are entirely consistent with those behind the Dutch

19  statutory scheme.  Like E100, California law makes transactions under duress

20  voidable, *California Standard Fin. Corp. v. Cornelius Cole, Ltd.*, 9 Cal. App. 2d

21  573, 578 (1935); Cal. Civ. Code § 1566, but requires former owners to act promptly

22  to annul contracts entered into under duress, and requires them to repay any

23  consideration received.  *E.g.*, Cal. Civ. Code § 1691; *Golem v. Fahey*, 191 Cal. App.

24  2d 474, 477 (1961).  California law also gives the State power to sell unclaimed

25  stolen property that has been recovered by the State.  Cal. Penal Code § 1411(a).

26  Thus, applying a Dutch restitution scheme that embodies the same basic principles

27  as California law would not offend California's interests.

28      Moreover, the Netherlands has a much greater interest than California in

-27-

1    having its law applied.  The Netherlands has deep and abiding interest in the

2    enforcement of its wartime decrees, which reflect the Dutch government's careful

3    policy balance between giving victims of Nazi occupation the chance to reclaim

4    their property and redressing the economic harm suffered by Dutch society as a

5    whole.  The Netherlands also has a strong interest in having its law govern the

6    conduct, rights, and liabilities of its own government acting within its territory.

7          Likewise, to the extent Dutch and California law differ, the Court should

8    apply Dutch law to determine whether the Firm waived and abandoned its right to

9    the Cranachs in the 1950s.  The Dutch government has a greater interest than

10   California in having its law govern whether a Dutch company through conduct in

11   the Netherlands abandoned its right to paintings located in the Netherlands and

12   thereby transferred rights to the Dutch State.  *See CRS Recovery, Inc. v. Laxton*, 600

13   F.3d 1138, 1142 (9th Cir. 2010) (applying governmental interest test to whether

14   plaintiff abandoned property rights).  Finally, the Court should apply Dutch law to

15   determine whether the Firm waived its right to the Cranachs in the 1952 settlement

16   because it was signed and performed in the Netherlands.  *See* Cal. Civ. Code § 1646;

17   *Frontier Oil Corp. v. RLI Ins. Co.*, 153 Cal. App. 4th 1436, 1458 (2007).

18   **IV.   ARGUMENT**

19         Plaintiff told the Ninth Circuit that "[t]his case is only about one thing:

20   whether Marei or the Museum has title to the Cranachs."  *Von Saher v. Norton*

21   *Simon Museum of Art at Pasadena*, No. 12-55733 (9th Cir.), Docket No. 8, at

22   18.  Plaintiff has no conversion claim based on the Norton Simon's purchase of the

23   Cranachs if the Norton Simon acquired good title to them.  *See Cassirer*, 2015 WL

24   9464458, at *11; *cf. Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 208 (2014)

25   ("Conversion is the *wrongful* exercise of dominion over the property of *another*.")

26   (emphasis added).  Plaintiff's replevin claim stands on the same footing because it

27   seeks a form of relief for conversion.  *See Adler v. Taylor*, No. CV-04-8472-

28   RGK(FMOX), 2005 WL 4658511, at *3 (C.D. Cal. Feb. 2, 2005); *Stanley W. Smith,*

*Inc., v. Pilgrim,* 93 Cal. App. 539, 541 (1928).  And Plaintiff cannot prevail on her claims for quiet title, a declaration that she is the "rightful owner[]" and for violation of Cal. Penal Code § 496 unless she, not the Norton Simon, has title.  *See* Cal. Civ. Proc. Code § 761.020; *Hudson v. West*, 47 Cal. 2d 823, 831 (1957); *Finton Constr., Inc. v. Bidna & Keys, APLC*, 238 Cal. App. 4th 200, 213 (2015).

The Norton Simon traces its title to the Cranachs through Stroganoff to the Dutch State.  If the Court agrees with *any* of the following, Plaintiff cannot prove that she has title, and *all* of her claims must fail:

1.  the State acquired title or the power to dispose under Dutch law;

2.  the State acquired title or the power to dispose under international law;

3.  the Firm abandoned its rights to recover the Cranachs by its conduct;

4.  the Firm waived those rights in the 1952 Settlement Agreement;

5.  the Norton Simon's chain of title consists of Dutch sovereign acts that cannot be invalidated under the act of state doctrine;

6.  Plaintiff's claims are preempted because they contravene the result of her prior restitution claim for the Cranachs in the Netherlands; *or*

7.  the Norton Simon acquired title by adverse possession.

Each of these conclusions would be independently dispositive regardless of any factual dispute about whether the Stroganoff family owned the Cranachs.[4]  Finally, *laches* and the statute of limitations also bar Plaintiff's claims.

### A.   The Dutch State Acquired Ownership or a Power to Transfer the Cranachs after World War II

#### 1.   The Dutch State Acquired Ownership Under E133 and E100

Although the Goudstikker Firm's sale of the Cranachs to Göring in July 1940 was prohibited by, and automatically void under, Decree A6, the nullity of that sale

---

[4] Of course, Plaintiff's delay has prejudiced the Norton Simon in litigating that dispute at trial because Stroganoff can no longer defend his family's assertion of ownership.  (*See infra* Part IV.E.2.)

was revoked by CORVO in February 1947 after the Cranachs were recuperated from Nazi Germany.  SUF ¶¶ 356-358.  As a result, the sale was "effective" under article 10 of Decree A6 to transfer ownership of the Cranachs to Göring.  SUF ¶ 358.  Because Göring was an enemy within the meaning of Decree E133, SUF ¶ 322, his assets located in the Netherlands—including the Cranachs—automatically passed in ownership to the Dutch State under article 3 of E133.  SUF ¶ 326.

Nonetheless, under E100, Göring's title to the Cranachs, and thus the Dutch State's title, was voidable until July 1, 1951.  The undisputed facts show, however, that the Goudstikker Firm strategically chose not to void the Göring transaction.  SUF ¶¶ 118-129.  As the Council held in the Dollhouse case and as the directors and lawyers of the Firm understood, the Göring/Miedl transaction occurred under duress.  SUF ¶¶ 76, 143, 160.  The Firm also uncovered irregularities surrounding the transaction that could have further supported a request for annulment.  SUF ¶ 82.  E100 gave the Council the power to "declare totally or partially null and void any legal relations that originated or were modified during enemy occupation of" the Netherlands, and *presumed* annulment where a transaction had occurred "under coercion, threat or improper influencing by or on behalf of the enemy."  SUF ¶¶ 263, 265.  The Firm successfully petitioned the Council under E100 to annul decisions taken at other shareholder meetings during the war and petitioned for restoration of rights under the Miedl transaction before settling with the Dutch State.  SUF ¶ 83.  The Firm's lawyer and director, Max Meyer, understood that "nullification of the Göring transaction" under E100 was likewise an option.  SUF ¶ 122.  But the Firm "manoeuver[ed] very carefully" to *avoid* this option.  SUF ¶ 122.  Thus, the Firm did not request annulment of the Göring transaction prior to the deadline, and it was never annulled.  SUF ¶¶ 156-157.[5]

---

[5] The Goudstikker Firm did belatedly request restoration of rights as to the Göring transaction from the successor to the Council (the Court of Appeal in the Hague) in 1998, but that request was rejected in a final decision.  SUF ¶¶ 230-232, 375.

The Goudstikker Firm's deliberate decision to forgo nullification of the Göring transaction under E100 is dispositive.  As even Plaintiff's Dutch legal expert admits:  (1) E100 was the mechanism by which the Dutch determined whether there was a former Dutch owner to whom recuperated artwork should be restituted, or whether the artwork was an enemy asset that became the property of the state under E133; (2) E100 barred a civil law claim to annul the Göring transaction in an ordinary court, so the Goudstikker Firm's exclusive recourse was to the Council for Restoration of Rights under E100; (3) the Firm was obliged to follow the procedure of E100 in order to recover the artwork taken by Göring; and (4) the Firm could have invoked that procedure, and nothing stopped it from doing so.  SUF ¶¶ 312-314.  Although the Dutch State's title was *voidable* until 1951, the Firm chose not to void it.  SUF ¶¶ 118, 280.  As a consequence, the Dutch State remained the owner of the Cranachs until 1966 when it transferred ownership to Stroganoff.  SUF ¶ 315.

