**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

| | |
|---|---|
| Case No.   **CV 07-2866-JFW (SSx)** | Date: August 9, 2016 |

Title:   Marei von Saher -*v*- Norton Simon Museum of Art At Pasadena, et al.

**PRESENT:**

   **HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **Shannon Reilly** | **None Present** |
| **Courtroom Deputy** | **Court Reporter** |

| | |
|---|---|
| **ATTORNEYS PRESENT FOR PLAINTIFFS:** | **ATTORNEYS PRESENT FOR DEFENDANTS:** |
| None | None |

**PROCEEDINGS (IN CHAMBERS):**   ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [filed 6/13/2016; Docket No. 186];

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 [filed 6/13/2016; Docket No. 213]

   On June 13, 2016, Defendants Norton Simon Museum of Art at Pasadena and Norton Simon Art Foundation (collectively, "Defendants" or "Norton Simon") filed a Motion for Summary Judgment [Docket No. 186].  On July 1, 2016, Plaintiff Marei von Saher ("Plaintiff") filed her Opposition [Docket No. 236].  On July 18, 2016, Defendants filed a Reply [Docket No. 308].

   On June 13, 2016, Plaintiff filed a Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 [Docket No. 213].  On July 1, 2016, Defendants filed their Opposition [Docket No. 256].  On July 18, 2016, Plaintiff filed a Reply [Docket No. 291].

   Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matters appropriate for submission on the papers without oral argument.  The matters were, therefore, removed from the Court's August 1, 2016 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

I.  **FACTUAL AND PROCEDURAL BACKGROUND**[1]

Plaintiff seeks to recover a pair of sixteenth century oil paintings, entitled "Adam" and "Eve," by Louis Cranach the Elder (the "Cranachs"), which were taken by Nazis during World War II from Plaintiff's father in-law, Jacques Goudstikker, in a forced sale. The Cranachs were acquired by Norton Simon from George Stroganoff-Scherbatoff in 1971 and have remained in Norton Simon's possession ever since. The Cranachs are currently on public display at the Norton Simon Museum of Art in Pasadena, California.

### A.  The Paintings and Their History

Before World War II, Jacques Goudstikker ("Jacques") was a prominent Dutch art dealer and the principal shareholder of an Amsterdam art dealership (the "Firm" or the "Goudstikker Firm"). On or about May 11, 1931, Jacques, on the Firm's behalf, purchased the Cranachs from the Soviet Union at the Lepke auction house in Berlin. Although the auction was entitled the "Stroganoff Collection" and featured artworks that the Soviet Union had forcibly seized from the Stroganoff family, it also included other artworks, such as the Cranachs, that were never owned by the Stroganoff family but rather that were seized from churches and other institutions.

In May 1940, Nazi troops invaded the Netherlands. Because he was Jewish, Jacques fled with his wife and son, Desi and Edo, to South America by ship. Although Jacques was forced to leave his art gallery and all of its assets behind, including more than 1200 artworks, Jacques brought with him a black notebook (the "Blackbook") which contained descriptions of the artworks in the Goudstikker Firm's collection at that time. The Cranachs were among the artworks listed in the Blackbook. Unfortunately, Jacques died in a ship-board accident shortly after leaving the Netherlands. Upon Jacques's death, Desi and Edo inherited Jacques's shares in the Firm.

In July 1940, after the Goudstikkers escaped, Nazi Reichsmarschall Herman Göring, and his cohort, Aloïs Miedl, acquired the Firm's assets through two involuntary "forced sales." Miedl acquired the Firm, its showroom, some of its paintings, and the family's castle and villa for 550,000 guilders, and Göring acquired other artworks, including the Cranachs, for 2 million guilders.

After defeating Germany, the Allied Forces recovered much of Göring's collection of looted artworks, including the Cranachs. On July 29, 1945, at the Potsdam Conference, President Truman formally adopted a policy of "external restitution," which governed recovered artworks found within the United States' zone of occupation. Under this policy, the United States

---

[1] The Court has elected to provide a brief and succinct statement of the relevant undisputed facts necessary to the Court's decision, and to the extent any of these facts are disputed, they are not material to the disposition of these motions. In addition, to the extent that the Court has relied on evidence to which the parties have objected, the Court has considered and overruled those objections. As to the remaining objections, the Court finds that it is unnecessary to rule on those objections because the disputed evidence was not relied on by the Court. Because much of the evidence was offered in connection with both motions, the Court has elected, for ease of reference, to cite to the exhibits offered in support of, and in opposition to, Norton Simon's Motion for Summary Judgment.

determined that recovered artworks should be returned to their countries of origin, not to individual owners. Those countries of origin were then responsible for establishing procedures for restituting the artworks to their lawful owners.

When property was returned by the United States, it was required that the country of origin acknowledge that it received the property. Some of the receipts expressly provided that the country of origin would keep the objects "as custodians pending the determination of the lawful owners thereof," and that the goods "will be returned to their lawful owners." Beginning some time in 1946, the United States ceased using this language, and instead the receipts reflected the possibility that an Allied Restitution Commission would be established that would make determinations about claims. However, such a commission was never established. In the event that the commission was not established, the receipts provided that "the transfer shall be dealt with in accordance with such procedure as may be established for other deliveries."

Pursuant to the U.S. policy of external restitution, in or about 1946, the Allied Forces returned hundreds of artworks looted from the Goudstikker Firm, including the Cranachs, to the Netherlands. Although some of the receipts for these artworks contained language designating the Netherlands as "custodian," the receipt for the Cranachs did not contain any such language. The Dutch government placed the Cranachs and other recovered artworks in the custody of the *Stichting Nederlands Kunstbezit* (the Netherlands Art Property Foundation, or "SNK") under the supervision of the *Nederlandse Beheersinstituut* (Dutch Custody Institute, or "NBI") pending any claims for restitution under the procedures that the Dutch government established after the war.

### B. The Dutch Government's Legal Framework

During the war, while in exile, the Dutch government enacted several royal decrees, three of which are relevant to this case: Royal Decree A6, Royal Decree E100, and Royal Decree E133. In order to understand the restitution process and the Dutch government's actions following the war, a brief discussion of these decrees is necessary. The Court will analyze the legal effect of these decrees in greater detail *infra*.