The Netherlands' restitution scheme was hardly unusual in treating a contract entered into under duress as effective to transfer ownership if not promptly annulled. That was also the rule under Dutch civil law before E100 preempted that law.  SUF ¶ 334.  It has also long been the law in California.[6]

The Dutch government's expropriation of the Cranachs is confirmed by the closest case that the parties and their experts have identified:  *Rebholz.*  That case involved a painting that the Nazis involuntarily confiscated from Kohn, a Dutch Jew, during the occupation of the Netherlands.  The Rebholzs, German nationals, bought the painting and sent it to Germany.  Like the Cranachs, the painting was returned by the Allies to the Netherlands after the war and the SNK took possession of it.  Without following E100's procedures, the SNK returned the painting to Kohn,

---

[6] *See California Standard Fin. Corp.*, 9 Cal. App. 2d at 578 (contract obtained through duress voidable); Cal. Civ. Code § 1566 (same); *Myrick v. O'Neill*, 33 Cal. App. 2d 644, 648 (1939) (voidable contract conveyed title); *Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919, 929-30 (2016) (voidable contract can be ratified); Cal. Civ. Code § 1691 (party must promptly rescind and return payment).

in exchange for requiring Kohn to assign a portion of his rights to the purchase price the Rebholzs had paid. The Rebholzs challenged this, but the NBI decided that the SNK had acted properly. The Rebholzs appealed to the Judicial Division of the Council for the Restoration of Rights. SUF ¶ 335.

The Council noted that the Rebholzs were enemies within the meaning of E133, and therefore held that "the ownership of their estate has been transferred to the State by operation of law" under E133. SUF ¶ 336. The Council further noted that the Rebholzs had not requested de-enemization under E133. SUF ¶ 338. In these circumstances, the Council ruled, the Rebholzs could not be considered "interested part[ies]," and their appeal was "inadmissible." *Id*. In U.S. legal terms, the Council dismissed the Rebholzs' appeal for lack of standing because they had no interest in the paintings that were the subject of their appeal.

The Rebholzs then petitioned the Council for reconsideration on the ground that they had, in fact, petitioned for de-enemization. SUF ¶¶ 339, 341. They did not challenge the Council's holding that ownership of the painting had passed to the Dutch State under E133. SUF ¶ 340. But their pending de-enemization request meant that the Dutch State's expropriation under E133 could be undone, giving them an interest. SUF ¶ 341.

In response to this petition, the Council's decision reaffirmed its earlier decision that "the painting, once returned to the Netherlands, definitely falls under [E133]" because (1) the Rebholzs were enemies within the meaning of article 2 of E133, and (2) the painting belonged to Mrs. Rebholz's estate "as she had acquired ownership of it through purchase." SUF ¶ 342. The Council reiterated this point by noting that the Dutch State should have given the painting "to the NBI as manager of Mrs. Rebholtz's estate." SUF ¶ 343. That is because, as the Council noted in its first decision, article 10 of E133 provides that "[p]roperty of an enemy state or of an enemy national, the ownership of which has been transferred to the State as a result of the provision in Article 3, will be managed by the [NBI] for the benefit of the

State."  SUF ¶¶ 344-345.  The Court further held that the State erred by treating "the original owner Kohn as the rightholder to the painting" and returning the painting to him without following E100.  SUF ¶ 346.  The State should have referred Kohn to proceedings under E100 and left it to the Council to determine whether he should have his ownership rights restored.  SUF ¶ 346.  By acting outside of E100, the State had unlawfully reduced the value of the Rebholz's seized estate, harming the Rebholzs to the extent they succeeded in obtaining de-enemization.  SUF ¶ 346.[7]

The *Rebholz* case confirms several crucial principles of Dutch restitution and reparations law:  (1) artworks recuperated from Germany after the war that had been purchased by an enemy (like the Rebholzs or Göring) constituted enemy property that was expropriated by the State under E133; (2) this was so even when the former Dutch owner (like Kohn or the Goudstikker Firm) had been deprived of his rights involuntarily; (3) if the former Dutch owner wished to recover the artwork, he had to seek restoration of rights from the Council under E100; and (4) the Dutch State, despite being owner of these recuperated artworks under E133, had to properly follow the procedures of E100 and E133 because its ownership was defeasible:  The State might turn out to be a custodian for a person "shown to have a right" in an artwork, such as a former owner who timely and successfully invoked E100, or an enemy owner who successfully invoked de-enemization.  SUF ¶¶ 348, 350.

Plaintiff's experts are flatly wrong, however, in suggesting that the Dutch State *perpetually* remained a mere custodian ("*detentor*" in Latin or "*houder*" in

---

[7] The Council also considered and rejected two *alternative* grounds that the Dutch State argued gave the State ownership of the paintings and cut off the Rebholzs' rights—*independent* of E133 and thus not conditional on the outcome of the de-enemization proceedings.  SUF ¶ 347.  The Dutch State pointed to two laws promulgated by U.S. authorities in occupied Germany regarding the transfer of property to formerly occupied nations, called "Law 52" and "Law 63."  SUF ¶ 347.  The Council rejected this argument on the ground that *these U.S. military laws*, at most, made the receiving state a custodian for "the person that is shown to have a right to them."  SUF ¶ 348.  But the Council did not reverse its prior ruling that the State was owner of enemy property under E133.  Indeed, the Rebholzs had not even challenged that ruling.  SUF ¶ 340.

Dutch) for the Goudstikker Firm.  Nothing in E133 or E100 declares that the Dutch State was a mere custodian.  SUF ¶ 283.  Plaintiff's experts improperly rely on references to custodianship in certain "Cultural Object Receipt" forms that the Dutch government signed when it took possession of some recuperated artworks from Allied forces.  These experts admitted that the custodianship language *does not appear in the receipt form that was signed for the Cranachs*.  SUF ¶¶ 103.  Plaintiff's experts also incorrectly substitute Dutch government officials' internal debates about what legal positions to take for the plain text of Dutch statutes and decisions such as those in the *Rebholz* case.

The interplay of Decrees E133 and E100 is clear:  Property purchased by enemies, even when involuntarily taken from former Dutch owners, was enemy property that was automatically expropriated by the State under E133 when it came within the territory of the Netherlands.  The former Dutch owner could nullify the enemy's purchase and regain the property through a claim under E100.  But such claims had to be brought by July 1, 1951.  After that, former owners could no longer annul the sale to the enemy and the Dutch State's ownership was confirmed.

## 2.  E100 Gave The Dutch State the Power to Dispose

Both parties' experts agree that, to the extent ownership of the Cranachs did not pass to the State under E133, chapter VII of E100 applied to the Cranachs.  SUF ¶ 287.  This Chapter (articles 110 – 113) regulates "[a]ny item located in the [Netherlands] whose owner is unknown."  SUF ¶ 287.  As the Norton Simon's experts explain, the Dutch government applied chapter VII broadly, including in cases where the true owner was unknown as a *legal* matter such as where potential claimants were known but had chosen not to file a claim.  SUF ¶ 288.  And Plaintiff's expert Prof. Salomons agrees that until "the original owner steps forward in order to reclaim" recuperated artworks, "he/she is also 'unknown.'"  SUF ¶ 288.

Article 110 of E100 directs the Council to administer these artworks.  SUF ¶ 284.  But article 113(2) of E100 creates a deadline for the administration and

1  provides that the State will sell objects whose owners have not come forward by that

2  date, which the Dutch government set as September 30, 1950.  SUF ¶¶ 289-291.  As

3  contemplated by this provision, beginning about two months after the deadline and

4  without any objection from the Firm, the State auctioned numerous unclaimed

5  Goudstikker artworks that had been recuperated from Germany.  SUF ¶ 147.

6       As Dr. van Vliet explains, article 113(2) of E100 grants the Dutch State a

7  *power of disposal* over the goods governed by this chapter, including the Cranachs.

8  SUF ¶ 285.  Under Dutch law as well as California law, a seller with a power of

9  disposal (also called a power to transfer in U.S. law) can transfer ownership of a

10 good to a buyer even if the seller is not the owner.  SUF ¶ 292; *see also* Cal. Com.

11 Code § 2403 ("A purchaser of goods acquires all title which his transferor had *or*

12 *had power to transfer* ...." (emphasis added)).  A power of disposal can arise by

13 agreement (e.g., granting an agent a power of attorney) or by statute (e.g., Dutch

14 statutory law giving a secured creditor the right to sell property securing a defaulted

15 debt).  SUF ¶¶ 293-294.  Dutch law recognizes that a statutory right to sell, such as

16 the one granted to secured creditors, must entail a power to dispose and transfer

17 ownership to the buyer, even if not expressly stated.  SUF ¶ 295.