**Royal Decree A6**. On June 7, 1940, shortly after the invasion of the Netherlands by Nazi Germany, the Dutch government, in exile, issued Royal Decree A6 in an effort to protect the Dutch State against enemy attempts to damage its economic interests and plunder Dutch assets. Royal Decree A6 prohibited all transactions with Germans and other enemies that had effects outside the Nazi-occupied Netherlands, unless prior approval was obtained from a special committee, *Commissie Rechtsverkeer in oorlogstijd* ("CORVO"). Such prohibited transactions were automatically void if entered into without CORVO's prior consent, but Decree A6 gave CORVO the power to "revoke the invalidity" of these transactions after the fact "based on special circumstances by declaring the agreement or act still effective."

After the war, on February 5, 1947, CORVO revoked Royal Decree A6's automatic invalidation of all agreements to the extent they related to "recuperated" goods, i.e., goods found in enemy territory and returned to the Netherlands after the war. Its decision stated that it had decided to "sanction all acts and agreements, performed or entered into in violation [of Decree A6, article 6.1], insofar as these acts or agreements related to matters, which were found in enemy territory, after such territory was liberated or occupied by the allied forces, [which] since then have

returned to or will have been returned to the Netherlands." CORVO based its decision on the grounds that the invalidation of the transactions, which was intended to prevent harm to the interests of the Dutch State, was no longer important with regard to recuperated goods in light of their return to the Netherlands. Despite the sanctioning of these transactions, CORVO expressly indicated that these transactions could still be declared void under Royal Decree E100.

**Royal Decree E100**. Royal Decree E100 was issued on September 17, 1944 and became effective on September 21, 1944. It established a Council for the Restoration of Rights (the "Council") with broad and exclusive powers to review all wartime transactions and order restitution. Under E100, the Council had the power to declare totally or partially null and void, or to modify, "any legal relations that originated or were modified during enemy occupation of the [Netherlands]" if (a) "these legal relations exist between persons of whom at least one is an inhabitant of the [Netherlands] or if these legal relations concern an item or a right located within the [Netherlands]," and (b) the Council concluded that "non-intervention would be unreasonable in view of the special circumstances." The Council would presumptively intervene in cases where a transaction occurred under coercion, threat, or improper influence by the enemy, and it had the power to order the return of property to its former owner, subject to appropriate conditions, or to order compensation.

Royal Decree E100 generally required claimants who had received money from the Nazis in forced sales to return that money as a condition of recovering their property. The Dutch Government set a deadline of July 1, 1951 for the filing of claims for restoration of rights under E100. After that deadline, the Council retained the discretionary authority to order restoration of rights "ex officio" (i.e., *sua sponte* or on its own motion). E100 also authorized the Dutch State to sell property of unknown owners who had not come forward by September 30, 1950.

E100 created several divisions of the Council, including an Administration Division (which included the NBI) and an independent Judicial Division. A claimant always had the right to bring a claim before the independent Judicial Division, and decisions by any of the other divisions could be appealed to the Judicial Division. The decisions of the Judicial Division were final and had the force of a court judgment.

**Royal Decree E133**.

Royal Decree E133 was promulgated on October 20, 1944 and became effective on October 21, 1944. This decree facilitated reparations, as opposed to restitution, and expropriated enemy assets in order to compensate the Dutch State for losses that the Netherlands suffered during World War II. Article 3 of Royal Decree E133 decreed that all enemy property within the jurisdiction of the Netherlands automatically passed in ownership to the State on an ongoing basis (until July 1951 when the ongoing expropriating effect as to German assets ended by treaty). However, Decree E133 permitted "enemy" property owners to petition for "de-enemization" so they might regain their property.

### C. The Firm's Post-War Restitution Claim

In 1946, after the war, Desi Goudstikker ("Desi"), Jacques Goudstikker's widow and Plaintiff's mother-in-law, returned to the Netherlands to pursue restitution. After she returned, Desi became one of three directors of the Firm. The other two directors were Max Meyer, a Dutch

lawyer who served as the Firm's counsel, and Enrst Lemberger, Jr., a Dutch banker.  With advice from their lawyers and consultants, the Firm's directors decided to pursue restitution of the Firm's real estate and other assets that had been "sold" to Miedl, but decided not to pursue restitution of the artworks forcibly "sold" to Göring (which included the Cranachs).

      In an October 3, 1950 memorandum, one of the Firm's directors, Max Meyer, documented the Firm's restitution decisions and efforts to that point.  He explained that unwinding the Göring transaction could be disadvantageous to the Firm because, *inter alia*, (1) the Firm would be "left with a large number of works of art that are difficult to sell," including many objects "that had proved unmarketable for dozens of years that had been written down to a value of [1 guilder]"; (2) restitution of those artworks would "inevitably have led to the revival of an art dealership" which would be problematic because "it proved impossible to find a suitable person to run such a business and because reliable staff was lacking"; and (3) restitution would have resulted in a "considerable reduction in the [Firm's] liquid assets," with the Firm potentially having to pay back more money each time a new artwork was repatriated.  Accordingly, as Meyer stated in the October 3, 1950 memorandum, "[i]n accordance with the recommendations given, it was decided to direct the course of events in such a manner as to prevent inclusion of the Göring transaction in the restoration of rights, also given the unpredictable consequences this would entail."  However, Meyer recognized that: "It could not be predicted with certainty whether we would succeed.  The [Dutch government] could have made the restoration of rights conditional upon the nullification of the Göring transaction, which was certainly not inconceivable.  We therefore had to manoeuver very carefully."