18      For the same reasons, article 113(2) of E100 grants the Dutch government a

19 power of disposal in objects unclaimed by the September 30, 1950 deadline.  SUF

20 ¶ 285.  By directing that these objects will be sold, article 113(2) grants the Dutch

21 State a right to sell them, much like a secured creditor.  SUF ¶ 285.  And, as with

22 secured creditors, that right would be illusory without the power to transfer

23 ownership to the buyer.  SUF ¶ 285.  Plaintiff's experts have not rebutted the

24 opinion of the Norton Simon's expert Dr. van Vliet on this point.  SUF ¶ 285.

25 Although Plaintiff's expert Prof. Salomons maintains that the Dutch State was a

26 mere custodian, he acknowledged that the Dutch government by statute can grant

27 even a mere custodian a power of disposal.  SUF ¶ 296.

28      Because the Dutch State had a power to dispose of the Cranachs under E100

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

regardless of whether it was the owner, under both Dutch and California law the State transferred ownership of the Cranachs to Stroganoff through the 1966 sale that was part of the settlement of Stroganoff's restitution claim.  SUF ¶ 286.

### 3.     The Dutch State Had Title or the Power to Dispose of the Cranachs Under International Law

The Dutch State independently acquired title and/or the power to dispose under international law.  Both parties' experts agree that practices among sovereign states are an important source of international law.  SUF ¶ 303.  And there is no dispute that longstanding state practice, as embodied in numerous treaties, reflects the principle that art taken by an occupying force should be returned to the government of the occupied nation.  SUF ¶ 304.  The policy of external restitution adopted by the U.S. and its Allies incorporates this international law principle.

It is also common ground that international law gives states receiving returned art discretion to enact their own laws for restituting property to former owners.  SUF ¶ 355.  This international legal authority includes the power to impose deadlines to file restitution claims, and to require former owners to repay any consideration that they received in the challenged transaction that they seek to annul.  SUF ¶¶ 305-306. The U.S. itself adopted this obligation as part of Law No. 59, which established the restitution scheme administered by the United States military in occupied Germany. SUF ¶ 302.  Indeed, the U.S. policy of external restitution was based in part on the concern that "[t]he original owners may have received part payment for property taken from them under duress and the governments in question may wish to make adjustments for this circumstance in returning the property."  SUF ¶ 95.

State practice following World War II confirms that international law also gives nations the authority to take or convey title to property that former owners do not claim within a specified timeframe.  SUF ¶ 307.  That was exactly what the United States and Great Britain did in their occupation zones in Germany after the war.  Law No. 59 imposed deadlines for filing claims that were significantly shorter

than E100's deadlines.  SUF ¶¶ 299-300.  And, as the U.S. Court of Restitution Appeals made clear, where former owners failed to file claims by the deadline, "all right, title and interest to the claim and to the restitutable property became vested by operation of law" in the Jewish Restitution Successor Organization ("JRSO"), a third party appointed by the U.S. government.  *Advisory Opinion No. 1*, 1 Court of Restitution Appeals Reports 489, 492 (Aug. 4, 1950) (SUF ¶¶ 301, 308).  The former owner "lost his right to restitution … when the vesting of the claim in the successor organization took place" and was "forever barred from making any claim for the restitution of such property."  *Id.*

Applying these principles, U.S. restitution courts repeatedly held that the JRSO had title to unclaimed property as against former owners who did not file claims prior to the statutory deadline.  SUF ¶ 309.  Even when the JRSO transferred its rights to several of the German states, as it did in a number of cases, title to unclaimed property passed to those German states as against former owners.  SUF ¶ 310.  Indeed, the JRSO and its counterparts under parallel legislation in the British occupation zone, West Berlin, and decades later in the former East Germany after unification all took the position that national administrations gave them good title to unclaimed property.  SUF ¶ 311.

This historical practice demonstrates that states have the power to confer title to unclaimed property taken during wartime.  Under international law, the Netherlands possessed the same power, following World War II, to take or confer title to recovered property after former owners failed to reclaim it.  Indeed, the general principle of the state's power to take title to unclaimed property is widely accepted across jurisdictions, including California and federal law.  Cal. Penal Code § 1411(a) (Failure to Claim Stolen Property); 21 U.S.C. § 853(n) (Criminal Forfeiture).  No possible source of law here—not public international law, federal law, Dutch law, or California law—makes the Netherlands a permanent trustee of Nazi-looted property that the Goudstikker Firm failed to reclaim.

### 4. The Dutch State Acquired Title Because the Goudstikker Firm Waived, Abandoned, and Settled Its Claims

#### (a) The Goudstikker Firm Abandoned Its Rights in the Göring Works by Its Conduct in 1949 – 1951

Under Dutch law, a person abandons her rights in property through an intent to abandon coupled with words or conduct evincing that intent. SUF ¶ 372. Regardless of intent, abandonment will be found where another party reasonably interprets the words or conduct as abandonment. SUF ¶ 372. Upon abandonment, the person's property rights pass to whoever has possession of the good (through the doctrine of "occupation"). SUF ¶ 372. California law is similar. *See Hopson v. Nat'l Un. of Marine Cooks and Stewards*, 116 Cal. App. 2d 320, 325 (1953); *CRS Recovery, Inc.*, 600 F.3d at 1146.

On November 10, 1949, the Goudstikker Firm's director and lawyer, Max Meyer, expressly and unconditionally announced to the Dutch State that the Firm was waiving restoration of rights in the Göring artworks. SUF ¶ 140. As Plaintiff's expert concedes, it was already clear under binding Dutch Supreme Court precedent that a claim for restoration of rights under Decree E100 was the *exclusive* means for the Firm to annul the Göring transaction and regain the recuperated Göring artworks. SUF ¶¶ 273, 275. By waiving restoration of rights, the Firm was choosing to ratify the Göring contract, keep the monies it received, and accept the Dutch State's continued ownership of the Göring artwork. *Yvanova*, 62 Cal. 4th at 930 (voidable contract "subject to ratification"). *Cf. DM Residential Fund II v. First Tenn. Bank Nat'l Ass'n*, 813 F.3d 876, 878 (9th Cir. 2015) (where a party who "took actions inconsistent with unwinding the contract" waits even two years to rescind it, she has "affirmed the transaction," and her "right to rescind it is gone.").

We know that was the Firm's intent because Meyer's October 1950 memorandum tells us so: the Firm had decided to "direct the course of events in such a manner as to *prevent* the inclusion of the Göring transaction in the restoration of rights," and to "maneuver very carefully" to achieve that goal. SUF ¶ 122. The

Firm preferred to keep the money Göring paid rather than return that money for artwork it believed would be difficult to sell.  SUF ¶¶ 121-127.

Meyer's November 1949 formal announcement culminated the Firm's restitution efforts to that point, which were consistently focused on restitution solely of Miedl assets.  And the Firm's subsequent conduct reaffirmed the waiver.  The Firm let pass the September 1950 deadline for unknown owners to come forward and claim objects administered by the State, after which the State would sell them.  SUF ¶ 146.  Although the State's auction of Goudstikker paintings was announced in newspapers and auction catalogues, there is no evidence that the Firm ever objected.  SUF ¶¶ 147-148.  Even after the NBI announced that it would not approve the Miedl-only settlement that the Firm had worked so hard to negotiate, the Firm chose to submit a request for restoration of rights in the Miedl transaction only.  SUF ¶¶ 154-155.  The Firm deliberately excluded the Göring transaction from its request and ultimately secured a settlement excluding it.  This entire course of conduct constitutes an acceptance and ratification of the Göring contract and a waiver and abandonment of the Firm's rights in the Cranachs and other artwork sold to Göring.  SUF ¶ 373.

We also know that the State understood the Firm to have abandoned its restitution claim for the recuperated Göring artworks and relied on that understanding.  Beginning in November 1950, the State sold a number of recuperated Goudstikker-Göring objects at public auctions.  SUF ¶ 147.  It transferred others, including the Cranachs, to the national collection.  SUF ¶ 180.  And in 1966 the State sold the Cranachs to Stroganoff in settlement of his threatened claims.  SUF ¶ 200.

Plaintiff may rely on 1952 correspondence to argue that the Firm had not abandoned its rights to the Göring works and the Dutch government understood as much.  The facts show otherwise.  On February 5, 1952, the State asked whether the Firm was waiving its rights in the so-called meta-paintings that had been co-owned

by the Firm in 1940.  SUF ¶ 162.[8]  The Firm, however, had consistently taken the position that, as Meyer expressed in the memo attached to his November 1949 letter to the State, "the meta-paintings were not part of the transaction with Göring."  SUF ¶ 163.  Accordingly, the Firm's February 23, 1952 response reserving all rights did not encompass Göring works such as the Cranachs.  SUF ¶ 164.  The Firm no longer had any rights to reserve in the those works, having:  (1) renounced them in its letter more than two years earlier; (2) deliberately excluded the Göring transaction from its restoration of rights petition while letting the July 1, 1951 deadline pass; and (3) allowed the State to sell Göring artworks in reliance on its statements.