      The Dutch government and the Firm attempted to reach an "amicable" resolution regarding the restoration of rights.  In late May 1951,  when it became clear that a settlement would not be finalized before E100's final July 1, 1951 deadline for requesting restoration of rights, the Dutch government suggested that the Firm file claims with the Council under E100 to preserve its rights while negotiations continued.  Shortly thereafter, on June 26, 1951, the Dutch government advised the Firm that it would not approve a settlement which only covered the Miedl transaction, stating: "We kindly wish to inform you with this writing that our Head Office has communicated to us that it cannot cooperate in the establishment of amicable restoration of rights regarding N.V. Goudstikker / Miedl, as it is considered incorrect to lift one transaction out of a complex of deeply intertwined war transactions which should, in fact, be considered a single transaction, and to conclude amicable restoration of rights on this one part only because this part was considered detrimental to the Goudstikker company, while the other transactions, which had been profitable for Goudstikker, are left out of the amicable restoration of rights."  However, notwithstanding the Dutch government's position and with full awareness of the impending E100 deadline, on June 27, 1951, the Firm only filed a claim with the Council for restoration of rights under E100 as to the Miedl property, and did not file any claim as to the artworks forcibly "sold" to Göring (the "Göring artworks") .

      Ultimately, in 1952, the Firm entered into a settlement agreement with the Dutch government covering the Miedl transaction. The settlement agreement expressly stated that Desi had agreed to the settlement because of her frustration with the restitution process, her desire to avoid years of expensive litigation, and her dissatisfaction with the fact that the Dutch government would not compensate her "for the profits made by said Alois Miedl and/or Miedl NV with [the Firm] and for the loss of the goodwill of [the Firm]."  The parties dispute whether the settlement

agreement released the Firm's claims to the Göring artworks. In any event, it is undisputed that the Firm intentionally allowed E100's final deadline of July 1, 1951 to expire without requesting restitution of the Göring artworks.

### D. Dutch State's Position Re: Ownership of Recuperated Artworks in the 1940s and 1950s

After the war, Dutch officials internally debated whether, and on what basis, the Dutch State could exercise ownership over the recuperated artworks. Some officials and legal experts opined that the State could take the position that it owned recuperated artworks under Royal Decree E133, whereas others opined that it would be more appropriate to take the position that the State acted as a custodian for original owners, but if no original owners asserted a claim or that claim was rejected, then the State acquired ownership under international law. However, the Dutch State recognized that these positions were not beyond doubt or without substantial risk, and that there was "no unchallengeable right of ownership of the State." Exh. 285 at 1766.

In any event, the Dutch State sold many unclaimed recuperated artworks, including former Goudstikker artworks, at public auctions in the 1950s. Other recuperated artworks, including the Cranachs, were transferred to the national art collection.

### E. Stroganoff's Purchase of the Cranachs from the Dutch State in 1966

In 1961, George Stroganoff notified the Dutch government that he claimed four paintings in the possession of the Dutch government -- the Cranachs, a Rembrandt, and a Petrus Christus. He claimed that these paintings had belonged to his family and that they had been unlawfully confiscated by the Soviet Union. From 1964 to 1966, the Dutch State and Stroganoff engaged in negotiations regarding his claim.

In 1965, Stroganoff proposed that he would abandon his claim to the Rembrandt if the State would allow him to "buy back" the Cranachs at a price to be determined. The Minister of Culture, Recreation, and Social Work initially rejected Stroganoff's proposal to purchase the Cranachs, explaining: "The sale of paintings from the State's art collection only takes place in exceptional cases, actually only if the interest of the country requires such a sale. At this time, I do not find that any such reason has presented itself." The Minister further noted that the two Cranachs are "especially important for the Dutch cultural collection."

The Dutch State ultimately agreed to Stroganoff's proposal in which Stroganoff would abandon his claim to the Rembrandt if the Dutch State would allow him to purchase the Cranachs and the Petrus Christus. The head of legal affairs for the Ministry of Culture explained the decision in a 1968 Memorandum as follows:

> These paintings had come into the property of the Dutch state after the (Jewish) art dealer Goudstikker from Amsterdam had been forced to sell them to Göring and after the American occupational forces subsequently sent them back to the country of origin where the paintings, pursuant to the Decree of Enemy Assets [E133], fell to the state. The legitimacy of this title of ownership was contested by

> [Stroganoff], as well as the legitimacy of the title of ownership originally acquired by Goudstikker. Our office at that time advised your predecessor to contest this claim, but your predecessor preferred to come to a settlement with the claimaint. On the one hand, he based this preference on the risk of possibly losing the Rembrandt, which was valued at more than one million guilders, and on the other hand on the doubts expressed by the state attorney, who estimated the costs of a possible court case to be approx. ƒ. 80,000. Accordingly, a settlement was reached in 1966, in which Stroganoff agreed to waive all his claims on the Rembrandt, while purchasing the other three paintings from the state of the Netherlands for a total sum of ƒ. 60,000.

The agreement between the Dutch State and Stroganoff was implemented on or around July 22, 1966, and the Dutch government transferred the Cranachs to Stroganoff. On January 13, 1971, Norton Simon purchased the Cranachs from Stroganoff for $800,000. The Cranachs remain in the possession of Norton Simon and are currently on public display.

### F.   Plaintiff's More Recent Restitution Claims

In 1996, Desi and her son Edo both died, leaving Plaintiff as the sole living heir of the shareholders of the Firm. In early 1998, Plaintiff revived the Firm, and filed several requests seeking the return of the artworks forcibly "sold" to Göring.

On January 9, 1998, the Firm petitioned the Dutch Ministry of Education, Culture, and Science to return the Göring artworks still in the Dutch national collection. The Ministry rejected that request in March 1998 concluding that the Firm had deliberately and intentionally decided not to submit a request for restoration of rights as to the Göring transaction.

Following this decision, the Firm, with Plaintiff's involvement, requested restoration of rights under E100 with respect to the Göring transaction. The Firm submitted a claim to the Court of Appeals in The Hague, which was the successor to the Council for the Restoration of Rights. The Firm sought the return of paintings in the Dutch State's possession, and also amended its claim to seek monetary compensation for any artworks that had been sold by the Dutch State, i.e., the Cranachs. On December 16, 1999, the Court of Appeals in The Hague rejected the Firm's claim as untimely because it had not been submitted prior to the July 1, 1951 deadline. However, it also considered whether to exercise its discretion to grant restoration of rights "ex officio," even though the deadline had expired. The Court of Appeals in The Hague rejected restitution on that basis as well, emphasizing that "nearly 50 years have now elapsed since the last moment that an application for the restoration of rights could be submitted," and that Ms. Goudstikker had made a "conscious and well considered decision to refrain from asking for restoration of rights with respect to the Göring transaction".[2]

---

[2] In 2001, the Firm also filed a separate claim against the Dutch State in the District Court in The Hague, seeking *revindication* (similar to common law replevin) of the Göring artworks. The Hague District Court rejected that claim on the ground that E100 was the exclusive recourse for relief related to wartime transactions.