Nor does the August 1952 Settlement Agreement contradict the undisputed evidence of abandonment.  First, as discussed below, the agreement, when properly construed, confirms the Firm's waiver of rights in the Göring contract.  Second, even under Plaintiff's expert's reasoning the agreement is simply silent as to the Göring contract because its scope was limited to settling the pending Miedl proceedings.  SUF ¶ 368.  The Firm's rights in the Göring transaction had already been abandoned.  SUF ¶ 373.  Third, it cannot be disputed that the State *understood* the Firm to have abandoned its rights to the paintings left in the State's possession after the 1952 settlement.  Plaintiff's own expert agrees that the State from that point considered itself and acted as the owner of those paintings.  SUF ¶ 178.

### (b)     The Goudstikker Firm Waived Its Rights in the 1952 Settlement Agreement

Under Dutch contract law, the Goudstikker Firm gave up any rights it still had to the Cranachs in the 1952 Settlement.  The Restitutions Committee was not applying that law when it reached a different conclusion in 2006.

Under Dutch law, contract interpretation always depends on the facts and

---

[8] The February 1952 letter was sent by HERGO, a department of the Ministry of Finance that took over management of recuperated artwork from the SNK (to whom Meyer had addressed the November 1949 letter).  SUF ¶ 162.

circumstances at the time of contract and is never confined to an objective reading of the written text of the agreement.  SUF ¶ 364.  Although the text may be of considerable importance, it is the intention of the parties rather than the literal sense of the words that controls.  SUF ¶ 364.  The Court considers all surrounding circumstances to assess the meaning the parties reasonably attached to the terms of the contract and what the parties reasonably expected from each other at the moment they concluded it.  SUF ¶ 365.

Article 5.1 of the August 1952 Settlement Agreement is a crucial provision of the settlement, containing the mutual discharge between the parties.  It provides that the parties mutually release all rights and claims relating to the "purchase agreements mentioned in the preamble," except for those rights and claims expressly reserved.  SUF ¶ 170.  The preamble of the final settlement agreement does not mention any purchase agreements, because the entire recitation of the transactional history was cut in the final agreement.  SUF ¶ 173.  But under Dutch law, a contract should be interpreted so as to give effect to all of its provisions, not to render them nullities.  SUF ¶ 366.  The parties must have intended to release *some* rights and claims by this provision.  The best evidence for the intended scope of article 5.1's waiver is the last draft referring to purchase agreements in the preamble:  the June Draft, which mentions the July 13, 1940 Göring contract as well as the July 1, 5, and 13, 1940 Miedl contracts.  SUF ¶ 165.  Article 1.6 of the final agreement confirms the logic of looking to this source because it continues to provide that the Firm remains entitled to assert rights and to claim goods *not* covered by the very same purchase agreements mentioned in the June Draft's preamble.  SUF ¶ 171.

The best interpretation of article 5.1 is that both sides release all rights and claims vis-à-vis one another relating to the Miedl *and Göring* contracts.  SUF ¶ 371.  Indeed, this is the *only* interpretation that has been put forward:  Plaintiff's expert was unable to ascribe any meaning to article 5.1, and suggested that the continued reference to the Göring transaction in article 1.6 is a mistake.  SUF ¶ 367.

Plaintiff points instead to article 1.4 of the final agreement, in which the Goudstikker Firm waives over to the Dutch State all rights it could enforce against anyone in the world with respect to artworks delivered to Miedl.  She emphasizes that a draft of this provision also referred to artworks delivered to Göring and that the reference was dropped in the final agreement.  But it makes perfect sense that this provision would be limited to Miedl, and that the Dutch notary responsible for the agreements characterized the change to this provision as one of "a few editorial changes."  SUF ¶ 169.  That is because article 1.4 addresses the "Dollhouse" problem:  If the Goudstikker Firm were allowed to bring claims against third parties who purchased art from the Miedl Firm during the war (as happened in the Dollhouse case), this would create liability for the State.  SUF ¶ 369.  The parties to the 1952 Settlement Agreement were keenly aware of the problem; the preamble of the June Draft discusses the Dollhouse case and the issue of third party liability extensively, SUF ¶ 165, and the May 1950 draft settlement likewise used a separate provision to deal with this problem.  SUF ¶ 150.

The Dollhouse problem, however, was limited to artworks that the *Miedl Firm* held during the war.  Because the State had expropriated the Miedl Firm, it would be liable to indemnify third parties who acquired artworks from Miedl against claims from the Goudstikker Firm.  SUF ¶ 369.  The State had no such potential responsibility for claims against the Göring estate by third parties who bought paintings from him.  SUF ¶ 370.  Accordingly, the State had every reason to stop the Goudstikker Firm from suing third parties anywhere in the world over paintings that the Miedl Firm got its hands on during the war.  But it had no reason to stop the Goudstikker Firm from suing third parties over artworks they acquired from Göring.

That explains why the 1952 Settlement Agreement dropped the Göring paintings from the waiver in article 1.4 for claims against third parties.  To read that change as creating a reservation of rights as to the Göring transaction would contravene not only the text and drafting history, but the entire selective restitution

strategy adopted and pursued by the Goudstikker Firm for five years.  There is no evidence that anyone *at the time* understood the settlement to mean that the Goudstikker Firm would retain rights to restitution that it "maneuver[ed] very carefully" to avoid.  SUF ¶ 122.

In deciding that the 1952 Settlement Agreement waived rights in the Miedl transaction only, the Restitutions Committee in 2006 did not (and did not have to) reconcile article 1.4 with articles 5.1 and 1.6, or explain why the notary called the change to article 1.4 as an "editorial" one, or even discuss the relevance of the Dollhouse problem.  That is because the Restitutions Committee is not a court and, unlike the Court of Appeals, had an "obligation … to issue a recommendation … based more on policy than strict legality."  SUF ¶ 246.  The Committee's interpretation on that basis cannot guide this Court's interpretation of the contract as a matter of law.  The most logical inference from the undisputed facts is that the Firm waived its rights and claims vis-à-vis the Dutch State as to both the Göring and Miedl transactions, resulting in a transfer to the State of any rights the Firm held in the Göring artworks that the Dutch State had recovered.  SUF ¶ 371.

### B.   Plaintiff's Claims are Barred by the Act of State Doctrine

Echoing this Court's concern, Docket No. 88 at 9, the Ninth Circuit has cautioned that Plaintiff's claims "may implicate the act of state doctrine," *Von Saher II*, 754 F.3d at 726.  The Circuit held it could not "decide that issue definitively" absent discovery and "remand[ed] for further development of this issue."  *Id.* at 725.  The undisputed evidence now makes clear that the doctrine bars Plaintiff's claims.

The act of state doctrine forbids American courts to "sit in judgment on" the validity of sovereign actions taken by foreign governments.  *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897).  Under that doctrine, "the act within its own boundaries of one sovereign state cannot become the subject of re-examination and modification in the courts of another."  *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918).  Such an action "becomes . . . a rule of decision for the courts of this

country." *Id.* The doctrine applies when (1) there is an "official act of a foreign sovereign performed within its own territory"; and (2) "the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405 (1990).

The Norton Simon traces its title to the Dutch State's assertion of ownership of unclaimed, recuperated artwork and its conveyance of the Cranachs to Stroganoff. Plaintiff's own complaint implicitly acknowledges that these sovereign acts, if valid, cut off her chain of title, fatally undermining her claims. That is why Plaintiff has undertaken to prove that "the Dutch Government did not act reasonably," "wrongfully" delivered the Cranachs to Stroganoff, and was, in fact, a permanent custodian for the Goudstikker Firm (FAC ¶¶ 28, 40, 43). As explained above, Plaintiff's characterization of the Dutch government's restitution regime lacks any factual support, which itself entitles the Norton Simon to summary judgment. But Plaintiff's inquest into the Dutch government's post-war actions itself requires judgment against her. Under the act of state doctrine, what the Dutch government did as a sovereign state *is the law* in this case. *Ricaud*, 246 U.S. at 310. Because there can be no dispute that the State's actions that led to the Norton Simon's acquisition of the Cranachs were sovereign acts, they must be deemed valid. It follows that title based on those acts is valid as well.