In 2001, the Dutch government announced a new policy for handling restitution claims for recovered artworks based on the recommendations of the Ekkart Committee,[3] who described the Dutch government's handling of restitution in the immediate postwar period as "legalistic, bureaucratic, cold and often even callous." The new policy for handling restitution claims departed from a "purely legal approach to the restitution issue" in favor of "a more policy-oriented approach . . . in which priority is given to moral rather than strictly legal arguments." However, under this new policy, "settled cases", in which "either the claim for restitution resulted in a conscious and deliberate settlement or the claimant expressly renounced his claim for restitution," would not be re-opened. The policy also did not extend to objects, such as the Cranachs, that had been transferred to a third party, unless that party consented. In connection with its new policy, the Dutch government created the Dutch Advisory Committee on the Assessment of Restitution Applications for Items of Cultural Value and the Second World War (the "Restitutions Committee") to review claims and advise whether restitution should be made.

In 2004, the Firm submitted a claim under the new policy with the State Secretary of the Dutch Ministry of Education, Culture and Science, seeking return of the artworks in the Dutch State's possession (which did not include the Cranachs). The State Secretary referred the claim to the Restitutions Committee. After an extensive review of the historical evidence and "based more on policy than strict legality," the Restitution Committee concluded that Plaintiff's claim for the works taken by Göring was "still admissible" and recommended the return of the Göring artworks that were still in the Dutch government's possession. On February 6, 2006, the Dutch State Secretary adopted the Restitution Committee's recommendations regarding the return of the Göring artworks, but rejected the Restitution Committee's conclusion that the Goudstikker matter had not been "settled," explaining: "In 1999 the Hague Court of Appeal in its capacity as Restoration of Rights Court gave a final decision in this case. This is why this case is not included in the current restitution policy." Nevertheless, based on "the facts and circumstances surrounding the involuntary loss of property and the manner in which the matter was dealt with in the early Fifties," the Dutch State Secretary concluded that "in this special case there are grounds that justify a restitution in keeping with the recommendations of the Committee."

Concerned by these developments, Norton Simon sent a letter the Dutch State Secretary, asking the Dutch Government to confirm that it lawfully conveyed title to the Cranachs to Stroganoff in 1966. In response, in a letter dated March 31, 2006, the Director of Cultural Heritage, writing on behalf of the State Secretary, refused to express an opinion stating: "The two pieces of art involved here, are not part of the claim for which I have decided on 6 February of this year to make the return. The Restitution Committee did not include the facts and circumstances with respect to the two objects from the Norton Simon Art Foundation in its recommendation. As a result, I refrain from an opinion regarding the two pieces of art under the restitution policy."

Later, in a letter dated December 21, 2006, the Director of Cultural Heritage, again writing

---

[3]The Ekkart Committee was appointed by the State Secretary of Education, Culture and Sciences in 1997 in order to investigate the provenance of the so-called "NK Collection," i.e. the collection of artworks recuperated after World War II and still under the management of the Dutch State, and to advise the Minister of Education, Culture and Science on a future policy with regard to the return of those artworks. Exh. 275 at 11 (Salomons Expert Report).

on behalf of the State Secretary, advised Plaintiff's counsel (with a copy to Defendant's counsel): "As I understand from you, there exists a dispute between your client Marei von Saher and the Norton Simon Art Foundation concerning the ownership of two works, namely 'Adam' and 'Eve' by Cranach the Elder, which are currently located in the Norton Simon Museum. I confirm to you that the State of the Netherlands is not involved in this dispute. The State is of the opinion that this concerns a dispute between two private parties."

### G.     Plaintiff's First Amended Complaint[4]

On May 1, 2007 Plaintiff commenced this action against Defendants seeking to recover the Cranachs. In her First Amended Complaint filed on November 8, 2011, Plaintiff alleges the following state-law claims for relief: (1) Replevin; (2) Conversion; (3) Damages under California Penal Code § 496; (4) Quiet title; and (5) Declaratory relief. The parties have filed cross-motions for summary judgment.

## II.    LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party meets its burden, a party opposing a properly made and supported motion for summary judgment may not rest upon mere denials but must set out specific facts showing a genuine issue for trial. *Id.* at 250; Fed. R. Civ. P. 56(c), (e); *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). In particular, when the non-moving party bears the burden of proving an element essential to its case, that party must make a showing sufficient to establish a genuine issue of material fact with respect to the existence of that element or be subject to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is not enough to defeat summary judgment; there must be a genuine issue of material fact, a dispute capable of affecting the outcome of the case." *American International Group, Inc. v. American International Bank*, 926 F.2d 829, 833 (9th Cir. 1991) (Kozinski, dissenting).

An issue is genuine if evidence is produced that would allow a rational trier of fact to reach a verdict in favor of the non-moving party. *Anderson*, 477 U.S. at 248. "This requires evidence, not speculation." *Meade v. Cedarapids, Inc.*, 164 F.3d 1218, 1225 (9th Cir. 1999). The Court must assume the truth of direct evidence set forth by the opposing party. *See Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). However, where circumstantial evidence is presented, the Court may consider the plausibility and reasonableness of inferences arising therefrom. *See Anderson*, 477 U.S. at 249-50; *TW Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631-32 (9th Cir. 1987). Although the party opposing summary judgment is entitled to the benefit of all reasonable inferences, "inferences cannot be drawn from thin air; they must be based

---

[4]The protracted history of this action is well known to the parties, and is extensively set forth in the Ninth Circuit's opinions, 592 F.3d 954 (2010) and 754 F.3d 712 (2014), and this Court's prior orders [Docket Nos. 47, 88 and 119].

on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party." *American International Group*, 926 F.2d at 836-37.  In that regard, "a mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997).