**Assertion of Ownership**. The undisputed facts demonstrate that the Dutch government consistently asserted and exercised ownership over unclaimed externally restituted artwork, including the Cranachs, in its sovereign capacity. SUF ¶ 177. Plaintiff's expert has conceded that, at least following the August 1, 1952 settlement agreement, the Dutch government "considered itself the lawful owner" of the Cranachs and acted as their true owner. SUF ¶ 178. The State's sovereign assertion of ownership makes it the owner for purposes of this case.

1    The Dutch State asserted ownership at the highest levels of the government.

2  In the late 1940s, the Minister of Finance took the position that the government

3  would liquidate artworks "for which the State can be considered the owner.  These

4  are the art treasures that no original rightholders have announced themselves for, or

5  that are related to restitution claims that were not granted."  SUF ¶ 186.  With the

6  Minister of Justice's concurrence, SUF ¶ 187, the Dutch government sold some of

7  them to raise funds for the State and transferred others into public collections.  SUF

8  ¶ 180.  Government officials analyzing Stroganoff's claims expressly affirmed that

9  the State had become the owner of the Cranachs by operation of law when they were

10  recuperated to the Netherlands and went unclaimed in post-war restitution

11  proceedings.  SUF ¶ 192.

12    The Dutch State based its ownership as sovereign in some instances on E133,

13  a government expropriation decree, and in others in the law of nations based on

14  policy considerations about maximizing reparations for the Dutch State.  SUF

15  ¶¶ 181-187, 192.  An American court may not "sit in judgment" of this internal

16  debate.  *Underhill*, 168 U.S. at 252.  The dispositive fact is that the Dutch

17  government's decision to assertion and exercise of ownership of the Cranachs

18  "constitute[d] a considered policy decision by a government to give effect to its

19  political and public interests" because only a sovereign state could take custody of

20  externally restituted property, establish an internal restitution process for citizens to

21  claim that property, and then assert ownership and dispose of any unclaimed

22  property by adding the property to its national collection.  *See Clayco Petrol. Corp.*

23  *v. Occidental Petrol. Corp.*, 712 F.2d 404, 406-7 (9th Cir. 1983); *Int'l Ass'n of*

24  *Machinists and Aerospace Workers v. OPEC*, 649 F.2d 1354, 1360 (9th Cir. 1981)

25  ("When the state qua state acts in the public interest, its sovereignty is asserted.").

26  The act of state doctrine therefore requires this Court to give effect to the Dutch

27  State's assertion of ownership.  *See Tchacosh Co. v. Rockwell Int'l Corp.*, 766 F.2d

28  1333, 1337-38 (9th Cir. 1985) ("[W]hen a foreign government … has the parties and

the *res* before it and acts in such a manner as to change the relationship between the parties touching the *res*, it would be an affront to such foreign government for courts of the United States to hold that such act was a nullity.").

   **Transfer to Stroganoff**.  Plaintiff's claims would also require this Court to invalidate the Dutch government's decision to settle Stroganoff's claims by allowing him to purchase the Cranachs.  In *Von Saher II*, the Ninth Circuit stated it was "important to determine whether the conveyance to Stroganoff constituted an official act of a sovereign, which might trigger the act of state doctrine."  754 F.3d at 726.  At the motion to dismiss stage, the Ninth Circuit was unable to "answer this question because the record [was] devoid of any information about that transfer." *Id*.  The undisputed discovery record has now revealed that the Dutch government's decision to transfer the Cranachs to Stroganoff, made at the Cabinet level of government, was not a run-of-the-mill sale transaction, but rather a "considered policy decision by a government to give effect to its political and public interests" in preserving public ownership of artwork and avoiding the risks and costs of litigation.  *Clayco Petrol. Corp.*, 712 F.2d at 406-07.

   As Plaintiff's expert concedes, the Cranachs were not for commercial sale in 1966 any more than paintings at the Louvre or the National Gallery are today.  SUF ¶ 191.  In December 1965, the Dutch Minister of Culture wrote that "the two Cranachs are especially important for the Dutch cultural collection," and "[t]he sale of paintings from the State's art collection only takes place in exceptional cases, actually only if the interest of the country requires such sale."  SUF ¶¶ 196-197.  As discussed above, the Dutch government ultimately decided it was *in the national interest* to allow Stroganoff to purchase the Cranachs in "settlement" of his claim for four works of art in the State's collection.  *See supra* at 21; SUF ¶ 200.  The Dutch government sought to avoid "the risk of possibly losing the Rembrandt, which was valued at more than one million guilders," and other risks.  SUF ¶ 200.  This record leaves no room for dispute that the Dutch State's sale of the Cranachs to

Stroganoff was a sovereign act that "cannot become the subject of re-examination and modification" by this Court. *Ricaud*, 246 U.S. at 310. *See also Tchacosh Co.*, 766 F.2d at 1337-38.[9]  Contrary to Plaintiff's theory that the Dutch government "wrongfully" conveyed the Cranachs to Stroganoff, the Court must accept the conveyance as valid. *Id.*  That, in turn, validates Defendants' chain of title, defeating Plaintiff's claims as a matter of law.

**1999 Court of Appeal Decision**.  Finally, Plaintiff's claim that she owns the Cranachs requires this Court to set aside the Dutch State's acts of adopting and executing a comprehensive and exclusive restitution policy.  This policy culminated in the Dutch Court of Appeal's 1999 decision that the Goudstikker Firm was not entitled to restoration of rights in the Göring transaction under E100, *including compensation for the State's sale of the Cranachs*.  SUF ¶¶ 231-232, 375-382.  That decision itself was an act of state because it effectuated the Dutch government's exclusive procedures for resolving claims for restoration of rights to recuperated artwork after World War II.  *Clayco Petrol Corp.*, 712 F.2d at 406-07.

It is undisputed that, as to wartime transactions, the Dutch government displaced ordinary civil law claims and courts and gave exclusive jurisdiction to the Council for the Restoration of Rights applying unique rules under E100.  SUF ¶¶ 273- 274, 276.  The Dutch Supreme Court has so held, and the regular Dutch courts rejected the Firm's claims under Dutch civil law.  SUF ¶¶ 275, 384.

The Council had broad powers to declare void or modify any change in rights that occurred in the Netherlands, during the war, including on its own initiative.  SUF ¶¶ 262-266.  The Council also had authority to order compensation in cases where property could not be returned.  SUF ¶ 268.  In 1999, the Dutch Court of Appeals, sitting as the successor to the Council for the Restoration of Rights,

---

[9] *Cf.* Restatement (Third) of Foreign Relations Law § 443, Reporter's Note i. (1987) ("An official pronouncement by a foreign government describing a certain act as governmental is ordinarily conclusive evidence of its official character.").

rejected the Goudstikker Firm's effort to obtain that relief as to the Cranachs under this exclusive scheme. SUF ¶ 375. The Court *qua* Council declined to exercise its discretionary *ex officio* power because it concluded that the Firm had made a considered decision after the war not to take advantage of the full and fair opportunity provided by the Dutch government's restitution scheme. SUF ¶¶ 377-381. This execution of an exclusive and comprehensive restitution scheme by the administrative agency assigned to the task is beyond the proper scope of this Court's review. *Clayco Petrol Corp.*, 712 F.2d at 406-07; *Ricaud*, 246 U.S. at 310.

That is true even construing the Dutch Court of Appeals' decision as simply a court judgment. "While a foreign court judgment arising out of private litigation is generally not an act of state, it can be when it gives effect to the public interest of the foreign government." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1226 (9th Cir. 2006) (en banc) (Ferguson, J. concurring); *In re Philippine Nat'l Bank*, 397 F.3d 768 (9th Cir. 2005). Whether to exercise "*ex officio*" (essentially *sua sponte*) authority to grant relief as to artworks that had passed into the Dutch national collection under the Dutch government's exclusive statutory framework for restitution meets that standard.

At bottom, Plaintiff's claims seek to circumvent the Dutch government's exclusive assignment of claims related to wartime transactions to the Council under E100. She seeks relief in a California court that the Dutch civil courts held unavailable, advancing the (wholly unsubstantiated) theory that the Court of Appeals' decision was "misleading and false" and that the framework it applied was unfair or unreasonable. SUF ¶ 383. Those arguments are out of bounds under the act of state doctrine, which requires this Court to give effect to the execution of the exclusive restitution policy that the Dutch government established. Far from undermining that logic, the Restitutions Committee's decision in 2006 underscores it: the act of state doctrine exists so that foreign governments, not U.S. courts, can judge their own prior acts. "Whatever rights such an American citizen may have" to

complain about them "can be asserted only through the courts of" the foreign state "or through the political departments of our government." *Ricaud*, 246 U.S. at 310.