## III.  DISCUSSION

Plaintiff's claims – for replevin, conversion, violation of California Penal Code § 496, quiet title, and declaratory relief – all depend on whether Norton Simon acquired "good title" to the Cranachs.  Norton Simon traces its title to the Cranachs through Stroganoff to the Dutch State.  The parties agree that if the Dutch State acquired ownership of the Cranachs, then Norton Simon acquired "good title" and is entitled to summary judgment on all of Plaintiff's claims.

Based on the undisputed facts, and as a matter of Dutch law, the Court concludes that the Dutch State acquired ownership of the Cranachs pursuant to Royal Decree E133 and thus that Norton Simon is entitled to summary judgment on all of Plaintiff's claims.[5]  The Court finds it unnecessary to address the parties' remaining arguments because the Court's determination of this issue is dispositive of Plaintiff's claims.

### A.  Effect of Royal Decree A6 and the 1947 CORVO Decision

It is undisputed that the forced sale of the Cranachs to Göring in July 1940 was automatically void, at least initially, pursuant to Royal Decree A6.  As discussed *supra*, Royal Decree A6 prohibited all transactions with Germans and other enemies that had effects outside the Nazi-occupied Netherlands, unless prior approval was obtained from CORVO.  Exh. 60 (Royal Decree A6) at 3.  Such prohibited transactions were automatically void if entered into without CORVO's prior consent.  *Id.* Because CORVO did not give its prior consent to the Göring transaction, the transaction was automatically void.

However, Decree A6 gave CORVO the power to "revoke the invalidity" of these transactions after the fact "based on special circumstances by declaring the agreement or act still effective." Exh. 60 (Royal Decree A6) at 5.  CORVO did exactly that with respect to the Göring transaction in 1947, when it "sanction[ed] all acts and agreements, performed or entered into in violation [of Decree A6, article 6.1], insofar as these acts or agreements related to matters which were found in enemy territory, after such territory was liberated or occupied by the allied forces, [which] since

---

[5]Norton Simon argues, under California's conflict of law rules, that Dutch law governs whether the Dutch government acquired ownership of the Cranachs while the Cranachs were in the Netherlands.  Plaintiff apparently agrees that Dutch law governs this issue, because she has failed to offer any choice-of-law analysis and generally cites to Dutch law when analyzing this issue.  To the extent that there is any dispute, the Court concludes, for the reasons stated in Norton Simon's moving papers, that Dutch law governs this issue.  Pursuant to Federal Rule of Civil Procedure 44.1, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law."

then have returned to or will have been returned to the Netherlands." Exh. 70 (1947 CORVO decision). Accordingly, because the Cranachs had been returned to the Netherlands pursuant to the United States' policy of external restitution, the Göring transaction was no longer automatically void and was "effective" to transfer ownership of the Cranachs to Göring.

Although the Göring transaction was no longer automatically void and now considered "effective," the Firm could still seek to void or nullify the transaction under Royal Decree E100. In other words, the transaction remained voidable.[6] Indeed, in its 1947 decision, CORVO expressly contemplated that former owners could seek to nullify these transactions by filing a claim under Royal Decree E100. *See* Exh. 70 (1947 CORVO decision) ("[B]y elimination of such nullity the question whether pursuant to provisions regarding restitution the goods will return to the person who at the time of the act or agreement was the owner thereof is not prejudged".).

### B. Effect of Royal Decree E100

As discussed *supra*, under Royal Decree E100, the Council had the power to "declare totally or partially null and void, or to modify, any legal relations that originated or were modified during enemy occupation of the [Netherlands]." Exh. 1 at 6 (Royal Decree E100). The Council's power specifically included the power to nullify transactions that occurred "under coercion, threat or improper influencing by or on behalf of the enemy." Exh. 1 at 7 (E100 art. 25). If the Council declared a transaction null and void, then the former owner of the property was restored as the owner of the property, and the Council could order the property returned to that owner (usually on the condition that she return to the Dutch State any consideration received for it). *Id.* at 6, 7 (E100 art. 20, 27.5).

E100 provided the exclusive recourse for claimants seeking restitution of property lost as a result of wartime transactions. *See id.* at 5 (E100, art. 19.1) ("The common-law court is incompetent to hear and decide on claims or requests that the Council is competent to handle by virtue of this Decree."); Exh. 21 (Vliet Expert Report) at 17-18 & n. 76; Exh. 71 at 6 (Dutch Supreme Court Judgment, NJ 1947/159, Feb. 20, 1947); Exh. 93 at 4 (Dutch Supreme Court Judgment, NJ 1953/465, Nov. 28, 1952); Exh. 123 (Decision of the District Court in The Hague dated Jan. 10, 2001); Exh. 279 at 12 (Salomons Expert Rebuttal Report). Accordingly, unless the Göring transaction was nullified by the Council under E100, the Göring transaction would, and always would, remain "effective."

The Dutch Government set a deadline of July 1, 1951 for the filing of claims for restoration

---

[6]Plaintiff contends that the Göring transaction remained void, not voidable, after the 1947 CORVO decision. However, Plaintiff's contention is belied by both the express language of the 1947 CORVO decision and the language of Royal Decree E100. Indeed, the 1947 CORVO decision clearly "sanctioned" the Göring transaction subject to the Firm obtaining a restoration of rights under E100. Moreover, E100 provided that the Council has the power to "declare totally or partially null and void" transactions that occurred "under coercion, threat or improper influencing by or on behalf of the enemy." Accordingly, the Göring transaction, as a transaction that occurred "under coercion, threat or improper influencing by or on behalf of the enemy," was subject to being declared void (i.e., voidable) and was not automatically void.

of rights under Royal Decree E100. The Firm did not seek to nullify the Göring transaction prior to the July 1, 1951 deadline. Although the Council retained the discretionary authority to order restoration of rights "ex officio", the Firm had no right to request relief under E100 after the deadline. *See* Exh. 7 (Decision of the Court of Appeals in the Hague dated December 16, 1999) at 15 ("[I]t was determined that such claims must have been submitted prior to July 1, 1951. . . . The claim submitted to the Court of Appeals on August 19, 1998, therefore, was not submitted on time, so that in principle a ruling of inadmissibility must follow on this ground."); Exh. 22 (Vliet Expert Rebuttal Report) at 5 n.8. In any event, in 1999, the Court of Appeals in The Hague, as successor to the Council, held that the Firm was not entitled to such "ex officio" relief. Exh. 7 at 7-8 (Decision of the Court of the Appeals in The Hague dated December 16, 1999). As a result, because the transaction was never nullified under Royal Decree E100, the Göring transaction remained "effective." *See* Exh. 21 (Vliet Expert Report) at 25.