**Commercial Exception**.  None of the three acts of state discussed above qualifies for an exception to the act of state doctrine.  "A plurality of the Supreme Court has noted that an exception [to the act of state doctrine] may exist for 'purely commercial acts' in situations where 'foreign governments do not exercise powers peculiar to sovereigns' and instead 'exercise only those powers that can be exercised by private citizens.'"  *Von Saher II*, 754 F.3d at 726-27 (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 704 (1976)).  The Ninth Circuit has "not yet decided whether to adopt a commercial exception," *id*. at 727, and several district courts in the Ninth Circuit have refused to do so, *see In re Transpacific Passenger Air Transp. Antitrust Litig.*, 2011 WL 1753738, at *18 n.16 (N.D. Cal. May 9, 2011).  So should this Court.

Even assuming the commercial exception exists, it is inapplicable because none of the acts of state at issue was a "purely commercial act."  First, as explained above, the Dutch government's assertion and exercise of ownership of the Cranachs under its post-war restitution scheme was the quintessential exercise of "powers peculiar to sovereigns" that could not be "exercised by private citizens." *Dunhill*, 425 U.S. at 704.  The Dutch Court of Appeal's 1999 decision to deny the Goudstikker Firm restoration of rights in the Cranachs and other Göring works under this same restitution policy falls in the same category.  And the sale to Stroganoff cannot be characterized as "purely commercial" because the Cranachs were not "for sale" in any ordinary commercial sense.  A cabinet minister specifically decided that the Cranachs were important to Dutch cultural patrimony and could only be sold if the national interest required it.  SUF ¶¶ 191, 196-197.  He later decided that the sale was in the national interest—a power peculiar to sovereigns—because, *inter alia*, it would allow the State to keep in its public collection a Rembrandt of substantial cultural and economic value, SUF ¶ 200.  *See*

1   *OPEC*, 649 F.2d at 1360 (presence of a "commercial component" does not create an

2   exception to the act of state).

3       **C.**    **Plaintiff's Claims Are Preempted by Federal Restitution Policy**

4       The U.S. Constitution also requires this Court to enforce the outcome of the

5   post-war restitution process in the Netherlands, including the legal consequences of

6   the Goudstikker Firm's strategic decision not to pursue restitution for the artwork

7   recovered from Göring.  That is because discovery has confirmed that Plaintiff's

8   claims conflict with U.S. foreign policy regarding external restitution.

9       Plaintiffs' experts agree with the basic contours of this policy as described by

10  the Court of Appeals, SUF ¶ 96:  "the U.S. restituted the looted artwork to countries,

11  not individuals" and "'allow the individual governments to handle restitution in

12  whatever way they [saw] fit.'"  *Von Saher v. Norton Simon Museum of Art at*

13  *Pasadena*, 592 F.3d 954, 962 (9th Cir. 2010) ("*Von Saher I*").  As a matter of

14  foreign policy, then, the United States has a "continuing interest in respecting the

15  finality of 'appropriate actions' taken in a foreign nation to restitute Nazi-

16  confiscated art."  *Von Saher II*, 754 F.3d at 722.  A foreign nation has taken such

17  "appropriate actions" when the artwork was "subject to postwar internal restitution

18  proceedings" in that nation.  *Id*. at 721.[10]

19      *Von Saher II* involved a Rule 12(b)(6) motion to dismiss.  In that posture, the

20  Ninth Circuit inferred from the allegations in Plaintiff's complaint and the limited

---

[10] Although *Von Saher II* is binding on this Court, the Norton Simon reserves its objections to the decision's reformulation of U.S. policy on recovered art.  Among other things, the Solicitor General's brief in this case concluded that U.S. foreign policy prohibited reopening this case because the Cranachs were "subject (or *potentially subject*) to bona fide internal restitution proceedings in the Netherlands" that gave "[petitioner] and her predecessor adequate *opportunity* to press their claims."  *Von Saher v. Norton Simon Museum of Art at Pasadena*, No. 09-1254 (U.S.), Br. of U.S. as Amicus Curiae, 2011 WL 2134984 ("U.S. Amicus Br."), at 17, 19 (emphasis added).  The Norton Simon adheres to its position that the Circuit contravened settled case law holding that courts "have no authority … to decide what U.S. foreign policy is," *id.* at 731 (Wardlaw, J., dissenting).  As explained by its expert William Taft IV, former Legal Advisor to the State Department, briefs signed by the Legal Advisor reflect the considered view of the State Department and carry the force of foreign policy.  SUF ¶ 97.

record of judicially noticed material that "the Cranachs were never subject to postwar internal restitution proceedings in the Netherlands." 754 F.3d at 721. In particular, the Ninth Circuit inferred that the Cranachs "fell outside" Plaintiff's 1998 request to the Court of Appeal in The Hague, because Plaintiff had sought only "the return of all the Goudstikker artworks the Dutch government had in its possession." *Id.* at 722 & n.1. Discovery has now shown that the Ninth Circuit's assumptions based on the complaint were incorrect. The undisputed evidence demonstrates that Plaintiff in fact *did seek* restitution as to the Cranachs in its 1998 petition, and that those proceedings constituted internal restitution proceedings under E100.

Plaintiff specifically amended her request to the Dutch Court of Appeal to seek not only return of artworks still in the Dutch government's possession, but also compensation for artworks that the government had sold. SUF ¶ 232. And she submitted to that Court a list of such artworks. *The only paintings identified on that list as having been sold by the government were the Cranachs.* SUF ¶¶ 233-234. The Court construed Plaintiff's request as one for restoration of rights under E100 and considered that request in its capacity as successor to the Council for the Restoration of Rights, the Dutch agency tasked with overseeing restitution. SUF ¶ 376. Contrary to Plaintiff's past contentions (*Von Saher II* Reply Br. at 10), E100 provided that the Council could order monetary compensation as a remedy if returning the claimed property was inappropriate or impossible. SUF ¶ 268.

Plaintiff thus initiated and received Dutch postwar internal restitution proceedings as to the Cranachs. Those proceedings' outcome was that the Court declined to annul the Göring transaction or order restoration of rights because Plaintiff's request was untimely and because the Court found no good cause to order restitution *ex officio* after the deadline given the Goudstikker Firm's deliberate and strategic decision not to request restitution before the deadline. SUF ¶¶ 378-381.

Even apart from the 1999 decision, Plaintiff's claim is preempted because the Cranachs were subject to appropriate restitution proceedings in the immediate

postwar period.  The Ninth Circuit credited Plaintiff's allegations, under a 12(b)(6) standard, that there were no immediate postwar restitution proceedings because Desi "could not achieve a successful result in a sham restitution proceeding."  754 F.3d at 722.  But the factual record developed on remand confirms that the U.S. was correct that the Dutch government conducted "bona fide post-war restitution proceedings following the return of Nazi-confiscated art to that nation"; and that those proceedings involved negotiations and dealings over the Göring artworks, including the Cranachs.  U.S. Amicus Br. at 19.

As described above, the Firm (1) obtained a ruling from the Council that the Miedl and Göring transactions were involuntary, making them *presumptively* eligible for restoration of rights under E100; and then (2) formally notified the Dutch State that it was waiving its right to request restoration of rights in the Göring works; (3) filed a petition for restoration of rights in just the Miedl transaction; and (4) signed a settlement with a division of the Council waiving rights in the Göring transaction.  *See supra* at 15, 17-19, 40-43.  That these proceedings took the form of negotiations resulting in a formal waiver, rather than a petition leading to a formal decision, was the Firm's own strategic decision, not a sign that they were sham.  Indeed, the undisputed facts show that the Dutch government's restitution laws and practices were "appropriate" and "bona fide" under international law norms.  *Cf. United States v. Yousef*, 327 F.3d 56, 92 (2d Cir. 2003).  Among other things, they shared key features with the restitution laws that the U.S. itself set up in its occupied zone of Germany.  *See supra* at 11.  Plaintiff's own expert, Eltjo Schrage, concedes that "every civil servant" involved in the restitution process "did the utmost to serve the interest of the country and of the citizens."  SUF ¶ 100.

U.S. foreign policy demands respect for the finality of these proceedings.  By asking this Court to restore her property rights in the same works that already were subject to internal restitution proceedings in the Netherlands, and by challenging proceedings that were demonstrably "appropriate," Plaintiff's lawsuit fundamentally

1   undermines this U.S. policy.  The claims are therefore preempted under the foreign

2   affairs doctrine.  *See Von Saher II*, 754 F.3d at 719-20.