### C. Effect of Royal Decree E133

Because the Göring transaction was considered "effective" unless and until it was declared null and void under Royal Decree E100, the Cranachs were automatically expropriated pursuant to Royal Decree E133 as enemy property.

As discussed *supra*, Royal Decree E133 facilitated reparations, as opposed to restitution, and expropriated enemy assets in order to compensate the Dutch State for losses that the Netherlands suffered during World War II. *See* Exh. 21 at 19 (Vliet Expert Report). Article 3 of Royal Decree E133 decreed that all enemy property located within the Netherlands or belonging to the "legal sphere" of the Netherlands automatically passed in ownership to the State on an ongoing basis (until July 1951 when the ongoing expropriating effect as to German assets ended by treaty). *See* Exh. 2 at 2-3 (E133, arts. 3, 1.8); Exh. 21 at 19 n.80, 21 nn.93, 94 (Vliet Expert Report). The Court concludes, and the parties and their experts agree, that this provision of Royal Decree E133 applied to enemy property recuperated to the Netherlands after the war.[7] *See* Exh. 19 at 10 (Hartkamp Report); Exh. 21 at 25-26 (Vliet Expert Report); Exh. 91 at 1 (Judgment of the Judicial Division in the Rebholz-Schröter v. NBI case, dated July 9, 1951) (holding that recuperated painting was expropriated under E133, art. 3); Exh. 94 at 1 (Judgment of the Judicial Division in the Rebholz-Schröter v. NBI case, dated Nov. 23, 1953) ("[N]ot to be discussed is the question raised by the petitioners whether or not the painting, as long as it was in Germany, fell under Decree E 133, because petitioners have acknowledged that the painting, once returned to the Netherlands, definitely falls under that decree . . . ."); Exh. 170 (Schrage Dep. 49:6-50:16); Exh. 156 at 9-10 (Salomons Expert Report); Plaintiff's Motion at 19 n. 6.

---

[7]Although Plaintiff's expert Professor Salomons acknowledges that Royal Decree E133 applied to enemy property recuperated to the Netherlands after the war, he attempts to carve out an exception for recuperated goods that had been "returned for restitution to the Netherlands for their previous Dutch owners." Exh. 274 at 7 (Salomons Expert Report). However, Royal Decree E133 contains no such exception or distinction: "[i]t applies to all assets owned by the enemy . . . without regard to what supposed purpose motivated their return to the Netherlands." Exh. 20 at 3 (Hartkamp Expert Rebuttal Report); *see also* Exh.22 at 3-4 (Vliet Expert Rebuttal Report) ("This exception cannot be found in Decree E133, which applies to all property owned by the enemy.").

As the Dutch Supreme Court held in 1955, Royal Decree E133 made the Dutch State the full owner of the covered assets, as opposed to a mere fiduciary for another owner. Exh. 95 at 3 (Dutch Supreme Court Judgment, NJ 1955/357, Apr. 6, 1955). In so holding, the Dutch Supreme Court noted that, although the Dutch State may possibly be required to return the property expropriated under E133 (if, for example, the "enemy" successfully petitions for de-enemization), "the possibility of a return and the powers allotted with this in mind do not automatically mean that the State, as long as the return has not been realized, is not the owner." *Id.* at 5.

It is undisputed that Göring qualified as an enemy under Royal Decree E133,[8] and that the Cranachs were returned to the Netherlands in 1946. Accordingly, based on its application of the relevant law, the Court concludes that the Dutch State acquired ownership of the Cranachs pursuant to Royal Decree E133. Specifically, the Court concludes that: (1) because CORVO revoked the automatic invalidity of the Göring transaction in 1947, that transaction was "effective" and the Cranachs were considered to be the property of Göring; (2) because Göring was an "enemy" within the meaning of Royal Decree E133, his property located in the Netherlands, including the Cranachs, automatically passed in ownership to the Dutch State pursuant to Article 3 of Royal Decree E133; (3) unless and until the Council annulled the Göring transaction under Royal Decree E100, the Cranachs remained the property of the Dutch State; and (4) because the Göring transaction was never annulled under Royal Decree E100, the Dutch State owned the Cranachs when it transferred the paintings to Stroganoff in 1966. *See* Exh. 21 at 22-33 (Vliet Expert Report); Exh. 19 at 10-16 (Hartkamp Expert Report).

### D. The *Rebholz* Decisions

The Court's conclusion that the Dutch State acquired ownership of the Crananchs pursuant to Royal Decree E133 is entirely consistent with, and supported by, the Council's decisions in the *Rebholz* case. *See* Exhs. 91 and 94.

The *Rebholz* case concerned a painting which, at the beginning of World War II, belonged to H. Kohn, who fled to England in May 1940. The painting was seized by the Germans, and then sold at auction. Erna Rebholz, who qualified as an enemy under Royal Decree E133, purchased the painting on July 1, 1941 at the price of ƒ 58,500. The painting was thereafter seized by the Allies in Germany, and returned to the Netherlands. The Dutch State returned the painting to Kohn, its former owner, even though he had not obtained restoration of rights under E100. The Rebholzs challenged the Dutch State's actions. In its Judgment dated July 9, 1951, the Judicial Division of the Council held that the Rehbolzs were enemies within the meaning of Article 2 of Royal Decree E133, and "that, therefore the ownership of their estate has been transferred to the State by operation of law, pursuant to article 3" of Royal Decree E133. Because the Rebholzs had failed to submit an application for de-enemization, the Council ruled that their appeal was "inadmissible." *See* Exh. 91 at 1-2.