3           **D.      Plaintiff Cannot Prove Ownership Based on Soviet Theft**

4           Plaintiff cannot prove title to the Cranachs because her claim to ownership is

5   based on Soviet looting.  In stark moral contrast to the Norton Simon's assertion of

6   title based on the Dutch State's restitution process, Plaintiff traces her title to the

7   Soviet campaign to liquidate churches and confiscate church treasures.  And the

8   undisputed evidence—including an interview with Jacques himself—shows that one

9   of Europe's most sophisticated art dealers knew or should have known that the

10  Cranachs were stolen property when he bought them in 1931.  SUF ¶¶ 50, 55-56.

11          California does not permit Plaintiff to pursue a conversion claim based on that

12  unlawful conduct.  *See Wong v. Tenneco, Inc.,* 39 Cal. 3d 126, 134 (1985); *Suttori v.

13  Peckham*, 48 Cal. App. 88, 91 (1920) ("It should need no citation of authorities to

14  establish the proposition that no person can acquire title or right of possession to

15  property of the state by the act of taking possession thereof illegally"); *Lee On v.

16  Long*, 37 Cal. 2d 499, 502-503 (1951) ("If the plaintiff cannot open his case without

17  showing that he has broken the law, the court will not assist him, whatever his claim

18  in justice may be upon the defendant.").

19          Further, Plaintiff has not adduced evidence sufficient to establish that the

20  Goudstikker Firm acquired good title when it purchased confiscated property from

21  the Soviet Union, which is fatal to all of her claims, including her claim for

22  conversion.  *See supra* at 28-29.  The first element of a conversion claim under

23  California law is that the plaintiff had ownership with the right to possession or

24  actual possession at the time of the alleged conversion.  *See Rutherford Holdings,

25  LLC v. Plaza Del Rey,* 223 Cal. App. 4th 221, 233 (2014).  Plaintiff has proven

26  neither.  As this Court has held: (1) the alleged conversion at issue here took place

27  when the Norton Simon acquired the Cranachs, long after Plaintiff's predecessor

28  lost possession, *see* Docket No. 119 at 8-9; and (2) under California law, stolen

1    property remains stolen and a thief cannot pass good title, *id.* at 8-10.  Nor can

2    Plaintiff prove that title passed to the Soviet Union or to the Firm under any foreign

3    law that could be applied under California's conflict of law rules.  SUF ¶¶ 385-388.

4    Plaintiff cannot pursue a conversion claim based on the Soviet Union's theft.

   **E.**     **The Passage of Time Bars Plaintiff's Claims**

   **1.**     **The Statute of Limitations Bars Plaintiff's Damages Claims**

7        Plaintiff's damages claims remain subject to the pre-existing three-year

8    statute of limitations.  In 2009, the Ninth Circuit held that the three-year statute of

9    limitations in the California Code of Civil Procedure applied to Plaintiff's claims

10   and that the claims "began to accrue when she discovered or reasonably could have

11   discovered her claim to the Cranachs, and their whereabouts."  *Von Saher I*, 592

12   F.3d at 968-69.  The California Legislature later extended the limitations period, but

13   only for claims for "the *specific recovery* of a work of fine art."  Cal. Civ. Proc.

14   Code § 338(c)(2) (emphasis added).

15       The plain meaning of "specific recovery" does not include damages.[11]  For

16   over a century, California cases have used specific recovery to denote the remedy of

17   return of property, not damages.  *See, e.g.*, *Lowe v. Ozmun*, 137 Cal. 257, 259

18   (1902) ("In cases of unlawful taking or detaining personal property the wronged

19   party has usually the option of either bringing an action for its specific recovery or

20   an action to recover its value . . . ."); *Flores v. California Dep't of Corr. & Rehab.*,

21   224 Cal. App. 4th 199, 206 (2014); *State Farm Mut. Auto. Ins. Co. v. Dep't of Motor

22   Vehicles*, 53 Cal. App. 4th 1076, 1081 (1997).

23       The statutory structure confirms that the text means what it says.  The general

24

25   ───────────────
     [11] Plaintiff has submitted an expert report by an appraiser who claims that the
26   Cranachs currently have a fair market value of $150 million, over *ten times more*
     than the highest price ever paid for a work by Lucas Cranach the Elder, more than
27   the highest price ever paid for a painting by Leonardo da Vinci, and more than has
     ever been paid for any "Old Master" artwork save one by Rembrandt.  SUF ¶¶ 294-
28   252.  With trebling, then, Plaintiff seeks almost a half-billion dollars in damages
     from the Norton Simon, non-profit entities.

statute of limitations is worded broadly and applies to "[a]n action for taking, detaining, or injuring goods or chattels, *including actions for the specific recovery of personal property*." Cal. Code. Civ. P. 338(c)(1) (emphasis added). The original statute thus applied to a class of claims broader than the specific recovery claim to which the extended statute is directed. *See Riverside Cty. Sheriff's Dep't v. Stiglitz*, 60 Cal. 4th 624, 630 (2014) ("the court should avoid a construction that makes some words surplusage"). The Legislature's amendment of the statute as to specific recovery left the pre-existing statute intact for other kinds of claims.

The final text of the statute that created the new limitations period removes any doubt on this point. The Legislature enacted the special statute to remove obstacles to "*recovery of these objects* by parties that claim to be their rightful owner" and indicated that it was enacting an actual discovery rule "for actions against a museum, gallery, auctioneer, or dealer *to recover fine art*." 2010 Cal. Legis. Serv. Ch. 691 (A.B. 2765), §§ 1(a)(2), 1(c) (emphasis added). There is no evidence that the Legislature intended to extend the statute of limitations for damages claims.

Under the pre-existing three-year statute of limitations, Plaintiff's "cause of action began to accrue when she discovered or reasonably could have discovered her claim to the Cranachs, and their whereabouts." *Von Saher I*, 592 F.3d at 969. The undisputed facts show that, as a matter of law, Plaintiff waited more than three years to file suit after she could have discovered the Cranachs. *See Orkin v. Taylor*, 487 F.3d 734, 741 (9th Cir. 2007). In *Orkin*, the Court held that the plaintiff had constructive notice of a painting's whereabouts where the defendant was listed as the owner in the catalogue raisonné. *Id.*

*Orkin* is dispositive here because it is undisputed that the Norton Simon has displayed the Cranachs publicly since the 1970s and that, as early as 1978, the catalogue raisonné for *The Paintings of Lucas Cranach* identified the Norton Simon as the owner of the Cranachs and the Goudstikker Firm as the former owner. SUF

¶ 213.[12]   Indeed, Plaintiff's constructive notice is even clearer in this case. Jacques's entry for the Cranachs in his Blackbook refers expressly to the catalogue raisonné.  SUF ¶ 214.  Moreover, the Dutch government in 1998 gave Plaintiff a list of former Goudstikker artworks which stated that the Cranachs had been sold to Stroganoff.  SUF ¶¶ 233-235.  Finally, Plaintiff has not rebutted the opinion of the Norton Simon's provenance expert that any competent researcher "should have easily located the Cranachs at the Norton Simon."  SUF ¶ 215.  Since Plaintiff and her predecessors had all of the information they needed to find the Cranachs no later than 1998, the three-year statute of limitations bars her $450 million damage claim.

### 2.        Laches Bars Plaintiff's Claims For Specific Return

In extending the statute of limitations for claims for the specific recovery of fine art, the California Legislature expressly preserved the defense of laches.  *See* Cal. Civ. P Code § 338(c)(5).  Laches applies where a plaintiff unreasonably delays in pursuing her claims and prejudices the defendant.  *In re Estate of Kampen*, 201 Cal. App. 4th 971, 997 (2011).  Although the "existence of laches is a question of fact to be determined by the trial court" it "may be addressed as one of law if the facts are undisputed."  *Id.*  Thus, a "district court may properly grant summary judgment on the basis of laches."  *Am. Int'l Grp., Inc. v. Am. Int'l Bank,* 926 F.2d 829, 831 (9th Cir. 1991); *see Shiotani v. Walters,* 2012 WL 6621279, at *6 (S.D.N.Y. Dec. 3, 2012), *aff'd,* 555 F. App'x 90 (2d Cir. 2014) (granting summary judgment on the basis of laches in a case involving a dispute over the ownership of artwork); *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, 1999 WL 673347, at *10 (S.D.N.Y. Aug. 30, 1999).