The Rebholzs then petitioned the Council for reconsideration on the ground that they had, in

---

[8]The definition of enemy included all natural persons who were nationals of Germany or Japan at any time after May 10, 1940. Exh. 2 at 1-2 (Royal Decree E133, arts. 1 & 2). Göring, as a leader of Nazi Germany and a German national, clearly met this definition.

fact, petitioned for de-enemization. *See* Exh. 92. The Rebholzs did not challenge the Council's holding that ownership of the painting had been transferred to the Dutch State pursuant to Royal Decree E133. *See id.* at 2 ("[F]or these proceedings the petitioner, without prejudice to all her other rights, wishes to accept that this painting which was not in the Netherlands at the moment the Decree on Enemy Assets entered into effect, is deemed to be subject to the forfeiture or transfer of ownership, pursuant to article 3 of the Decree on Enemy Assets, despite the territorial scope of the Decree on Enemy Assets . . . ."). Accordingly, the Council, upon reconsideration, did not disturb the prior holding. Indeed, in its Judgment dated November 23, 1953, the Council stated: "[N]ot to be discussed is the question raised by the petitioners whether or not the painting, as long as it was in Germany fell under the Decree E 133, because petitioners have acknowledged that the painting, once returned to the Netherlands, definitely falls under that decree, since Mrs. Rebholz although she might also have Dutch nationality, is a person as mentioned in Article 2 of the Decree E133." Exh. 94 at 1.

Because the Rebholzs had petitioned for de-enemization and thus the Dutch State's expropriation under Royal Decree E133 could be set aside,[9] the Council then analyzed whether the Dutch State could have acquired ownership of the painting on a different basis - under "Law 52" or "Law 63." Exh. 94 at 1-2. Laws 52 and 63 were promulgated by Allied authorities in Allied-occupied Germany. The Council concluded that the Dutch State did not acquire ownership of the painting under Laws 52 or 63, but rather that it received the painting as a custodian, stating, in relevant part: "[T]he Council . . . considers the aforementioned Laws to be exclusively aimed at returning the goods in question to the jurisdiction of the State from which said goods were removed and for that purpose aimed at bringing these goods under the factual power of the State that will keep them and will secure their return to the estate of the person that may be shown to have a right to them, which is why the Foundation, which can here be equated with the State, received the painting as custodian for the rightholder." Exh. 94 at 2. In rejecting the Dutch State's claim that it acquired ownership under Law 52 and Law 63, the Council also noted that "the aforementioned laws [Law 52 and Law 63] have <u>territorial application</u>, meaning they only apply to the German territories occupied by the allies and that these statutes cannot affect the relationships of people residing outside those territories vis-à-vis the goods found in those territories." Exh. 94 at 2.

Accordingly, because Mrs. Rebholz was an "enemy" and the painting belonged to Mrs. Rebholz's estate "as she had acquired ownership of it through purchase," the Council concluded that the painting should have been given to the NBI as "manager of Mrs. Rebholz's estate" pursuant to Royal Decree E133.[10] Exh. 94 at 2. The Council further held that the Dutch State erred by treating "the original owner Kohn as the rightholder to the painting" and returning the painting to him when his rights had not been restored by the Council under Royal Decree E100. Exh. 94 at 2.

---

[9]"In law the State had full ownership under E 133, but because that ownership might be undone through the pending de-enemization procedure, in practical terms it was akin to custodianship (until de-enemization was finally rejected)." Exh. 21 at 31 n.129 (Vliet Expert Report).

[10]Article 10 of Royal Decree E133 provides that "[p]roperty of an enemy state or of an enemy national, the ownership of which has been transferred to the State as a result of the provision in Article 3, will be managed by the [NBI] for the benefit of the State." Exh. 2 at 7 (Royal Decree E133).

The Court concludes that the *Rebholz* decisions confirm the following principles: (1) artworks recuperated from Germany after the war that had been purchased by an enemy (like Rebholz or Göring) constituted enemy property that was expropriated by the Dutch State under Royal Decree E133; (2) contrary to Plaintiff's argument, this principle applies even when the former Dutch owner (like Kohn or the Goudstikker Firm) had been deprived of his rights involuntarily; (3) if the former Dutch owner wished to recover the artwork, he had to seek restoration of rights from the Council under Royal Decree E100; and (4) the Dutch State, despite being the owner of the works under Royal Decree E133, had to properly follow the procedures of Royal Decrees E100 and E133 because its ownership was defeasible. *See* Norton Simon's Motion [Docket No. 186] at 33.

Accordingly, the *Rebholz* decisions support the Court's conclusion that, because the Göring transaction was never annulled under Royal Decree E100 (and because Göring never filed a petition for de-enemization, which certainly would have been denied), the Dutch State owned the Cranachs pursuant to Royal Decree E133.

### E.     Plaintiff's Arguments

Plaintiff argues that the Dutch State did not become the owner of unclaimed recuperated property, like the Cranachs, but rather was a permanent or perpetual custodian (or "detentor") of the property pending its return to its lawful pre-war owner. Specifically, Plaintiff argues that "[p]ursuant to Allied policy, assets looted by the Nazis were returned to the [Dutch government] for it to act as custodian (or *detentor*), locate the pre-War owners, and return assets to them." Plaintiff's Reply [Docket No. 291] at 3. She claims that, pursuant to that policy, the Dutch government "was obligated to construct a restitution process under which the artworks would be returned to Goudstikker, who throughout remained the lawful owner." Plaintiff's Opposition [Docket No. 236] at 9.

The Court disagrees with Plaintiff's argument that the Allies' post-war restitution policy required the Dutch State to act as a permanent or perpetual custodian of the Cranachs. As pointed out by Norton Simon, absent a treaty, executive agreement, or other pact, the Allies' post-war restitution policy cannot be binding on a sovereign state such as the Netherlands. Moreover, even assuming that the Allies' post-war restitution policy could bind the Netherlands, there is nothing in that policy that requires the Netherlands to act as a custodian in perpetuity. Indeed, Plaintiff's theory of perpetual custodianship is belied by the United States' own actions after the war. Military Law 59, which was enacted for U.S.-occupied Germany, provided that if a former owner failed to file a restitution claim before the deadline, that former owner "lost his right to restitution" and was "forever barred from making any claim for restitution of that such property." Exh. 11 at 30-31 (Taft Expert Report); Exh. 132 at 3-5 (Advisory Opinion No. 1, 1 Court of Restitution Appeals Reports 489, 492 (Aug. 4, 1950). Upon expiration of the deadline, "all the right, title, and interest to the claim and to the restitutable property became vested by operation of law" in the Jewish Restitution Successor Organization ("JSRO"), a third party charitable organization appointed by the U.S. Government. Exh. 132 at 3-5.