The undisputed evidence shows an unreasonable delay.  *See Shiotani*, 2012 WL 6621279, at *6 (twenty-five year delay in filing claim for artwork was

---

[12] As the Norton Simon's expert also explains, many other public sources have long identified the Norton Simon as the owner of the Cranachs.  SUF ¶ 216.

unreasonable).  Plaintiff's predecessors had an opportunity to reclaim the Cranachs *decades* ago.  The Firm knew that the Dutch government possessed artwork that had been recovered from Goring and had every opportunity to file a claim for those works, but made a strategic choice based on expert advice not to do so.  In the subsequent four decades, Plaintiff's predecessors did nothing to seek the return of the Cranachs.  Plaintiff further contributed to this unreasonable delay when, after the Dutch government informed her in 1998 that it had sold the Cranachs, SUF ¶¶ 233-235, she made no effort to locate or recover them for several years.

Plaintiff's and her predecessors' unreasonable delay has seriously prejudiced the Norton Simon:  *Every witness with personal knowledge about the key issues in this case died during the period of delay*.  *See Getty v. Getty*, 187 Cal. App. 3d 1159, 1170 (1986) ("prejudice results from the death of important witnesses"); *Bakalar v. Vavra*, 819 F. Supp. 2d 293, 306 (S.D.N.Y. 2011), *aff'd* 500 F. App'x 6 (2d Cir. 2012) (sustaining a laches defense in an art law case where the claimant's delay "resulted in deceased witnesses, faded memories, lost documents, and hearsay testimony of questionable value").  **Desi Goudstikker** cannot provide crucial testimony regarding the Firm's intent in declining to file a restitution claim for the artwork sold to Göring and the 1952 settlement agreement.  **Max Meyer**, the Goudstikker Firm's lawyer, cannot testify about the Firm's decisions, his 1949 letter waiving the Firm's claims to the Goring works, or his 1950 memorandum analyzing its restitution options.  **A.E.D. von Saher** cannot testify about the Firm's strategic decisions or his 1952 report memorializing them.  And **Dutch government officials** cannot explain their negotiations with the Firm, their assertion of ownership over unclaimed property or the circumstances of the 1966 sale to Stroganoff.

The prejudice to the Norton Simon from not being able to call key witnesses to testify that they meant what they said in key documents is manifest, particularly when Plaintiff asks this Court to draw inferences away from the clear (and harmful for Plaintiff) implications of these historical documents.  The prejudice is

compounded by Plaintiff's admitted spoliation of evidence:  Plaintiff acknowledged under oath that she and her husband destroyed Desi's personal papers.  SUF ¶ 218.  Those documents might well have further illuminated Desi's understanding and decision-making, including the Firm's decision not to annul the Göring transaction.

## F.   The Norton Simon Acquired Ownership of the Cranachs by Adverse Possession

### 1.   California's Adverse Possession Statute Applies

Under Section 1007 of the California Civil Code, "[o]ccupancy for the period prescribed by the Code of Civil Procedure as sufficient to bar any action for the recovery of the property confers a title thereto, denominated a title by prescription, which is sufficient against all…."  Cal. Civ. Code § 1007.  To date, California courts have reserved the question of whether Section 1007 applies to personal property.  *See, e.g.*, *Soc'y of Cal. Pioneers v. Baker*, 43 Cal. App. 4th 774, 785 n.13 (1996); *San Francisco Credit Clearing House v. Wells*, 196 Cal. 701, 708 (1925).  A federal court therefore must predict how the California Supreme Court would resolve the issue.  *See Trishan Air, Inc. v. Fed. Ins. Co.*, 635 F.3d 422, 426–27 (9th Cir. 2011).  Section 1007's text and history make clear that it "establish[es] the right to acquire title to personal property by adverse possession." 13 Witkin, Summary 10th (2005) Pers. Prop., § 123, p. 139.

The plain text of Section 1007 encompasses all "property" without limitation, which the Civil Code defines to include both "1. Real or immovable; or, 2. Personal or movable" property.  Cal. Civ. Code § 657.  The fact that the Code in accompanying sections refers specifically to "real property" or "land" rather than broadly to "property," Cal. Civ. Code §§ 1006, 1008, shows the Legislature knew how to limit "property" when it wanted.  The fact that the Legislature chose to use "property" without differentiation in Section 1007 confirms its broad meaning.  That point is further underscored by the Legislature's use of the term "[o]ccupancy," a term that "is synonymous with the word 'possession' and connotes a subjection of

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   property to one's will and control."  *Williams v. Goodwin*, 41 Cal. App. 3d 496, 508

2   (1974); *see also McKenzie v. Brandon*, 71 Cal. 209, 211 (1886); *Lawrence v.*

3   *Fulton*, 19 Cal. 683, 688 (1862).

4        This identity between occupancy and possession has deep common law roots

5   predating the Legislature's enactment of Section 1007 in 1872.  Blackstone, for

6   example, wrote that "a property in goods and chattels may be acquired by

7   occupancy ….."  3 William Blackstone & St. George Tucker, BLACKSTONE'S

8   COMMENTARIES WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS OF

9   THE FEDERAL GOVERNMENT OF THE UNITED STATES AND OF THE COMMONWEALTH OF

10  VIRGINIA 401 (2d ed. 1803).  Accordingly, the U.S. Supreme Court explained at the

11  time that "the weight of authority" was in favor of title to adverse possession of  real

12  *or personal property* …."  *See Campbell v. Holt*, 115 U.S. 620, 623 (1885)

13  (emphasis added); *Chapin v. Freeland*, 142 Mass. 383, 387 (1886) (Holmes, J.)

14  (citing cases).  The law presumes that the Legislature used "[o]ccupancy" to codify

15  this common law rule.  *See Keeler v. Superior Court.*, 2 Cal. 3d 619, 625 (1970).

16       The plain meaning of "property" and its specific usage in Section 1007 refute

17  the notion that the Legislature silently departed from the long-settled principle that

18  prescription applies to personal property.  *Cf.* 3 AM. JUR. 2D ADVERSE POSSESSION §

19  12 (2007); 2 C.J.S. Adverse Possession § 315.

20            **2.      The Norton Simon's Title By Adverse Possession Vested**

21            **Before the Legislature Amended the Statute of Limitations**

22       Section 1007 "confer[red] a title" to the Cranachs on the Norton Simon

23  because:  (1) it had "[o]ccupancy" of them for more than three years after the then-

24  applicable statute of limitations began to run, *see supra* at 54-56 and (2) the Norton

25  Simon's possession satisfied the elements of adverse possession under California

26  law, *see Gilardi v. Hallman*, 30 Cal. 3d 317, 321 (1981).  *First*, the Norton Simon

27  *continuously* possessed and displayed the Cranachs for decades.  SUF ¶ 212.

28  *Second*, as *Orkin* confirms (*see supra* at 55-56), the Norton Simon's possession was

1  "open and notorious" because Plaintiff and her predecessors had "such constructive

2  notice as would place him on inquiry." *Yuba River Sand Co. v. City of Marysville*,

3  78 Cal. App. 2d 421, 429 (1947).  The Norton Simon possessed the Cranachs under

4  "color of title" based on, among other things, Stroganoff's conveyance, SUF ¶ 210.

5  *Aguayo v. Amaro*, 213 Cal. App. 4th 1102, 1110-11 (2013); *Buic v. Buic*, 5 Cal.

6  App. 4th 1600, 1604 (1992).  And the Norton Simon's possession was hostile

7  because it did not claim permission from Plaintiff and was "unaccompanied by any

8  recognition"—express or implied—of Plaintiff's rights to the Cranachs. *Fugl v.*

9  *Edwards*, 96 Cal. App. 2d 460, 464 (1950).

### 3. Retroactive Extension of the Statute of Limitations to Defeat the Norton Simon's Title Would be Unconstitutional

12      In 2010, the Legislature retroactively extended the statute of limitations for a

13  claim to recover the Cranachs.  *See* Cal. Civ. Proc. § 338(c)(3)(A).  However,

14  because the Norton Simon's title to the Cranachs by adverse possession vested

15  pursuant to the statute well before that time, the Constitution's Due Process Clause

16  prohibits applying the amended statute to divest the Norton Simon of title.  *See*

17  *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613, 619-20 (9th Cir.

18  2013) (citing *Campbell*, 115 U.S. at 623).

## V.   CONCLUSION

20      The Norton Simon is entitled to summary judgment on all claims.

DATED:  June 13, 2016            MUNGER, TOLLES & OLSON LLP
                                      RONALD L. OLSON
                                      LUIS LI
                                      FRED A. ROWLEY, JR.
                                      E. MARTIN ESTRADA
                                      ERIC P. TUTTLE

                                 By: */s/ Luis Li*
                                      LUIS LI
                                 Attorneys for Defendants