In support of her argument, Plaintiff heavily relies on the language of certain receipts for recuperated property in which the Dutch State acknowledged that it accepted the property "as custodians pending the determination of the lawful owners thereof" and that the property "will be returned to their lawful owners." However, it is undisputed that the United States ceased using the

quoted language in 1946, and that the receipt for the Cranachs did not include such language. Moreover, even if the receipts for the Cranachs did include that language, Plaintiff fails to adequately explain how that language foreclosed the Dutch government from taking ownership of the Cranachs when the Firm did not seek to nullify the transaction with Göring prior to the July 1, 1951 deadline. Indeed, based on the plain text of Royal Decree E100, the Firm did not qualify as the "lawful owner" unless and until the Göring transaction was declared null and void by the Council. Because the Göring transaction was never declared null and void by the Council, the Dutch State, pursuant to Royal Decree E133, was the "lawful owner" of the Cranachs.

Plaintiff also relies on the *Rebholz* decisions as support for her theory that the Dutch State was a perpetual custodian of the Cranachs. However, rather than support her theory, the *Rebholz* decisions refute it. Although the Council held that the Dutch State received the painting at issue as custodian under Laws 52 and 63, it also held that those laws only have "territorial application, meaning they only apply to the German territories occupied by the allies and that these statutes cannot affect the relationships of people residing outside those territories vis-à-vis the goods found in those territories." Exh. 94 at 2. Moreover, the Council in *Rebholz* confirmed that Royal Decree E133 applied to enemy property recuperated to the Netherlands after the war and, as such, *could* be expropriated by the Dutch State.

In addition, Plaintiff cites to, and relies on, various reports and statements by Dutch committees and officials which express the view that the Dutch State did not acquire ownership of recuperated artworks pursuant to Royal Decree E133. Those reports and statements do not alter the Court's conclusion. The Court notes that, in many other documents not cited by Plaintiff, Dutch officials opined that the Dutch State *could* exercise ownership of recuperated property under Royal Decree E133. *See* Exh 144 at 1; Exh. 96 at 2; Exh. 105; Exh. 113. More importantly, none of the reports and statements cited by Plaintiff can supersede the express language of the Royal Decrees and the cases interpreting those decrees.[11]

---

[11] Indeed, Plaintiff's heavy reliance on a report by the "Dutch Committee for Recovered Property" is entirely misplaced in light of the subsequent *Rebholz* decisions. In that report, the Committee expressed the view that it was "very debatable" whether the Dutch State could acquire ownership of recuperated artworks pursuant to Royal Decree E133 given the territorial limits imposed under Article 1.8. Exh. 284 at 1743. Specifically, Article 1.8 limited the application of E133 to property that is "located within the territory of the [Netherlands], belonging to the legal sphere of the [Netherlands] . . . , or - regardless where they are located . . . belong to Dutch people, Dutch nationals or persons who have their place of residence within the [Netherlands] or are located there . . . .". Exh. 2 at 2 (Royal Decree E133). Based on this language (and the official Dutch government's explanatory notes to E133), it was believed that Royal Decree E133 may not apply to recuperated goods because "property belonging to persons other than residents . . . situated outside of these borders did not belong to the Dutch legal sphere and so [could not] be enemy capital within the meaning of Royal Decree No. E. 133." Exh. 284 at 1743. However, as discussed, the Council terminated this debate with its *Rebholz* decisions, concluding that Royal Decree E133 applied to recuperated property once that property was returned to the Netherlands. *See* Exh. 91 at 1 (Judgment of the Judicial Division in the Rebholz-Schröter v. NBI case, dated July 9, 1951) (holding that recuperated painting was expropriated under E133, art. 3); *see also* Exh. 94 at 1 (Judgment of the Judicial Division in the Rebholz-Schröter v. NBI case, dated Nov. 23,

Finally, Plaintiff argues that the Restitution Committee's recommendations and the State Secretary's decision to return the Göring artworks in the Dutch Government's possession in 2006 demonstrate that "nothing in the post-War restitution regime, including Decrees E100 and E133, bestowed title on the [Dutch Government]" and that the Dutch State remained a custodian even after the July 1, 1951 deadline.  See Plaintiff's Opposition [Docket No. 236] at 15.  However, the Committee's recommendations and the State Secretary's decision were based on a new policy adopted by the Dutch government which departed from a "purely legal approach to the restitution issue" in favor of "a more policy-oriented approach . . . in which priority is given to moral rather than strictly legal arguments."  Exh. 124 at 4.  That policy is inapplicable to artworks, such as the Cranachs, that have been transferred to a third party.  Exh. 125 at 1, 5.  Unlike the Dutch government and Restitution Committee, this Court is required to apply a "strictly legal" approach, as opposed to one that is based on policy or moral principles. That "strictly legal approach" compels the conclusion that the Dutch State acquired ownership of the Cranachs, which necessarily resolves this action as a matter of law in favor of Norton Simon.

## IV.     CONCLUSION

For all of the foregoing reasons, the Court concludes that the Dutch State acquired ownership of the Cranachs pursuant to Royal Decree E133, and thus that Norton Simon has "good title" to the Cranachs.  Accordingly, Norton Simon's Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 is **DENIED**.

The parties are ordered to meet and confer and prepare a joint proposed Judgment which is consistent with this Order. The parties shall lodge the joint proposed Judgment with the Court on or before **August 15, 2016.**

IT IS SO ORDERED.

---

1953) ("[N]ot to be discussed is the question raised by the petitioners whether or not the painting, as long as it was in Germany, fell under Decree E 133, because petitioners have acknowledged that the painting, once returned to the Netherlands, definitely falls under that decree . . . .")*.*